DONALD M. FRIEDMAN
1301 Fourth Street
Napa, CA 94559
(707) 235-0353 Cellular Telephone
(707) 259-8133 Message Telephone
Email: don.friedman@yahoo.com

PLAINTIFF PRO SE

RECEIVED

AUG 2 7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

DONALD M. FRIEDMAN,

    Plaintiff,

    vs.

U.S. SECRET SERVICE,

    Defendant.

Case No.: Case No. 06-cv-2125 (RWR)

VERIFIED MOTION TO COMPEL PRODUCTION OF IMPROPERLY WITHHELD/EXCLUDED RECORDS, ETC.

1. The Plaintiff in the above-captioned case respectfully moves for this court to immediately compel the Defendant, U.S. Secret Service, to provide the records, etc. it was previously ordered by this court to provide to the Plaintiff by July 20, 2007. *See* this court's May 29, 2007 order. The vast majority of the requested records, etc. the Defendant has are presently being improperly and illegally withheld from the Plaintiff pursuant to the Defendant misusing many Freedom of Information Act ("FOIA") exemptions and a 5 USC § 552 (c)(1) FOIA record exclusion provision to avoid providing (or even acknowledging the existence of) the records, etc. to the Plaintiff which incriminate the agency in over 40 years of <u>very</u> serious criminal misconduct (including long-term, long-range, anonymous torture, coercion, control, abuse, etc. of the Plaintiff and thousands of

other similarly-situated victims from up to 1000 meters away) and reveal the very long-term, anonymous, covert, criminal misuse of directed-energy weapons ("DEWs") and other directed-energy technologies ("DETs"), as well as the warrantless misuse of electromagnetic radiation-based, long-range, wall-penetrating audio and video surveillance equipment which is used in conjunction with the DEWs and DETs for DEW/DET targeting and warrantless individual and group monitoring.

2.  The Plaintiff also respectfully moves for this court to order the Defendant to provide this court with an *in camera*, *ex parte*, sworn declaration from the current assistant director of the U.S. Secret Service Protective Research Division (due to a deputy assistant director previously committing perjury related to this matter) which accurately describes the contents of any excluded records, etc. pursuant to <u>Steinberg v. U.S. Dep't of Justice</u>, No. 91-2740, 1993 WL 524528, at *2 (D.D.C. Dec. 2, 1993) and that this court review that declaration carefully and suspiciously, in light of the Defendant's past history of committing perjury in furtherance of hiding its possession and use of DEWs, DETs, and the wall-penetrating surveillance equipment, to determine whether the Plaintiff's allegations contained in this motion are accurate and whether or not the Defendant's use of the 5 USC § 552 (c)(1) FOIA record exclusion provision is proper.

3.  The Plaintiff is requesting that the sworn declaration be provided by the assistant director of the protective research division because a former employee of the U.S. Secret Service, Mr. Larry Stewart, described in more detail later in this motion, has confirmed to the

Plaintiff that the protective research division is the part of the U.S. Secret Service which would be responsible for the misuse of the DEWs/DETs on the Plaintiff.

4.  The Defendant's misuse of the DEWs/DETs have had the following effects on the Plaintiff over the past 40 years:

  a.  The Defendant has caused frequently excruciating pain on the surface of the Plaintiff's skin (sometimes leaving burns) and frequently excruciating internal pain, often concentrated at the Plaintiff's solar plexus due to the concentration of nerves in that location.  This has been occurring, completely unprovoked, on nearly a daily basis since February 25, 1997.  The skin surface DEW strikes (from a millimeter wave-based DEW) have occurred over 125,000 times and the internal pain-causing DEW strikes (from an infrasonic/acoustic or microwave-based DEW) have occurred over 10,000 times in the period beginning in February 1997.

  b.  The Defendant has prevented the Plaintiff from thinking clearly or concentrating on anything since February 25, 1997.  This has been extremely debilitating to the Plaintiff.

  c.  The Defendant has caused the Plaintiff to be arrested and prosecuted more than 20 times and imprisoned for more than 10 years for crimes or offenses he did not commit of his own volition.  The Plaintiff has been imprisoned almost 6 of the last 10 years alone on charges the Defendant set the Plaintiff up on, while the Defendant was continuing with its torture, coercion, control, abuse, and other

1    criminal misuse of the DEWs/DETs and wall-penetrating surveillance equipment

2    on the Plaintiff, including while the Plaintiff was incarcerated.

3

4       d.  The Defendant has exerted tremendously undue control, interference, and

5    influence upon the Plaintiff and/or the Plaintiff's body the whole of the Plaintiff's

6    life, nonstop, since 1966.

7

8

9    5.  The relevant part of the FOIA statute (5 USC § 552) related to the record exclusion

10    provision the Defendant is misusing to illegally shield its criminal and professional

11    misconduct states:

12    (c)(1) Whenever a request is made which involves access to records described in

13    subsection (b)(7)(A) and--

14

15    (A) the investigation or proceeding involves a possible violation of criminal law;

16    and

17

18    (B) there is reason to believe that (i) the subject of the investigation or proceeding

19    is not aware of its pendency, and (ii) disclosure of the existence of the records

20    could reasonably be expected to interfere with enforcement proceedings, the

21    agency may, during only such time as that circumstance continues, treat the

22    records as not subject to the requirements of this section.

23

24

25

6. The obviousness of the agency's improper misuse of the record exclusion provision of the FOIA is extraordinary and the Defendant's use of it is entirely illegal and pretextual. The Plaintiff has never been involved in any illegal conduct (or even legitimately suspected of any or investigated for any), with the possible exception of a few non-federal traffic-related infractions, which the Defendant did not sadistically force him to be involved in from the very beginning. In addition, the Plaintiff is fully aware of the pendency of the agency's activities related to him and there is absolutely no legitimate governmental purpose to the Defendant's misuse of the DEWs, DETs, or warrantless surveillance on the Plaintiff or anyone else.

7. All of the things the Defendant has ever tried to use to justify its interest in the Plaintiff or activities related to the Plaintiff are things that the Defendant criminally and sadistically caused in the first place, hoping to give its interest in the Plaintiff and/or activities related to the Plaintiff the outside appearance of legitimacy, when none, in fact, exists.

8. The Plaintiff has obtained an admission from Mr. Larry Stewart, a former employee of the U.S. Secret Service, that the U.S. Secret Service has and has had deployed in the field for use for a very long time (in trucks he has personally seen) many of the DEWs, DETs, and wall-penetrating audio and video surveillance systems that the Plaintiff is alleging the Defendant has been sadistically misusing on the Plaintiff for over 40 years (since very shortly after the Plaintiff was born, and the Plaintiff was born on November 21, 1966 and is 40 years old). *See* attached, Exhibit "A," a true and correct copy of a letter from Mr. Larry Stewart which indicates his nearly 24 year employment with the U.S. Secret

Service, Exhibit "B," a true and correct copy of Mr. Stewart's Bio/Resume (*curriculum vitae* (CV)), and Exhibit "C," a true and correct copy of 4 pages from a certified transcript of a telephone conversation between Mr. Larry Stewart and the Plaintiff while the Plaintiff was incarcerated. In the transcript, on page 10, line 13, the "ADT" which is referred to is one of the DEW systems the Defendant denied having in its sworn and perjured declaration, evidenced in the following paragraph. The generic acronym "ADT" comes from the U.S. military's name for the larger, more powerful millimeter wave DEW developed by the U.S. Air Force, called the "Active Denial Technology" or "Active Denial System." The Plaintiff does not know what the Defendant calls its similar-but-smaller DEW system, so in his conversations with Mr. Stewart the Plaintiff called the millimeter wave, external pain-inducing DEW system either an ADT or ADS.

9. As evidence of the Defendant's extreme bad faith in relation to admitting its past and present misuse of DEWs and DETs, in 2003, the U.S. Secret Service committed perjury when it provided a sworn declaration to the federal court in another case which specifically stated that the U.S. Secret Service does not have or use any DEWs, which it called investigative techniques or equipment "to control any individual." *See* attached, Exhibit "D," a true and correct copy of the sworn and perjured declaration of Deputy Assistant Director Donald P. Zimmerman.

10. DEWs are control devices when used on human beings. *See* Paragraph 10 (Page 12) and Exhibit "B" of Plaintiff's Amended Complaint.

11. In the 2003 previous federal case, the Defendant also illegally refused to properly provide Brady v. Maryland disclosures to the defense when it was alleged by the defense during that case that the records were being improperly withheld (which is what gave rise to the federal court's order demanding the Defendant disclose its involvement with DEWs and their use on the Plaintiff). This was simply another attempt by the Defendant to illegally cover up its misconduct.

12. According to "The Secret Service: Hidden History of an Enigmatic Agency," by Philip H. Melanson, Ph.D. (2005 Revised & Expanded Edition, Carroll & Graf Publishers), in Chapter 9, "The Sixth Sense," pgs. 226-258, the Defendant's interest and activities related to nonlethal directed-energy technologies is generally described as having begun between 1963 and 1966. 1966 is the same year the Defendant began targeting the Plaintiff.

13. In addition to the Plaintiff, there are thousands of other similarly situated victims who are also experiencing the same, typically daily torture, coercion, control, abuse, etc. and other adverse effect that the agency's personnel are criminally causing or have caused using equipment which A.E. Pevler, an expert in high-power microwave weaponry, calls the "means to commit the 'perfect crime'" since the energy emitted from the DEWs and DETs penetrates almost every building material with ease and the use of the devices leaves no evidence of their use or misuse. *See* attached, Exhibit "E," a true and correct copy of the published paper by A.E. Pevler, entitled "Security Implications of High-Power Microwave Technology," and Exhibit "F," a true and correct copy of

"Backgrounder," a recent, well-written, and factually accurate newsletter entitled "The Viability of Directed Energy Weapons," published by the Heritage Foundation in 2006, which describes DEWs and some of their effects (on page 5, paragraph 4, of the newsletter it also confirms that a subset of high-power microwave or HPM weapons can effect the human body and this is relevant because A.E. Pevler's article addresses HPM weapon use on electronic equipment, but all of the same capabilities also apply to DEWs/DETs being used on human beings).

14. After 5 separate instances of Defendant requesting nonsensical extensions and stays in the instant case, including one motion for a stay which made up a non-existent fee issue and a second motion to extend a stay that had previously been denied, this court ordered the Defendant to produce all requested records, etc. to the Plaintiff by July 20, 2007.

15. In the Defendant's late response, dated July 23, 2007, the Defendant sent the Plaintiff approximately 150 pages of documents, some with redactions, along with a letter stating that 454 pages of additional records were being withheld in their entirety, pursuant to various exemptions. *See* attached, Exhibit "G," a true and correct copy of the July 23, 2007 letter from the Defendant.

16. The records the Defendant provided to the Plaintiff and the 454 pages which were withheld in their entirety represent only a very small portion of the records, etc. the Defendant has in its custody and/or control which are responsive to the Plaintiff's FOIA request.

17. The absence of any of the Defendant's earlier records, showing Defendant's activities in

relation to DEWs/DETs before 2004 is very conspicuous.  The U.S. military required

about 18 years (since 1989) to develop its larger, more powerful version of the ADT and

barely has a tested version ready for widespread deployment.  There is simply no

conceivable way that the U.S. Secret Service has developed, researched, tested, procured,

integrated, and rolled out on a widespread basis (for full, protective mission-related duty)

a fully developed and tested DEW/DET/surveillance (mobile) platform which could be

concretely relied upon in critical, life-or-death situations to protect the President of the

United States from attack (which it has also been misusing on the Plaintiff on a daily

basis for over 10 years and frequently for the 30 years prior to that) without generating <u>a</u>

<u>lot</u> more records, including enormous amounts of information related to the Plaintiff and

all of the Defendant's thousands of other victims.  The Plaintiff is requesting <u>all of the</u>

<u>information</u> and the Defendant is illegally and cowardly refusing to come-clean and

admit its wrongdoing so it can be properly judged by the American people and the

criminal and civil courts.

18. The Melanson book (in the same chapter previously cited) indicates the existence of very

extensive reports and other Defendant records dating back to 1963-1966, beginning with

the STAR Reports, as well as continuous additional work in the same areas subsequent to

those reports.

19. The Defendant is improperly basing its use of the 5 USC § 552 (c)(1) record exclusion

provision of the FOIA on the fact that any release of records, etc. verifying the Plaintiff's

allegations of DEWs'/DETs' misuse would instantly identify the Defendant as the source

of all of the DEW/DET-related activities/misconduct directed at the Plaintiff and the

Defendant's other victims, and would indiscriminately allow all of its victims to instantly

and positively identify the Defendant's activities in relation to them, which undoubtedly

includes some persons the agency believes it has a legitimate right to use the DEW/DET

devices on for investigations/enforcement actions who would also immediately become

aware of the pendency of the Defendant's activities in relation to them.  This instant

identification of the Defendant would be due to the unique, perceivable effects of the

DEWs/DETs, the fact that there are no other federal agencies as far along in using the

unique, Secret Service-adapted/developed combination of DEWs/DETs that have been

and are continuing to be misused on the Plaintiff, as well as the Defendant's unique

method of the misuse of the technologies and techniques.  This combination of

technologies and methods of misuse provide a "signature," identifiable as only belonging

to the Defendant, and the Defendant is using that as the flimsy, nonsensical, pathetic

excuse by which it is misusing the FOIA record exclusion provision of 5 USC § 552

(c)(1).

20. This sadistic and cowardly conduct, which clearly and undeniably "shocks the

conscience," violates all of the Plaintiff's and the Defendant's other victims' 5th

Amendment constitutional rights.  *See* Harbury v. Deutch, 233 F.3d 596 (C.A.D.C.

2000).

21.  "If an agency acts outside the scope of its investigatory powers, it is precluded from showing that it acted with a law enforcement purpose with regard to FOIA exemption. 5 U.S.C.A. § 552 (b)(7)." Ramo v. Department of the Navy, 487 F.Supp. 127 (N.D. Cal.1979), and cited positively by Pratt v. Webster, 673 F.2d 408 at 416 (C.A.D.C. 1982).

22.  "Freedom of Information Act exemption for law enforcement investigatory files does not shield materials relating to unauthorized or illegal investigatory tactics. 5 USC § 552 (b)(7)(A)," Kanter v. Internal Revenue Service, 433 F.Supp.812 (N.D.Ill. 1977), and cited positively by North v. Walsh, 881 F.2d 1088 at 1098 (C.A.D.C. 1989).

23.  In order for the Defendant to legitimately employ the 5 USC § 552 (c)(1) record exclusion provision of the FOIA, the records must first be entirely exemptible under 5 USC § 552 (b)(7)(A) before the exclusion can even be considered for use in an appropriate instance. In the instant case, however, the Defendants actions are highly illegal and unconstitutional and therefore not able to be shielded from disclosure through any law enforcement-related exemptions and therefore the record exclusion provision of the FOIA cannot even be considered for use no matter what the Defendant's so-called "justification" for attempting to use it is.

24.  The Defendant agency is deliberately misusing the record exclusion provision in a way it was never designed or intended to be used because it knows that if it discloses any records, etc. which confirm the Plaintiff's allegations of DEW/DET misuse, it will allow

every one of the thousands of the Defendant's victims, including the Plaintiff, to instantly and positively identify the Defendant as the source of the decades of torture, coercion, control, abuse, etc. and will allow all of the victims to take legal action against the Defendant as well as expose the Defendant's criminal and professional misconduct to the world, which would have extremely far-reaching consequences, including, but not limited to, the likely incarceration of all of the agency personnel involved and the stripping of the agency of the future use of any of the DEW, DET, and wall-penetrating audio and video surveillance devices which have been so egregiously misused by the Defendant for over 40 years.

25. The Plaintiff reporting the nature and effects of the Defendant's misconduct has also caused the Plaintiff enormous difficulties. The Plaintiff complaining of the physical, mental, and emotional torture, coercion, control, abuse, etc. has caused his entire family to shun him, as have the vast majority of his friends and business associates. The Defendant's intentional effects of its misuse of the DEWs/DETs on the Plaintiff and others have caused the Plaintiff to remain homeless for most of his entire adult life (when he was not being illegally incarcerated) and prevented him from being able to consistently maintain any gainful employment in his field of expertise for any substantial amount of time.

26. The Defendant's misuse of the DEWs, DETs, and wall-penetrating surveillance systems on the Plaintiff for over 40 years is very obviously criminal and unconstitutional and the Defendant has gone to enormous and criminal lengths to try to keep its activities from the light of public scrutiny, including torturing/controlling/interfering with the Plaintiff with

1   DEWs and DETs, committing perjury (which constitutes extreme bad faith), and much

2   more. The information the Plaintiff is seeking is necessary to confirm the Defendant's

3   criminal and professional misconduct and the public interest in the information is

4   tremendous and not insubstantial in any way. *See* Computer Professionals for Social

5   Responsibility v. United States Secret Service, 72 F.3d 897, for the test which this court

6   must use in determining if all of the information the Plaintiff is seeking (which is

7   currently being illegally withheld) should be ordered produced by this court.

8

9   27. The FOIA was specifically designed and intended to help the American people root out

10  just this type of government misconduct and to help end it, and this court should exercise

11  its discretion and authority to insure that the criminal misuse of DEWs, DETs, and wall-

12  penetrating surveillance systems ends as soon as possible by ordering the release of all of

13  the records, etc. the Defendant has related to its misuse of the DEWs, DETs, and wall-

14  penetrating surveillance systems and ruling that no FOIA exemptions or exclusions apply

15  to such tremendously unlawful and unconstitutional U.S. Secret Service activities.

16

17                          Dated this 17th day of August, 2007

18

19                          _____
                            DONALD M. FRIEDMAN

20                          PLAINTIFF PRO SE

21

22

23

24

25

1

## VERIFICATION

2

I, Donald M. Friedman, swear under penalty of perjury under the laws of the State of California
3  and the United States of America that the foregoing is true and correct.

4                                              Dated this 17th day of August, 2007

5

6                                              DONALD M. FRIEDMAN

7                                              PLAINTIFF PRO SE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT "A"

### Stewart Forensic Consultants, LLC



May 12, 2006

Dear Mr. Friedman,

I am in receipt of your written letters, dated April 24, 2006, May 7, 2006 and May 8, 2006. At your request in the April 24 letter, I spoke with Investigator Gaudet.

I will be able to provide you a fair and impartial examination of your evidence and case file. If appointed, to proceed I would need access to the records surrounding your investigation and arrest, as well as any actual evidence to be examined. I would then provide you with an official report of any investigative or forensic findings associated with your case. Courtroom preparation, presentation and testimony would also be available.

To answer your specific questions:
I am familiar with technologies developed for and used by the Secret Service in both their investigative and protective missions. That knowledge stems from my nearly 24 years as an employee of the Secret Service. I began working for them as a forensic scientist and ended my career with them as the Chief Forensic Scientist and Laboratory Director. In that capacity, I worked for both the protective and investigative sides of the Secret Service. As a forensic scientist, I can examine all of the evidence in the case and develop independent conclusions about origin, history, etc.

I hope I have been able to answer your questions. I am enclosing my resume and rates in case you decide to proceed by having Stewart Forensic Consultants appointed to examine the evidence.

Sincerely,

Larry F. Stewart
Chief Forensic Scientist

cc: Mr. Gaudet

793A East Foothill Boulevard, Suite 200, San Luis Obispo, California 93405
Tel. 805-595-3333, FAX 805-595-3333

EXHIBIT "B"

**BIO**

Larry F. Stewart was born in Asheville, North Carolina. He has earned an Associate of Arts degree from Florida Technological University in Orlando, a Bachelor of Science in Forensic Science degree from the University of Central Florida, also in Orlando and a Master of Forensic Sciences degree from Antioch University in Yellow Springs, Ohio. Mr. Stewart has worked for the U.S. Government as a forensic scientist for over 25 years. During that time he has worked on many notable cases to include; the Unabomber, numerous accused Nazi war criminals, e.g. John Demanjuk, a.k.a. Ivan the Terrible, the reinvestigation of the Dr. Martin Luther King murder, the reinvestigation of the Kennedy assassination/CIA conspiracy theory, the Jon Benet Ramsey murder investigation, the 9/11 terrorist attacks and the DC Sniper investigation. In addition, he has been called upon in international disputes regarding weapons of mass destruction and stolen nuclear materials. He has testified as an expert witness in state, federal and military courts of law, as well as in foreign court systems to include; Austria, Australia, Thailand, Sri Lanka and Canada. He has also testified at The Hague in the Netherlands and three times before the U.S. Congress. Mr. Stewart most recently held the position of Laboratory Director and Chief Forensic Scientist for the Department of Homeland Security, United States Secret Service, and has now begun an independent forensic consultant service known as Stewart Forensic Consultants, LLC.


**RESUME**

Larry F. Stewart

**Occupation:**

Chief Forensic Scientist and President – Stewart Forensic Consultants, LLC
San Luis Obispo, California

**Education:**

Associate of Arts Degree - Received June 1976
Florida Technological University
Orlando, Florida

Bachelor of Science in Forensic Science Degree - Received August 1979
Minors in Chemistry and Biology
University of Central Florida
Orlando, Florida

Master of Forensic Sciences Degree - Received June 1983
Antioch University
Yellow Springs, Ohio

**Pertinent Specialized Courses:**

Forensic Microscopy Course - March 1978

*1*



McCrone Research Institute
Chicago, Illinois

Atomic Absorption Spectrophotometry - April 1979
Perkin-Elmer Corporation
Gaithersburg, Maryland

Gas Chromatography Course - December 1979
Virginia Polytechnic Institute and State University
Gaithersburg, Maryland

Advanced Gas Chromatography - March 1980
Perkin-Elmer Corporation

Advanced High Pressure Liquid Chromatography Course - January 1981
Virginia Polytechnic Institute and State University
Washington, DC (course location)

Ink and Paper Analysis Seminar - January 1981
U.S. Air Force
Office of Special Investigations
Washington, DC

High Pressure Liquid Chromatography/Mass Spectrometry - July 1981
U.S. Justice Department, F.B.I.
Quantico, Virginia

High Pressure Liquid Chromatography/Computer Operation - March 1984
Perkin-Elmer Corporation
Rockville, Maryland

Questioned Document Course - February 1985
U.S. Secret Service
Washington, DC

Fourier Transform Infrared Spectroscopy Course - June 1986
Nicolet Analytical Instruments
Lanham, Maryland

Scanning Electron Microscopy - September 1994
Philips Electronic Instruments
Mahwah, New Jersey

ASCLD/LAB Inspector Training Course – January 2000
Portland, Oregon

**Work Experience:**
December 1975 through March 1979
Laboratory Technician
University of Central Florida

March 1979 through September 1979
Internship
Bureau of Alcohol, Tobacco and Firearms

September 1979 through July 1982
Forensic Chemist
Bureau of Alcohol, Tobacco and Firearms

July, 1982 through June, 2005
Counterfeit Specialist
Questioned Document Examiner
Lead, Instrumental Analysis Section
Lead, Instrumental and Computer Analysis Section
Senior Document Examiner/National Expert for the United States Secret Service
Chief, Questioned Document Branch
Assistant Laboratory Director
Laboratory Director/Chief Forensic Scientist
United States Secret Service

**Instructor:**
Bureau of Alcohol, Tobacco and Firearms
Rockville, Maryland

United States Air Force, Office of Special Investigations
Special Investigator's Course
Washington, DC

United States Secret Service
Washington, DC

Federal Law Enforcement Training Center
Glynco, Georgia

Drug Enforcement Agency
Washington, DC

International Law Enforcement Academy
Budapest, Hungary

Naval Criminal Investigative Service
Washington, DC

Rochester Institute of Technology
Rochester, New York

**Guest Speaker:**
Montgomery College
October 1980
Rockville, Maryland

Antioch School of Law
November 1980
Washington, DC

Antioch School of Law
February 1981
Washington, DC

Montgomery College
Ink and Paper Analysis/Instrumental Techniques - February 1982
Rockville, Maryland

DocSec'85
Document Security - May 1985
Washington, DC

George Washington University
Ink and Paper Analysis - February 1986
Washington, DC

Inspector Generals Office - Health and Human Services
Tri-regional Conference - January 1991
Mt. Pocono, Pennsylvania

Bolling Air Force Base
Joint Basic Computer Forensic Workshop - September 1993
Washington, DC

Virginia Military Institute
The Uses of Chemistry and Biology in the Forensic Sciences - April 1994
Lexington, Virginia

UCLA
Forensic Examination of Financial and Identity Documents – August 1998

American Society of Questioned Document Examiners meeting
Los Angeles, California

Catholic University
Science Under Oath – February 2000
Washington, DC

GATF Conference
Security Printing, Computers and the Forensic Scientist – August 2000
Pittsburgh, PA

Fraud Prevention Workshop
Security Printing – October 27, 2000
U.S. Department of State
Ft. Lauderdale, Florida

International Association for Identification
Forensic Science and Fraudulent Documents – May 2004
Sacramento, California

**Specialized Tours/Training:**
Crane-Weston Paper Mill
Dalton, Massachusetts - July 28, 1982

Philadelphia Mint
Philadelphia, Pennsylvania - July 29, 1982

Bureau of Engraving and Printing
Washington, DC - July 30, 1982

Visa International
San Francisco, California - January 3-6, 1984

Malco Plastics
Garrison Park, Maryland - January 1985

BIS CAP International, Ink Jet Printing Conference
Boston, Massachusetts - September 17-19, 1990

**Achievements:**
Participated as a "referee" in the 1980 Crime Laboratory Proficiency Training Program
Forensic Sciences Foundation, Colorado Springs, Colorado

Testified in May of 1989 and 1990 before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, U. S. House of Representatives. These matters concerned the investigation of fraud in science.

Recipient of the Health and Human Services Inspector General's Integrity Award, 1991.

Appointed Chairman of A.S.T.M. task groups concerned with developing standards for performing "Writing Ink Comparisons" and "Writing Ink Identifications".

United States Delegate at the 14th European Meeting on Currency Counterfeiting, The Hague, The Netherlands, October 9-11, 1991 and the First International Conference on Fraudulent Documents, Ottawa, Canada, April 27- May 1, 1992.

United States Delegate at the 6th European Conference for Police and Government Experts, London, United Kingdom, October 2-4, 1996. Presented a paper on Ink Dating, Relative and Absolute: New Approaches to Old Problems.

Testified on July 22, 1999 before the House Judiciary Committee, Subcommittee on Immigration and Claims, U.S. House of Representatives. This matter concerned detection and prevention of counterfeit documents.

Classified as an "Inspector" for the American Society of Crime Laboratory Directors

Elected to the Board of Directors for the American Society of Crime Laboratory Directors, September 14, 2000.

Elected to the Board of Directors for the Document Security Alliance, December, 2003

**Original Research Publications/Presentations:**
"Detection of Volatile Accelerants in Fire Debris. 1. A Comparative Evaluation... " Richard A. Strobel, Richard A. Tontarski, Larry F. Stewart, Philip Wineman presented at the American Academy of Forensic Sciences, New Orleans, Louisiana, February 1980, and the Mid-Atlantic Association of Forensic Scientists, combined meeting, Louisville, Kentucky, May 1980.

"Artificial Aging of Documents," L.F. Stewart. Published in the Journal of Forensic Sciences, Vol. 27, No. 2, April 1982.

"Ballpoint Ink Age Determination by Volatile Component Comparison," L.F. Stewart, Presented at the American Academy of Forensic Sciences meeting, Orlando, Florida, February 1982, and Mid-Atlantic Association of Forensic Scientists/Northeastern Association of Forensic Scientists joint meeting, Harrisburg, Pennsylvania, April 1982. Published in the Journal of Forensic Sciences, April 1985.

6

"The Role of the Secret Service in Counterfeit Deterrence," L.F. Stewart. Presented at the Mid-Atlantic Association of Forensic Scientists meeting, Baltimore, Maryland, April 1983.

"The Forensic Analysis of Printing Inks," Larry F. Stewart. Presented at the American Society of Questioned Document Examiners, Lake Tahoe, Nevada, September 1983.

"Counterfeit Credit Card Deterrence," Larry F. Stewart. Presented at the American Society of Questioned Document Examiners/Canadian Society of Forensic Scientists annual meeting, Montreal, Quebec, Canada, September 1985.

"Detection of Counterfeit Currency," Larry F. Stewart. Presented at the International Association of Identification conference, Arlington, Virginia, August 1987.

"Identification of United States Currency Security Fibers by Fourier Transform Infrared Spectroscopy," J.E. Brown and L.F. Stewart. Presented at the Canadian Society of Forensic Scientists annual meeting, Toronto, Ontario, Canada, October, 1988.

"U.S. Secret Service Ink Identification System," J.W. Hargett, J.E. Brown and L.F. Stewart. Presented at the Canadian Society of Forensic Scientists annual meeting, Toronto, Ontario, Canada, October 1988.

"Use of Enlargement Ratios of Negatives and/or Printing Plates to Characterize Counterfeit Currency," L.F. Stewart, R.L. Outland and J.E. Brown. Presented at the Canadian Society of Forensic Scientists annual meeting, Toronto, Ontario, Canada, October 1988.

"Current Status of Ink Age Determination," L.F. Stewart and S.L Guertin. Presented at the Ninth INTERPOL Forensic Science Symposium, INTERPOL Headquarters, Lyon, France, December 12, 1989. Published in INTERPOL International Criminal Police Review, March-April, 1991.

"A.S.T.M. Standard for Writing Ink Comparisons," L.F. Stewart and J.L. Becker Presented at the Mid-Atlantic Association of Forensic Scientists 1991 meeting, Bethesda, Maryland, May 31, 1991.

"Standard Guide For Test Methods For Forensic Writing Ink Comparisons," L.F. Stewart (Task Group Chairman). Published in the American Society For Testing and Materials (ASTM), Standard Designation number E-1422-91, November 1991.

"Counterfeit Documents Produced by Color Copier Systems," L.F. Stewart, Presented at INTERPOL Headquarters, Lyon, France, December 11-19, 1991.

7

"Sentence Insertions Detected Through Ink, ESDA and Line Width Analysis," S.L. Fortunato and L.F. Stewart. Published in the Journal of Forensic Sciences, November 1992.

"Status of U.S.S.S. Ink Dating Program," J.W. Hargett and L.F. Stewart. Presented at the Humboldt University, Berlin, Germany, April 2, 1993. Published in Kriminalistik und Forensische Wissenschaften, No. 82, 1994.

"U.S.S.S. International Ink Library and Bulletin Board System," L.F. Stewart. Presented at the Mid-Atlantic Association of Forensic Scientists meeting, Baltimore, Maryland, May 20, 1993.

"Standard Guide For Test Methods For Forensic Writing Ink Identifications," L.F. Stewart (Task Group Chairman). Published in the American Society For Testing and Materials (ASTM), Standard Designation number E-1422, 1995.

"The Government Response to Ink Age Determination," L.F. Stewart, J.L. Becker. Presented at the American Academy of Forensic Sciences meeting, Seattle, Washington, February 17, 1995. Published in the International Criminal Police Review - INTERPOL, Spring, 1996.

"Distinguishing Between Relative Ink Age Determination and the Accelerated Aging Technique," L.F. Stewart and S.L. Fortunato. Published in the International Journal of Forensic Document Examiners, January/March, 1996.

"Forensic Examination of Financial Crimes Documents," L.F. Stewart and J.W. Hargett. Presented at the 6th European Conference for Police and Government Document Experts, London, United Kingdom, October 2-4, 1996 and the GFS Conference, Luzerne, Switzerland, September 9-12, 1997.

"Unusual Document Examination Approaches and Their Relationship to the Daubert Challenge," L.F. Stewart. Presented at the American Board of Forensic Document Examiners meeting, Las Vegas, NV, June 23, 2002 and the American Society of Questioned Document Examiners meeting, San Diego, CA, August 14, 2002.

**Professional Affiliations:**
Mid-Atlantic Association of Forensic Scientists
American Academy of Forensic Sciences - Fellow
Canadian Society of Forensic Scientists (past member)
American Society of Crime Laboratory Directors
Document Security Alliance

**Offices Held:**
Mid Atlantic Association of Forensic Scientists
Secretary/Treasurer

8

November 1981 to October 1984.

American Society of Crime Laboratory Directors
Board of Directors
September 14, 2000 to September, 2003

Document Security Alliance
Board of Directors
December 2003 to November 2004

EXHIBIT "C"

1
2
3
4
5
6
7

PEOPLE OF THE STATE OF CALIFORNIA

8

V

9

DONALD M. FRIEDMAN

10
11

CASE NO. CR 125349

12
13

TRANSCRIPT OF JAILHOUSE TELEPHONE RECORDING OF 7/26/06

14

Call 2

15
16
17
18
19
20

Transcript Prepared By:
Stutchman Forensic Laboratory
421 Walnut St., #120
Napa, CA 94559
707-257-0828

21
22
23
24
25
26
27
28

1

2  O:      Operator.

3  R:      Recording

4  DF:     Don Friedman

5  LS:     Larry Stewart

6  *:      Unintelligible word

7  ***:    More than one unintelligible word

8  O:      You have a collect call from . .

9  DF:     Don Friedman.

10  O:     An inmate at the Napa County Department of Corrections.

11  R:     This call is from a correctional institution and is subject to monitoring and recording.

12  Custom calling features are not allowed during this conversation.  The cost for this call is

13  $3.79 for the first minute and $.69 for each additional minute.  If you consent to this call being

14  recorded and accept the charges, press zero.  *** call and prevent further calls from – Thank

15  you for using  Genetics.  Go ahead with your call.

16  DF:     I guess you got a call waiting call in.

17  LS:     Yeah.

18  DF:     Anyway, like I was saying before, what is your feeling about how certain you're going

19  to be able to nail this thing down?

20  LS:     I don't know at this point, Don.  I'm going to do what I told you before which is I'm

21  gonna do all the history and research and everything else I can do to help you have a valid

22  case and to go forward with it, but I can't tell you how it'll be because all the evidence isn't in

23  yet.

24  DF:     O.K.  All righty.  Well,

25  LS:     And the other thing, Don, I'm being cognizant of money and the taxpayers and stuff.

26  I'm not trying to pull time that I'm not using or anything.

27  DF:     Oh, now, I understand that.  I – I've gotten, I was talking to Ken about what his, his

28  experience was in this county as far as people getting money authorized and I was a little

1   LS:    Right, we will get – we'll have comparison shoes at that point to be able to do similar

2   tests on them.

3   DF:    Now are we gonna actually vaporize the new shoes in a similar size pattern, you

4   know, size and pattern and all that and then be able to figure out what the temperature is in

5   there?

6   LS:    Right. We'll try to create the same damage and see what it took to do it.

7   DF:    O.K. Awesome. Sounds like we are making definite progress. How long do you

8   think it'll take once you get back from Nike to do the other tests and to get that stuff done?

9   LS:    If there's no other tests that I can do at that point, based on their response, and I'll give

10   you and answer right away. If there are additional experiments I can do, then we'll

11   formulate 'em, I'll schedule 'em, I'll give you a call and we'll work out a time frame and It'd

12   probably be another week of experiments I would guess.

13   DF:    O.K. So that would be when you actually start melting the other shoes?

14   LS:    Yeah.

15   DF:    O.K. Well, we're definitely within the time frame that, I mean, any time frame that's

16   gonna eventually break the information loose is a good time frame. At least if it's sooner

17   than later. All right

18   LS:    Well, we will – I'll give you word as soon as I get any information that I can pass on to

19   you.

20   DF:    O.K. Is the afternoons the best time to reach you?

21   LS:    It depends on what I'm working on, Don. There's some stuff that I do that is

22   investigation stuff and I'm out all kind of different hours * it, so it's just kind of a catch me

23   when you can thing and unfortunately you just coming through the telephone as a collect call

24   and I don't have a method for forwarding it.

25   DF:    Right. Let me ask you something. Would it be in our best interest to actually go out

26   and try and locate – have you actually seen the platform that the Secret Service uses for their

27   protective surveillance, whatever it is that the equipment is mounted in?



28   LS:    Yes.

DF:    O.K. I assume that it's a truck of some kind. Would it be to our advantage for Ken Gaudet to go out and find that vehicle cuz it's gotta be within a thousand meters or so of me now.

LS:    If you want to ask him to do that, then that would, you know . .

DF:    If I have him call you, can you describe generally what the vehicle looks like?

LS:    Uh, huh.

DF:    O.K. that would be great because if he can get pictures of the vehicle and you can say, yeah, that's what the vehicle looks like, that would probably go a long way to helping Jan to say, o.k., let's do something about this.

LS:    O.K. Yeah, if you work it out with Ken just have him call me.

DF:    Awesome, very cool. I know he wants more hours so that would also give him a chance – now am I right that the range is about thousand meters cuz that's what  – in the publications is says the ADT system is, the millimeter wave system is about thousand meters.

LS:    They're fully adjustable, so it could be. That's typical of what you'd find, yes.

DF:    O.K. You know about the other systems that are required. They've got the microwave microphones going, cuz I've been in places where there's no windows and they've been able to hear what has been going on. They've got the thermal imaging. They've got the millimeter wave cameras. They've got all that stuff. If you can give him an idea of what their likely distance is from me, that would probably help even though I'm not sure that – I'm not sure from your perspective that you may want to do that. You may just want to let him find them and then, you know, whatever, but if you could give him at least a maximum range or an idea of a maximum range for the whole package as a ballpark figure, that might help him narrow down the places where he can look. Cuz Napa's a really small town.

LS:    O.K.

DF:    There's a – there's not all that many places that they can hide and, personally, I have a feeling that the local police or the local sheriff's department or something has already had contact with them because of the town – they undoubtedly have to run a generator almost all the time and cops in this town would probably have stopped and made inquiries at that type

1  of vehicle, so we may also want to contact them and find out what the heck is going on and

2  whether or not they've had contact and maybe issue a couple of subpoenas to find out. But I

3  will have Ken call you and we'll do our best to try and locate the vehicle locally and get some

4  pictures of it and maybe you could also include in the declaration later on that yeah, that's

5  the vehicle or at least that appears to look like the vehicle or the type of vehicle they use and

6  so on and so forth.

7  LS:    O.K.

8  DF:    O.K.?

9  Ls:    No problem.

10  DF:    Appreciate it and he should be calling you within a day or two.

11  LS:    O.K.

12  DF:    All right.

13  LS:    Take care, Don

14  DF:    Thanks.  Bye

15  (end of tape)

1        I, Miriam Ridling, certify that I am a transcriber employed by Stutchman Forensic

2   Laboratory.  Our company received nine jailhouse audio recordings for transcript

3   preparation.  The recordings were transferred to CDs for transcription.  I personally and to

4   the best of my ability placed into writing all oral statements which could reasonably be heard

5   and understood into the foregoing verbatim record consisting of 11 pages.  Identification of

6   any parties reflected within the transcript were stated therein.

7

8   Signed and sworn this 6th Day of November, 2006, at Napa, CA.

9

10  _____

11  Signature

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

$E_{XHIBIT}$ "$D$"

1   McGREGOR W. SCOTT
    United States Attorney
2   PHILIP A. FERRARI
    Assistant U.S. Attorney
3   501 I Street, Suite 10-100
    Sacramento, California  95814
4   Telephone: (916) 554-2744

**ORIGINAL
FILED**

JUL 2 2 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
              DEPUTY CLERK

5

6

7

8                IN THE UNITED STATES DISTRICT COURT FOR THE

9                     EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,        )
                                     )
12              Plaintiff,           )  CR.S-03-060 WBS
                                     )
13                                   )  DECLARATION OF DONALD P.
                                     )  ZIMMERMAN, DEPUTY ASSISTANT
14  DONALD M. FRIEDMAN,              )  DIRECTOR, OFFICE OF
                                     )  INVESTIGATIONS, USSS
15              Defendant.           )
                                     )  18 U.S.C. § 1746
16  ─────────────────────────────   )

17                            DECLARATION

18      I, Donald P. Zimmerman, hereby declare and state the

19  following:

20      1.       I am the Deputy Assistant Director, Office of

21  Investigations, United States Secret Service, Department of

22  Homeland Security (hereinafter "Secret Service").  I have held

23  this position since December, 2002.  I have been a Special

24  Agent with the Secret Service since May, 1983.

25                                  1

26

1     2.    In my capacity as Deputy Assistant Director I am

2     charged with the supervision of the Secret Service's major

3     field offices, including the San Francisco Field Office.

4     Additionally, I have oversight of the investigative techniques

5     and equipment utilized by the Secret Service in fulfilling its

6     investigative mission.  Finally, I am familiar with the

7     investigative techniques and equipment utilized by the Secret

8     Service since 1983.

9         3.    According to Secret Service records, more than one

10    individual served as the Special Agent In Charge of the San

11    Francisco Field Office during the period of January, 1996

12    through May, 2000.

13        4.    At my direction, the appropriate Secret Service

14    records were reviewed for information pertaining to:   (1) any

15    investigative technique or equipment utilized by the Secret

16    Service to transmit electromagnetic radiation to control any

17    individual; and (2) any investigative technique or equipment

18    utilized by the Secret Service to transmit anonymous spoken

19    messages to any individual.  This search revealed no records

20    indicating either the existence of any such investigative

21    techniques or equipment or their use against anyone, including

22    Donald M. Friedman.

23

24

25                                2

26

1      5.    I have no personal knowledge of the use or existence

2    of any such investigative techniques or equipment.

3    / / /

4    / / /

5    / / /

6

7      6.    I declare under penalty of perjury, pursuant to 28

   U.S.C. §1746, that the foregoing statements are true and

8    correct to the best of my knowledge and belief.

9

10

       Executed on July 21, 2003 at Washington, D.C.

11

12

13    BY:

14        DONALD P. ZIMMERMAN
          Deputy Assistant Director
          Office of Investigations
15        United States Secret Service

16

17

18

19

20

21

22

23

24

25                    3

26

<u>CERTIFICATE OF SERVICE BY MAIL</u>

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Eastern District of California and is a person of such age and discretion to be competent to serve papers; that on July 22, 2003, she served a copy of the attached **DECLARATION OF DONALD P. ZIMMERMAN, DEPUTY ASSISTANT DIRECTOR, OFFICE OF INVESTIGATIONS, USSS** by placing said copy in a postpaid envelope addressed to the person(s) hereinafter named, at the place(s) and address(es) stated below, which is/are the last known address(es), and by depositing said envelope and its contents in the United States Mail at Sacramento, California.

<u>Served By US Mail</u>:              <u>Served By Inter-Office Mail and Fax:</u>

Addressee(s):

Caro Marks, Esq.
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
FAX: 916-498-5710

GWEN LINCOLN
Legal Assistant

$E_{XHIBIT}$ "$E$"

# Security Implications of High-Power Microwave Technology

## IEE International Symposium on Technology and Society 1997

A.E. Pevler
Texas Engineering Solutions
Dallas, Texas 75244 USA

The development of high-power microwave (HPM) weaponry, and its proliferation into subversive organizations, offers the means to commit the "perfect crime." HPM attacks typically leave no residual evidence and their effects can range from nuisance to catastrophic.

This paper highlights some of the unusual aspects of HPM technology and raises issues regarding security of airliners, commercial power systems and other targets. It also discusses strategies to begin mitigating the risks.

## I.    Introduction – HPM Maturation

High-power microwave (HPM) technology was merely a theoretical possibility until the 1970s. In the last twenty years, advances in plasma physics, energy storage and fast switching devices have made HPM systems effective and the technology is migrating outside classified government research and development laboratories.

The maturation of technologies required for HPM feasibility is shown in Fig. 1. Since the technology is relatively new, and was closely guarded until the demise of the Soviet Union, the societal ramifications of HPM have received little analysis.

Within the past few years, non-military applications have been sought for HPM. These applications often are referred to as "non-lethal technologies." One such employment is the use of HPM by police to disable automobiles in a high-speed chase. Such discussions have further highlighted the capability of HPM, and presumably raised the general awareness of the technology's capability.

## II.    HPM Effects

The most widely acknowledged effect of high-power microwave energy is disruption of electronic systems. This perturbation is extremely short in duration, generally on the order of a few hundred nanoseconds. This brief disturbance can be sufficient to reset computers, cause complete loss of stored data and/or cause microprocessors to switch operating modes.

Advanced electronic systems are increasingly vulnerable to upset by electromagnetic radiation. Many Department of Defense (DoD) and Department Of Energy (DOE) studies indicate Radio Frequency (RF) power is a threat to the proper operation of modern systems. As circuits have become more densely packaged, more energy efficient and operate at higher speeds, they have experienced an associated increase in vulnerability and susceptibility to perturbations from non-ionizing radiation.

This inherent vulnerability to RF power has spawned international research in optimizing transmitters for use as weapons. NATO and former Soviet nations have developed HPM weapons. These weapons are designed to exploit this inadvertent vulnerability to RF power by concentrating as much power as possible into a controlled field. This has proven very effective, and anecdotal data suggest successful combat deployment.

*l*

0-7803-3982-7/97/$10.00 © 1997 IEEE



**Fig. 1 – Evolution of high-power microwaves [1]**

The effects of a successful HPM weapon attack are unpredictable. The primary goal is merely disruption of the victim system, the results of which are of secondary importance. Consequently, the result varies widely depending upon the victim system. In some cases, computers may be reset. In other cases, local oscillators may be driven off frequency, navigation systems misguided, safety sensors incorrectly set or reset, faulty data recorded and control systems given erroneous inputs.

The significance of the perturbation is proportional to the importance of the system corrupted. A portable compact disc player may react by garbling music or changing the track it was playing. A similar amount of energy directed at a commercial aircraft could corrupt the plane's control and navigation systems enough to cause a crash.

Another important similarity shared by vulnerable systems involves post-attack evidence. Typically, there is none. Although the perturbation of the victim system is indisputable while subjected to the electromagnetic field, the affected circuits are rarely permanently damaged. This makes identification of the cause extremely difficult. Failures appear to be anomalies with no traceable cause. An interesting aspect of a successful HPM weapon attack is that no evidence remains to incriminate the perpetrator.

Another feasible effect of an HPM attack, under proper conditions, is an unexplained explosion. The ability of electromagnetic energy to create a spark is undisputed. Inadvertently leaving a metal "twist tie" on a package placed in a common microwave oven can present impressive evidence of this phenomenon. An even more impressive proof can be achieved by filling the oven with an explosive vapor before activating the magnetron with the twist tie in the oven.

Whether there will be resulting evidence of a microwave-induced spark causing the resulting explosion is arguable.

Other experiments familiar to scientists and technicians further prove the ability of microwave energy propagating through space to transform to other forms of energy. Tossing steel wool into the main lobe of a search radar's antenna can produce a spectacular explosion. Fluorescent light bulbs can be lit without any wired connection at a considerable distance from a radar emitter.

After transoceanic flights, airliners often have more vapors than fuel in their tanks. These tanks also have conductive wiring harnesses inside the fuel tanks. If any of the wires immersed in this explosive vapor has an imperfection resulting in a sharp point, all the conditions are set for an HPM induced spark resulting in an unexplainable explosion. The origin of such an explosion would likely be impossible to discover from residual evidence.

Conditions similar to these were present when TWA 800 exploded shortly after takeoff in 1996. The center fuel tank contained mostly vapor, for reasons based in weight and economics. Although the reason the fuel tank exploded has not been determined, investigators are certain that the forces of that ignition made the incident unsurvivable. This has resulted in consideration within the aviation regulatory community of prohibiting the common practice of flying aircraft with mostly empty fuel tanks. Such a regulation might mitigate the risk on take off, but does not address the situation of tanks emptied in flight.

III.    Technological Growth and Proliferation

Most HPM experts acknowledge that at the end of the Cold War the Soviet Union was ahead of Western laboratories in the development of HPM weaponry. This is logical since Western weapon systems (planes, missiles, etc.) tended to be more

sophisticated than their Soviet bloc counterparts. Since HPM vulnerability tends to be proportional to a victim system's reliance on microprocessors, the technology would be more attractive to NATO adversaries. Implementation of HPM against sophisticated weaponry transforms that sophistication from an asset to an "Achilles heel".

With the demise of the USSR, the research and the scientists who performed it became less well controlled. This is particularly alarming since, unlike traditional weapons of mass destruction, there are no controllable components in an HPM weapon.

1995 saw the first known use of HPM technology by subversives. Chechnyan rebels used HPM to defeat a Russian security system and gain access to a controlled area. [2]

IV.    Ineffectiveness of Traditional Security Measures

Traditional means of improving security are ineffective in preventing an HPM attack. Ordinarily, the integrity of a region, building or other asset can be maintained by limiting physical access to the object of interest. This access control generally takes the form of guards, physical barriers and/or surveillance systems.

An HPM attack, however, uses invisible electromagnetic energy as "ammunition". This implies speed of light velocity, a very "deep magazine", and an effective range that is limited only by the weapon's effective radiated power and the victim system's susceptibility.

It is generally unnecessary, then, for an attacker to expose themselves to the secure environment provided by traditional security measures. They can instead remain outside the sterile environment and still disrupt electronic systems a great distance away.

3

While there are many variables that must be considered to determine the range of an HPM weapon, a reusable system able to disrupt systems hundreds of meters away is certainly achievable.

The important point is that a clandestine attack can be mounted using HPM without having to breach or even account for existing security systems. A less obvious result is that there is very little risk involved in unsuccessful attacks or "dry runs." Unlike traditional attacks, precise execution and planning is unnecessary and tactics can be tested and refined until the perpetrators achieve the desired effect.

## V.    Groups Most Attracted to HPM

Considering the intrinsic qualities of an HPM attack, it is useful to analyze what groups or individuals would be most likely to find such a weapon attractive. Further analysis can concentrate on whether such a population exists in today's society.

The bombing of Pan Am 103 in 1988 was a crime that was intended to be unsolvable. Although physical evidence has provided solid information identifying the bombers, those implicated have denied involvement. Indeed, the critical piece of evidence that led investigators to discover the explosion's origin was about the size of a fingernail.

HPM offers a means of attack that doesn't even leave evidence as small as that incriminating the bombers of Pan Am 103. For those desiring anonymity, there can be no better tool than an HPM weapon. Its effects are transient and leave no evidence in their wake.

This invisibility may be extremely attractive to an organization wishing to maintain plausible deniability. This is even truer if the subversives are religious fundamentalists. If science cannot attribute a catastrophe's cause, religious zealots can credit an angry Supreme Being.

As an example, a religious leader with ties to Libya could prophesize a communication from his deity denouncing the freezing of Libyan assets in response to Pan Am 103. In his public prophecy, he could express confusion about the meaning, while relaying the message that unless those assets were released by a certain date his god will cause "a large bird to fall from the sky." This prediction could then be followed by an unexplainable and unattributable airliner crash. This process could be repeated as necessary until the Western world capitulates. Of course, the demands would likely only be accelerated after that capitulation.

Other potential users of the technology are rouge countries seeking to expand their borders. If Iraq had even a single reusable HPM weapon in 1990, the United States and its allies could have been excluded from responding to the annexation of Kuwait.

Most troops were transported to the Desert Shield/Desert Storm theatre using commercial aircraft. If Saddam Hussein had HPM capability, those airliners might have crashed on final approach. Public pressure would have then pressured the U.S. to withdraw. Failing that, opposing troops would have been killed by the hundreds, seat belted to their airline seats, before they ever had a chance to fire a shot.

## VI.    A 1997 Scenario

As this paper was being written, Peruvian soldiers ended a four-month hostage crisis by storming the Japanese ambassador's residence in Lima and killing 15 Marxist rebels. Negotiations with the members of Tupac Amaru stalled over a single point of freeing imprisoned guerilas previously convicted of subversive activity.

Tupac Amaru could have achieved their goals if, instead of holding hostages, they used HPM weapons to disrupt crucial infrastructure assets. By attacking the commercial power grid, hospitals, and/or financial centers the small band of

4

subversives could have caused an intolerable environment without any direct loss of life. If Peru remained defiant, similar attacks could be launched against Peruvian allies until world pressure coerced the prisoners' release.

## VII.    Overt Attack

There will also be countries or groups who are not as interested a surreptitious attack as they are maximizing the resulting disruption. Those goals can also be met with an entirely different deployment of HPM technology.

Instead of using a reusable, focused and transportable system, these users may use expendable, explosively driven devices.

A virtual cathode oscillator (VIRCATOR) can easily be packaged into a guided missile or free fall bomb. Although these weapons are apparent because of the explosion that drives the HPM device, the electromagnetic emissions will still be extremely difficult to detect.

Explosively driven HPM devices can have footprints that disrupt electronic systems for several hundred meters in all directions. Such a system can be built from commonly available material for less than $2,000 [3].

## VIII.    Conclusion

HPM represents unique opportunities for subversives. Reusable systems, used against fly by wire airliners, can produce a "virtual windshear" on demand. Single shot, expendable systems can produce "virtual lightning strikes" over a large geographic region. In either case, modern electronic systems are vulnerable to catastrophic disruption.

For centuries, security systems have concentrated on exclusion and detection of intruders. Sophistication has ranged from moats with drawbridges to infrared and laser motion detectors.

In today's world, intrusion detectors and other modern security devices may become as antiquated as the moat without supplemental detection of electronic attacks.

The technology to launch an HPM attack exists, and is cost effective and easily obtainable. Security experts must counter this threat immediately. Until such detection technology is deployed, the opportunity endures to wreak tremendous havoc without fear of identification or recrimination – the perfect crime.

## IX.    References

[1] James Benford and John Swegle, *High-Power Microwaves*, Artech House, Inc. 1992

[2] Major General Vladimir M. Loborev, Russian Federation Ministry of Defense Central Institute of Physics and Technology; "HPM Terrorism," *AMEREM '96*

[3] Carlo Kopp, "The Electromagnetic Bomb -- A Weapon of Electrical Mass Destruction" USAF CADRE Air Chronicles, 1996

## X.    Biography

A.E. Pevler was born in New York May 16, 1955. He graduated from Southern Methodist University with a BSEE. His employment experience includes the United States Marine Corps, Omni-Spectra, Inc., Texas Instruments, Inc., EG&G Special Projects, Inc. and he founded Texas Engineering Solutions. Mr. Pevler is an expert in the uncooperative detection of high-power microwave emissions and has developed several systems for unique collection environments.

5



□ Abstract

BROWSE        SEARCH        IEEE XPLORE GUIDE

◄ View TOC

✉ e-mail

You are not logged in.

Guests may access Abstract records free of charge.

You must log in to access:
• Advanced or Author Search
• CrossRef Search
• AbstractPlus Records
• Full Text PDF
• Full Text HTML

## Login

Username

[                    ]

Password

[                    ] »

» Forgot your password?

Please remember to log out when you have finished your session.

**Access this document**

📄 Full Text: PDF (392 KB)

» Buy this document now
» Learn more about purchasing articles
» Learn more about purchasing standards

Rights and Permissions
» Learn More

Download this citation
Available to subscribers and IEEE members.

◄ View TOC | Back to top ▲

# Security implications of high-power microwave technology

Pevler, A.E.
Texas Eng. Solutions, Dallas, TX;

This paper appears in: Technology and Society, 1997. 'Technology and society at a Time Change'. Proceedings., 1997 International Symposium on
Publication Date: 20-21 Jun 1997
On page(s): 107-111
Meeting Date: 06/20/1997 - 06/21/1997
Location: Glasgow, UK
ISBN: 0-7803-3982-7
References Cited: 3
INSPEC Accession Number: 5856771
Digital Object Identifier: 10.1109/ISTAS.1997.658868
Posted online: 2002-08-06 21:08:03.0

**Abstract**
The development of high-power microwave (HPM) weaponry, and its proliferation into subversi offers the means to commit the "perfect crime." HPM attacks typically leave no residual eviden effects can range from nuisance to catastrophic. The paper highlights some of the unusual asp technology and raises issues regarding security of airliners, commercial power systems and otl discusses strategies to begin mitigating the risks



**Index Terms**
Available to subscribers and IEEE members.

**References**
Available to subscribers and IEEE members.

**Citing Documents**
Available to subscribers and IEEE members.

Help    Contact Us    Privacy & S

© Copyright 2006 IEEE –

Indexed by
🔲 Inspec



From IEEE Website    TO SHOW SOURCE OF ARTICLE

6

$E_{XHIBIT}$ " $F$ "

# Backgrounder

No. 1931
April 28, 2006

Published by The Heritage Foundation

# The Viability of Directed-Energy Weapons

## *Alane Kochems and Andrew Gudgel*

When directed-energy weapons are mentioned, most people think of "death rays" or Hollywood's latest science fiction movie. However, underlined directed-energy weapons (DEWs) are a reality, and several have already been tested under battlefield conditions.[1] They may begin to appear on the battlefield within the next decade, bringing a revolution in weapons and how war is waged.

While DEWs are not the solution to all combat situations, these technologies would provide the U.S. military with additional flexibility in tailoring its response to different types of threats. However, considerable work still needs to be done before they can be deployed. These technologies need the full support of the armed services, and the Department of Defense (DOD) needs to generate clear guidelines for their use.

The Pentagon believes that DEWs are legal under international law, but human rights groups are arguing that DEWs could be used inhumanely. Putting the proper protocols in place should mitigate these concerns. While DEWs are not a panacea, the armed services should fully support research and development of these useful technologies.

## Weapons Revolutions

From the Stone Age until the Middle Ages, a weapon's power was limited by the strength of the man wielding it or, in the case of bows, by the strength of material from which it was made. In the late Middle Ages, a revolution in the weaponry occurred when chemical-powered (gunpowder)

### Talking Points

- Directed-energy weapons (DEWs) use the electromagnetic spectrum (light and radio energy) to attack pinpoint targets at the speed of light. They are well-suited for defending against threats such as missiles and artillery shells, which DEWs can shoot down in mid-flight. In addition, controllers can vary the strength of the energy put on a target, unlike a bullet or exploding bomb, using them as nonlethal means to neutralize human threats.

- DEW technologies, while not the solution to all combat situations, provide the U.S. military with additional flexibility in responding to different types of targets.

- The armed services need to move from just saying that DEWs are a good idea to fully supporting their development. The Defense Department needs to establish clear guidelines for their use.

This paper, in its entirety, can be found at:
www.heritage.org/research/nationalsecurity/bg1931.cfm

Produced by the Douglas and Sarah Allison
Center for Foreign Policy Studies
of the
Kathryn and Shelby Cullom Davis
Institute for International Studies

Published by The Heritage Foundation
214 Massachusetts Avenue, NE
Washington, DC 20002–4999
(202) 546-4400 • heritage.org

Nothing written here is to be construed as necessarily reflecting the views of The Heritage Foundation or as an attempt to aid or hinder the passage of any bill before Congress.


The Heritage Foundation

Case 1:06-cv-02125-RWR     Document 27-2     Filed 08/27/2007     Page 34 of 43

weapons began to replace swords and bows. This revolution changed the nature of warfare: not just tactics, but also the usefulness of armor, castles, and then-popular weapons.

Since the invention of gunpowder, a weapon's effectiveness has no longer depended on the wielder's strength, but on the chemical energy of the propellant or explosive. While centuries of technological advances have improved the power of these materials, the basic operating principle of chemical-powered weapons ultimately remains the same. Modern battlefield weapons are the descendents of muskets and cannon.

Another revolution in weaponry is currently underway, with directed-energy weapons on the cusp of replacing chemical-powered weapons on the battlefield. DEWs use the electromagnetic spectrum (light and radio energy) to attack pinpoint targets at the speed of light. They are well-suited to defending against threats such as missiles and artillery shells, which DEWs can shoot down in mid-flight. In addition, controllers can vary the strength of the energy put on a target, unlike a bullet or exploding bomb, allowing for nonlethal uses.

## The Beginning of Directed-Energy Weapons

Both the Allies and the Axis powers conducted basic research and studies into primitive directed-energy weapons before World War II. However, British scientists calculated that the electronic systems of the time could not generate the power necessary for a "death ray," and research was redirected into early radar detection systems.[2]

During the Cold War, the U.S. and the Soviet Union studied the possibility of creating particle-beam weapons, which fire streams of electrons, protons, neutrons, or even neutral hydrogen atoms. The kinetic energy imparted by a particle stream destroys the target by heating the target's atoms to the point that the material literally explodes. These weapons were considered for both land and space-based systems. However, because beam strength degrades rapidly as the particles react with the atoms in the atmosphere, it requires an enormous power plant to generate a weapons-grade beam. The countries abandoned particle-beam weapon research as impracticable.[3]

## How Lasers Work

Albert Einstein described the theoretical underpinnings of lasers in 1917. However, the first working laser was not built until 1960, opening an entirely new avenue of directed-energy research. Lasers produce narrow, single-frequency (i.e., single-color), coherent beams of light that are much more powerful than ordinary light sources.

Laser light can be produced by a number of different methods, ranging from rods of chemically doped glass to energetic chemical reactions to semiconductors. One of the most promising laser devices is the free-electron laser. This laser uses rings of magnetically confined electrons whirling at the speed of light to produce laser beams that can be tuned up and down the electromagnetic spectrum from microwaves to ultraviolet light.[4]

Lasers produce either continuous beams or short, intense pulses of light in every spectrum, from infrared to ultraviolet. X-ray lasers may be possible in the not too distant future. The power output necessary for a weapons-grade laser ranges from 10 kilowatts to 1 megawatt. When a laser beam strikes a target, the energy from the photons in the beam heats the target to the point of combustion or melting. Because the laser energy travels at the speed of light, lasers are particularly well-suited

---

1. On August 24, 2004, the Tactical High Energy Laser (THEL) system destroyed a salvo of mortar rounds in midair during a test. "Mobile/Tactical High Energy Laser (M-THEL) Technology Demonstration Program," *Defense Update,* at *www.defense-update.com/directory/THEL.htm* (March 10, 2006).

2. David E. Fisher, *A Race on the Edge of Time: Radar—The Decisive Weapon of WWII* (New York: McGraw-Hill, 1988), pp. 15–31.

3. Richard M. Roberds, Ph.D., "Introducing the Particle-Beam Weapon," *Air University Review,* July–August 1984, at *www.airpower.maxwell.af.mil/airchronicles/aureview/1984/jul-aug/roberds.html* (March 15, 2006).

4. *Encyclopedia Britannica,* 15th ed., s.v. "laser."


The Heritage Foundation

for use against moving targets such as rockets, missiles, and artillery projectiles.

One problem that affects laser beam strength is a phenomenon known as "blooming," which occurs when the laser beam heats the atmosphere through which it is passing, turning the air into plasma. This causes the beam to lose focus, dissipating its power. However, a variety of optical methods can be used to correct for blooming. Laser beams also lose energy through absorption or scattering if fired through dust, smoke, or rain.

The number of "shots" a laser weapon can produce is limited only by its power supply. Depending on the type of laser, this means that the weapon can have an almost "endless magazine" of laser bursts. In addition, a laser shot (including the cost of producing the energy) is much cheaper than a shot from a chemical-powered weapon system. For example, when deployed, the anti–ballistic missile Airborne Laser will cost approximately $1,000 per shot,[5] while each Patriot missile currently costs $2 million to $3 million.[6]

## Current Laser Technology

Because they were invented several decades ago, lasers are the most mature of the DEW technologies. Laser dazzlers—devices that use laser light to temporarily blind sensors, optics, and personnel—are already available for law enforcement and military use. In 1995, the Chinese military marketed the ZM-87 laser interference device, a tripod-mounted battlefield laser dazzler designed to blind enemy soldiers and optics temporarily. In March 2003, North Korea may have used a ZM-87 to "paint" two U.S. Apache helicopters patrolling the Demilitarized Zone.[7]

The two U.S. laser weapons systems closest to actual deployment are the Tactical High-Energy Laser (THEL) and the Airborne Laser (ABL).

Development of the THEL began in 1996 as a joint program between the United States and Israel to develop a laser system capable of shooting down Katyusha rockets, artillery, and mortar shells. The THEL system uses radar to detect and track incoming targets. This information is then transferred to an optical tracking system, which refines the target tracking and positions the beam director. The deuterium fluoride chemical laser fires, hitting the rocket or shell and causing it to explode far short of its intended target.[8]

In August 2004, the THEL system shot down multiple mortar rounds during testing. However, the Army felt the fixed-base laser system was too large and cut funding for the program after the demonstration phase. Research was also conducted on a mobile version of the THEL called the MTEL.[9]

The ABL is a system that uses a megawatt chemical laser mounted on a modified Boeing 747 to shoot down theater ballistic missiles. The system consists of several modules: an infrared detection system to detect the missile's launch; the Tracking Illumination Laser (TILL); the Beacon Illuminator Laser (BILL); and the Chemical Oxygen Iodine Laser (COIL).[10]

Once tracked by the TILL, the BILL measures the atmospheric distortion between the COIL and the missile. These data are then passed on to the mirror

---

5.  Suzann Chapman, "The Airborne Laser," *Air Force Magazine*, Vol. 79, No. 1 (January 1996), at *www.afa.org/magazine/jan1996/0196airbo.asp* (March 15, 2006).

6.  GlobalSecurity.org, "Patriot Advanced Capability–3 (PAC-3)," at *www.globalsecurity.org/space/systems/patriot-ac-3.htm* (March 15, 2006).

7.  Bill Gertz, "N. Korea Fired Laser at Troops," *The Washington Times*, May 13, 2003, at *newsmine.org/archive/war-on-terror/north-korea/nkorea-fired-laser-at-troops.txt* (March 15, 2006).

8.  "Mobile/Tactical High Energy Laser (M-THEL) Technology Demonstration Program."

9.  *Ibid.*

10. Press release, "Airborne Laser Progress Continues as Northrop Grumman Runs Full-Power COIL Tests, Delivers Beacon Illuminator Laser," Northrop Grumman Corporation, January 4, 2006, at *www.irconnect.com/noc/pages/news_printer.mhtml?d=91869* (March 15, 2006).


The Heritage Foundation

system, which makes appropriate corrections so that, when the COIL fires, maximum microwave energy is transmitted to the target. The skin of the missile heats up, melts, and deforms, and the target breaks up in midair.[11]

The megawatt-class laser was tested at full power in early 2006. The Beacon Illuminator Laser system, which measures and corrects for atmospheric distortion, has also been shipped to Boeing for testing.[12] A complete prototype ABL weapons system will be assembled in 2006.[13]

A related project is the Advanced Tactical Laser (ATL) system, which uses a less powerful version of the ABL's COIL laser, instead of missiles, to attack ground targets. The laser is being built and will be tested in mid-2006. Boeing has received a C-130H transport aircraft from the Air Force and is modifying it for installation of the laser system. The full system will be fitted to the aircraft by 2007 and test-fired against ground targets.[14]

One shortcoming of laser weapons is that their beams travel only in straight lines, which means they have no indirect-fire mode and cannot shoot beyond the system's visual horizon. The DOD Office of Force Transformation (OFT), in conjunction with the Air Force Research Laboratory, is developing the Tactical Relay Mirror System (TRMS), which would use a mirror system mounted on an aerostat or UAV (unmanned aerial vehicle) to redirect the beams from laser weapons such as the ATL and ABL. Design specifications are already being determined.[15]

## How Microwave Weapons Work

Written off as impractical during World War II, technological advances have now made microwave weapons feasible. However, current research focuses on using them as a means of nonlethal area defense and as anti-electronic weapons rather than as "death rays."

High-power microwave (HPM) weapons work by producing either beams or short bursts of high-frequency radio energy. Similar in principle to the microwave oven, the weapons produce energies in the megawatt range.[16] When the microwave energy encounters unshielded wires or electronic components, it induces a current in them, which causes the equipment to malfunction. At higher energy levels, the microwaves can permanently "burn out" equipment, much as a close lightning strike could.

Semiconductors and modern electronics are particularly susceptible to HPM attacks. Electronic devices can be shielded by putting conductive metal cages around them; however, enough microwave energy may still get through the shielding to damage the device.

The short, intense bursts of energy produced by HPM devices damage equipment without injuring personnel. Mounted on properly shielded aircraft or ships, or dropped in single-use "e-bombs," HPM weapons could destroy enemy radars, anti-aircraft installations, and communications and computer networks and even defend against incoming anti-aircraft and anti-ship missiles. With the ever-increasing use of electronics in weapons systems, HPM devices could have a devastating but nonlethal effect on the battlefield.

## Current Microwave Weapons

HPM weapon technology is based on the same technology as radar devices, which already have a long history of research and development. However, no military has yet openly deployed HPM

---

11. *Ibid.*

12. *Ibid.*

13. SPG Media, "ABL YAL 1A Airborne Laser, USA," at *www.airforce-technology.com/projects/abl* (March 15, 2006).

14. Press release, "Boeing Receives Aircraft for Laser Gunship Program," Boeing, January 23, 2006, at *www.boeing.com/news/releases/2006/q1/060123a_nr.html* (March 15, 2006).

15. Colonel Craig Hughes, Office of Force Transformation, U.S. Department of Defense, "Re-directed Energy: the Tactical Relay Mirror System," presentation at The Heritage Foundation, Washington, D.C., February 13, 2006.

16. U.S. Air Force Research Laboratory, "High-Power Microwaves," fact sheet, September 2002, at *www.de.afrl.af.mil/Factsheets/HPM.swf* (March 15, 2006).



The Heritage Foundation

weapons. Current HPM research focuses on pulsed power devices, which create intense, ultrashort bursts of electrical energy and would be used to power the microwave generator of an HPM weapon. The Air Force Research Lab's Propulsion Directorate has studied using generators that use high-temperature superconducting wire and high-voltage capacitors.[17]

Another power source, well-suited to one-time use in an e-bomb, is the Explosively Pumped Flux Compression Generator (EPFCG). The EPFCG uses chemical explosives to compress an electrically charged coil. This destroys the device but produces electrical pulses in the terawatt range—the equivalent of 10 to 1,000 lightning strikes.[18]

Paired with a microwave generator, an EPFCG could produce an ultrashort, intense microwave burst. Depending on factors such as burst height, microwave frequency, and the shielding around the target electronics, such an e-bomb could have an effective range of several hundred meters.[19]

A subset of HPM devices can affect the human body. Millimeter waveband energy can penetrate human skin to a very shallow depth, heating the tissue below. This produces a burning pain without actually damaging the tissue. The pain forces the person to flee the area. This type of weapon shows great potential as a riot-control device or area-denial system.[20]

The Active Denial System (ADS) is a nonlethal anti-personnel DEW that uses millimeter-wavelength beams to create a painful sensation in an individual without causing actual injury. It is relatively close to deployment. The system generates a focused beam of energy at the frequency of 95 gigahertz. These waves penetrate only a few millimeters into the skin and cause the sensation of heat. The sensation increases in intensity until the affected individual moves out of the beam or it is shut off. There is no injury to the target individual.[21]

A demonstration system was tested at Kirtland Air Force Base in 2000. A year later, testing showed that the ADS could produce effects at ranges beyond current small-arms range. A prototype ADS system mounted on a Humvee went into testing in August 2005.[22]

## The Future of DEW

Future research will seek to increase the power and decrease the size of DEW systems. As they become smaller, DEW weapons will first be vehicle-mounted and then possibly man-portable. The death ray of science fiction may in fact become a reality in the not too distant future.

Lasers are becoming smaller and more powerful. For example, a recent test of a solid-state laser by Northrop Grumman produced a continuous 27-kilowatt beam that lasted just under six minutes.[23]

A possible future development is the electrolaser. Electrolasers make use of laser bloom, a normally undesired effect. In an electrolaser, twin laser beams create an ionized channel inside the atmosphere, which conducts electricity. A high-voltage electrical charge is then fed into one of the laser

17. Dr. Stephen Adams, "Electrical Power and Thermal Management for Airborne Directed Energy Weapons," U.S. Air Force Research Laboratory, September 2001, at *www.afrlhorizons.com/Briefs/Sept01/PR0101.html* (March 15, 2006).

18. Carlo Kopp, "The Electromagnetic Bomb—A Weapon of Electrical Mass Destruction," at *www.globalsecurity.org/military/library/report/1996/apjemp.htm* (March 15, 2006).

19. GlobalSecurity.org, "High Power Microwave (HPM)/E-Bomb," at *www.globalsecurity.org/military/systems/munitions/hpm.htm* (March 15, 2006).

20. *Ibid.*

21. U.S. Air Force Research Laboratory, "Active Denial System," fact sheet, September 2005, at *www.de.afrl.af.mil/Factsheets/ActiveDenial.swf* (March 15, 2006).

22. *Ibid.*

23. Press release, "Northrop Grumman Surpasses Power, Run-Time Requirements of Joint High Power Solid-State Laser Program for Military Use," Northrop Grumman Corporation, November 9, 2005, at *www.irconnect.com/noc/press/pages/news_releases.mhtml?d=89438* (March 15, 2006).



Case 1:06-cv-02125-RWR     Document 27-2     Filed 08/27/2007     Page 38 of 43

beams, striking the target. The electrical shock is enough to stun personnel, detonate improvised explosive devices, or destroy electronic equipment.

Improvements in energy-generating systems may also make particle-beam weapons feasible. Particle beams would have tremendous power as weapons. Like lasers, particle beams travel at the speed of light, but unlike lasers, the particles in a particle beam have mass, giving the beam tremendous kinetic energy.

At some point in the future, entire military units may be armed with only DEWs. A mechanized unit advancing through a town, protected by an anti-artillery and anti-missile laser shield, clearing the surrounding buildings of snipers and enemy troops with an active denial system, and using electrolasers to stun them before taking them prisoner, all while using HPM weapons to render the enemy's communications useless, would be a powerful military unit indeed.

## Policy and Legal Implications for DEWs

Weapons designed to cause undue suffering are banned under the Geneva Convention, and human rights groups argue that directed-energy weapons raise a host of new legal and moral concerns that do not apply to previous generations of conventional weapons. For example, while the Chinese ZM-87 laser interference device is technically a laser dazzler, it can permanently damage the human eye at a distance of two to three kilometers.[24] Would the permanent blinding of a soldier struck by a ZM-87's laser beam be considered intentional or accidental? Does the mere use of a weapon that can cause permanent blindness constitute inflicting undue suffering? The humanitarian community is also concerned about the long-term biological effects of DEWs (microwaves in particular) and their possible use against civilian targets.[25]

However, a stronger counterargument is that directed-energy weapons, especially lasers, are more humane than conventional weapons because they can strike pinpoint targets, thus causing less collateral damage. A laser weapon could target not only a single vehicle in a convoy, but also a specific spot on that vehicle (e.g., the engine) and disable it without injuring the passengers. Furthermore, the power of lasers and microwave weapons has decreased, allowing for nonlethal uses.

DEW technology is changing faster than international laws and treaties can adapt. General DOD policy is that directed-energy weapons can be used legitimately on the battlefield. As with all new weapons, the DOD General Counsel reviews each DEW for compliance with international and U.S. laws before the Pentagon is allowed to field it.[26] Most DEWs are not yet far enough along in development and thus have not received this final stamp of approval.

As the Pentagon addresses these issues, it should do so in the same way that it would for any other category of weapon that it has reviewed. While some uses may be illegal (e.g., targeting an unarmed civilian who in no way poses a threat), other uses are just as assuredly legal and legitimate.

## Fixing the Research and Deployment Bottlenecks

While directed-energy research is advancing, inadequate funding is hindering more rapid development and deployment of these technologies. The military has rhetorically embraced the wonders of DEWs, but it has not always opened its wallet to fund the technologies.

True support for a program is often best measured by the resources that an organization is willing to devote to it. For instance, the Active Denial

24. China North Industries Corporation, "ZM-87 Portable Laser Disturber Fact Sheet," quoted in Human Rights Watch, "Blinding Laser Weapons: The Need to Ban a Cruel and Inhumane Weapon," September 1995, at *www.hrw.org/reports/1995/General1.htm* (March 15, 2006).

25. "Electromagnetic Weapons: Come Fry with Me," *The Economist*, January 30, 2003, at *www.globalsecurity.org/org/news/2003/030130-ebomb01.htm* (March 15, 2006).

26. David Ruppe, "Directed-Energy Weapons: Possible U.S. Use Against Iraq Could Threaten International Regimes," Global Security Newswire, at *www.globalsecurity.org/org/news/2002/020816-dew.htm* (March 15, 2006).


The Heritage Foundation

System was not ready for deployment when the United States invaded Iraq, in part because the money was not there. The Defense Department and Congress should start to fund promising and proven DEW technology so that promising weapon systems can move from the lab to the battlefield where they can help military personnel.

## Conclusion

DEW technology and its enabling infrastructure have matured to the point that DEWs can begin moving from the lab to the battlefield. While directed-energy technology is not the panacea for all situations that its most ardent advocates claim, it can give the U.S. military flexibility in tailoring its responses (e.g., lethal or nonlethal) to different types of targets (humans or machines).

Much work needs to be done before DEWs are deployed. The armed services need to move from just saying that DEWs are a good idea to fully supporting their development. The Defense Department needs to establish clear guidelines for using the technology. The speed, ultraprecision, and non-lethal capabilities of directed-energy weapons are all good reasons why the United States should continue to research, develop, and, where appropriate, field these technologies.

*—Alane Kochems is a Policy Analyst for National Security in the Douglas and Sarah Allison Center for Foreign Policy Studies, a division of the Kathryn and Shelby Cullom Davis Institute for International Studies, at The Heritage Foundation. Andrew Gudgel, a former Army Warrant Officer, is currently a freelance writer.*



EXHIBIT "G"



# DEPARTMENT OF HOMELAND SECURITY
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

Freedom of Information and Privacy Acts Branch
245 Murray Drive
Building 410
Washington, D.C. 20223

JUL 23

Donald Friedman
1301 Fourth Street
Napa, CA 94559-3015

File Number: 20060535

Dear Requester:

Reference is made to your Freedom of Information and/or Privacy Acts request originally received by the United States Secret Service (USSS) on October 16, 2006, for information pertaining to Directed Energy Weapons etc.

In our January 24, 2007 response letter, we advised you that it would take USSS staff 80 hours to search its indices for all responsive documents. Subsequently, we received your payment of $3828.28. It took USSS staff 80 hours to locate and retrieve all documents believed to be responsive to your request.

Enclosed are copies of documents from Secret Service records. The referenced material was considered under both the Freedom of Information Act, Title 5, United States Code, Section 552 and/or the Privacy Act, Title 5, United States Code, Section 552a. Pursuant to the Acts, exemptions have been applied where deemed appropriate. The exemptions cited are marked below.

In addition, approximately 454 page(s) have been withheld in their entirety. An enclosure to this letter explains the exemptions in more detail.

☒  If this boxed is checked, deletions were made pursuant to the exemptions indicated below.

### Section 552 (FOIA)

| | | |
|---|---|---|
| ☒ (b) (1) | ☒ (b) (2) | ☐ (b) (3) Statute: |
| ☒ (b) (4) | ☒ (b) (5) | ☒ (b) (6)    ☐ (b) (7) (A)   ☐ (b) (7) (B) |
| ☒ (b) (7) (C) | ☐ (b) (7) (D) | ☒ (b) (7) (E)   ☐ (b) (7) (F)   ☐ (b) (8) |

### Section 552a (Privacy Act)

☐ (d) (5)   ☐ (j) (2)   ☐ (k) (1)   ☐ (k) (2)   ☐ (k) (3)   ☐ (k) (5)   ☐ (k) (6)

The following checked item(s) also apply to your request:

☐  Some documents originated with another government agency(s). These documents were referred to that agency(s) for review and direct response to you.

☐      Page of documents in our files contain information furnished to the Secret Service by another government agency(s). You will be advised directly by the Secret Service regarding the releasability of this information following our consultation with the other agency(s).

☐  Other:      .

☐  Fees:     .

If you disagree with our determination, you have the right of administrative appeal within 35 days by writing to Freedom of Information Appeal, Deputy Director, U.S. Secret Service, 245 Murray Drive, Building 410, Washington, DC 20223. If you do decide to file an administrative appeal, please explain the basis of your appeal.

Please use the file number indicated above in all future correspondence with the Secret Service.

Sincerely,

Peter Schurla
Acting Special Agent In Charge
Acting Freedom of Information &
Privacy Acts Officer

Enclosure:    FOIA and Privacy Act Exemption List

## PROOF OF SERVICE

Donald M. Friedman v. U.S. Secret Service
Case No. 06-2125 (RWR)

I, _____*Linda B Johnson*_____, am a citizen of the State of California, am over 18

years old am not a party to the above-referenced action.

On _____*8/21/07*_____ I mailed, via the U.S. Postal Service, postage fully pre-paid, *PRIORITY MAIL,*

the attached document(s) to the following party:

Mr. Kenneth Abebonojo, AUSA
United States Attorney's Office
555 4th Street, NW
Washington, DC 20530

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: *8/21/07*

Signed: _____

Address: *1511 McDowell St*
*VFO, CA 94590*