*[handwritten: Let this be filed. Urbina, U.S.D.J. 5-2-08]*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DONALD FRIEDMAN,

    Plaintiff,

    v.

U.S. SECRET SERVICE,

    Defendant.

Civil Action No. 06-2125 (RWR)

## PLAINTIFF'S VERIFIED MEMORANDUM OF OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT, MOTION FOR *IN CAMERA* REVIEW OF RECORDS, AND MOTION FOR CHANGE OF ADDRESS

### Statement of Genuine Issues of Material Fact

### I. Introduction

The Defendant, U.S. Secret Service, is moving for a final disposition to the instant case based on its assertion that it is entitled to a summary judgment as a matter of law. The Defendant states that it has fully discharged its responsibilities under Title 5, Section 552 of the United States Code Annotated ("U.S.C.A."), the Freedom of Information Act ("FOIA"), and the Defendant also asserts that there are no additional records that the Plaintiff is statutorily entitled to receive from the agency.

Nothing could be further from the truth.

1

This case is about the Plaintiff's efforts to expose the U.S. Secret Service's illegal and desperate attempt to fill a critical void in its protective-mission capabilities as well as enhance those capabilities with various highly-innovative directed-energy weapons, devices, and related technologies (along with the required and integrated targeting and audio and video surveillance systems) and the covert, out-of-control criminal and professional misconduct which has occurred and continues to occur during that effort. It is also necessarily about the Defendant's heinous and egregious methods that it has used to attempt to prevent the Plaintiff from stopping and exposing its criminal and professional misconduct in relation to those highly-innovative, but illegally developed and deployed directed-energy devices and technologies.

In the past, the government has conducted such harmful scientific experimentation and weapons development on an unsuspecting public countless times, and this is simply about one more of those times.

The Plaintiff will prove and show in this opposition to the government's current Motion for Summary Judgment, with strong, objective, and irrefutable evidence as well as a clear, and common sense argument, that there are a number of factors and FOIA-compliance-required actions that the agency has, in bad faith, either intentionally mishandled, ignored, or deliberately and deceptively refused to commence.

2

The Plaintiff will also prove and show, with convincing evidence, that the Defendant has done this in a deliberate, bad faith effort to hide its criminal and professional misconduct and to avoid the extremely bad publicity which will occur when the truth about its long-term criminal and professional misconduct is made public (which the Defendant agency's personnel are attempting to avoid at <u>literally</u> any and all costs, including by committing perjury and covertly torturing and abusing the Plaintiff for well over a decade!).

In addition, due to the resulting changes to the agency's capabilities which would most certainly (and nearly instantaneously) occur from negative congressional intervention once the truth about the agency's illegal activities becomes public, it would likely, unless drastic and widespread changes within the agency occur, destroy the Defendant agency's current and future ability to provide <u>any</u> reasonable level of protective-mission services for any of the principal protectees (the president, his immediate family, the vice-president, his immediate family, and others designated by the president as principal protectees). The Plaintiff includes this information to give this court additional information about the agency's extreme motivation for trying to avoid any disclosure about its criminal and professional misconduct in relation to its development and testing of directed-energy weapons and technologies for protective-mission use.

Public exposure of the truth about the Defendant's crimes will also definitely place many of the past and present agency personnel who have participated in the criminal and professional

3

misconduct in immediate jeopardy of criminal prosecution, lengthy prison terms, and other very severe criminal and civil sanctions. This is obviously another very strong motivating factor for those who would be adversely affected by it, as well as for the bad publicity-averse agency..

The Defendant has, for over four decades, since shortly after the assassination of John F. Kennedy in 1963, illegally developed and tested directed-energy weapons and devices on an unsuspecting American public in order to hastily field working, effective, and extremely reliable versions of them as quickly as possible. In the process the Defendant has severely and sadistically misused various, severe-pain-and-discomfort-inducing electromagnetic ("EM") radiation-based technologies on the Plaintiff more than 125,000 times and other, similar (and related) EM-radiation (or "EMR") technologies (which are sometimes less physically painful but are extremely psychologically disturbing and distracting/damaging) on a continuous, daily basis for more than 11 years. The daily, perceivable abuse has been during approximately a week during March of 1992, most of January-February of 1996 (all but several days of the two month period), and from February 25, 1997 to present.

There is evidence of the Defendant's initial interest in directed-energy technologies in a book written about the Defendant agency by an expert who has interviewed dozens of past and present agency personnel. *See* the book by Philip H. Melanson, Ph.D.[1], "The Secret Service: the

---

[1]Philip H. Melanson, Ph.D. is a widely accepted expert on the U.S. Secret Service, he has written many books on the agency, and he has been quoted by the U.S. Supreme Court (as an expert in his field of study on the Defendant

agency, including its policies and practices) in the U.S. Supreme Court case, <u>Rubin v. U.S.</u>, Case No. 98-151, decided November 9,

Hidden History of an Enigmatic Agency" (Carroll & Graf Publishers, 2005 Revised and Expanded Edition, available from Amazon.com for $11.53 plus shipping), Chapter 9, "The Sixth Sense," page 227.

The Plaintiff is not the only victim of the illegal testing, and is in contact with <u>dozens</u> of others, similarly situated, which he found by using the Internet to communicate with people all over the U.S. With the Internet as the communications medium, the Plaintiff was able to communicate with the other victims and we were able to share our experiences and compare the effects of the misuse of the technologies on our persons. These others are experiencing the identical effects of the misuse of the same types of directed-energy weapons as the Plaintiff.

The FOIA has often been referred to as the 'Sunshine Act' because it brings into the light of public scrutiny government corruption and misconduct which would have continued or remained unknown of and unexposed if not for being forced out into the sunlight of public scrutiny through the use of the FOIA.

No one is disputing that the U.S. Secret Service has a vital job to do, however, it can never, simply by virtue of the nature of its mission to protect the president, be allowed to so horrifically abuse and torture the citizenry, including the Plaintiff, as it has been doing with the DEWs and other, related DETs that it refuses to even publicly admit it has.

6

That it possesses them is beyond dispute and that it has abused them is, I believe I will have proven by proving the agency's lying about possessing them, reasonably certain. Otherwise, why would it commit perjury in such an obvious attempt to avoid the congressional and public interest and inquiry which would most certainly immediately occur from learning of the agency's possession and use or misuse of such novel and fascinating technologies and protective methods?

The public has an absolute right to know when the government has committed or is committing unlawful acts, no matter what. <u>The U.S. Secret Service is in such a sad state that its personnel believe that the public does not have the right to know when it breaks the law, and this court's rulings in this case will have the effect of either confirming or refuting that belief.</u>

For over a decade, the Plaintiff has been fighting a hugely uphill battle, with information availability being extremely scarce and his resources all but non-existent, while the agency has all of the records and information and nearly endless resources. This court must decide if this situation is fair, and the Plaintiff prays that this court will find this situation so fundamentally unfair and unjust that it will order the full disclosure of as many records as possible, despite the Defendant agency's objections and deceit.

## II. The Standard for Pro Se Litigants

The U.S. Supreme Court has found that *pro se* pleadings should be held to "less stringent standards" than those drafted by attorneys. *See* <u>Haines v. Kerner</u>, 404 U.S. 520 (1971).

### III. Proving the Agency's Bad Faith

The Plaintiff must first address the matter of the Defendant's past and present bad faith regarding the its possession and use of directed-energy weapons and the related wall and other solid object-penetrating targeting and audio and video surveillance systems that are required for the directed-energy devices' effective use. The Plaintiff must do this first to shed needed light on the Defendant's actions and to be certain this court will view all of the Defendant's actions or lack of actions with the proper perspective and suspicion.

On April 24, 2006 the Plaintiff contacted Mr. Larry Stewart, a former employee of the U.S. Secret Service who retired in October 2004, who now operates a forensic science consulting and testing company in Southern California. *See* attached, Exhibit "A," a true and correct copy of the letter from the Plaintiff to Mr. Stewart. In this letter, the Plaintiff described some of the types of misconduct the Plaintiff believed the U.S. Secret Service was guilty of in relation to its misuse of directed-energy weapons and other directed-energy technologies and asked Mr. Stewart for his help in proving it.

8

The Plaintiff was incarcerated in the Napa County Jail at the time he contacted Mr. Stewart. The Plaintiff was representing himself, and fighting criminal charges which resulted from employees of the U.S. Secret Service forcing the Plaintiff to engage in specific, unlawful conduct.

Mr. Stewart agreed to assist the Plaintiff with his Napa County case and confirmed that he was thoroughly familiar with the various technologies that the U.S. Secret Service employs in both its investigative and protective missions. *See* attached, Exhibit "B," a true and correct copy of Mr. Stewart's response to the Plaintiff's first contact with him, and Exhibit "C," a true and correct copy of Mr. Stewart's biography/resume, which highlights his nearly 24 years as an employee of the U.S. Secret Service as well as the fact that at the time of his retirement he was the Chief Forensic Scientist and the Forensic Science Laboratory Director for the U.S. Secret Service.

As a result of the Plaintiff's direct written communications and Napa County Jail-recorded telephonic communications with Mr. Stewart, the Plaintiff was able to confirm that the U.S. Secret Service does, in fact, have in its possession and it has fielded for domestic use, protective-mission capable directed-energy weapons ("DEWs") and other directed-energy technologies ("DETs") which the Plaintiff has been complaining of being misused on himself for a very long time. *See* attached, Exhibit "D," a true and correct copy of an excerpt of the certified transcript of a jail-recorded telephone conversation, dated July 26, 2006, between the Plaintiff

9

and Mr. Larry Stewart, in which Mr. Stewart clearly confirms his familiarity with the trucks that

the Defendant agency possesses and has the DEWs, DETs, and related, integrated, object-

penetrating targeting and audio and video surveillance systems deployed in as well as the fact

that he can identify them <u>on sight</u> (which denotes more than just a passing familiarity with them).

In the jail-recorded conversation, the Plaintiff, who is unaware of the precise name of the

U.S. Secret Service's comparable but smaller, more precise, and less-powerful system (which

uses an ultra-narrow beam, less than a millimeter wide in diameter, instead of the very wide

beam the military's version uses), refers to the DEWs as "the ADT system" (Exhibit "D," Page

10, Line 13), which is the generic name for a whole class of larger, more powerful millimeter-

wave DEW systems developed by the U.S. military and Sandia National Laboratory (through the

Department of Energy) called the Active Denial Technology ("ADT") or Active Denial System

("ADS"). *See* Exhibits "E" and "F," respectively, true and correct copies of a press release dated

June 30, 2005 from Sandia National Laboratories and an article from the Air Force Research

Laboratory newsletter called, "AFRL Technology Horizons" for very informative descriptions of

what one of the basic DEW technologies is, how it works, and what its effects are. *See also*

attached, Exhibits "G" and "H," respectively, true and correct copies of articles obtained from

the Internet describing two of the required through-wall targeting and surveillance technologies

which are integrated into the Defendant's DEW and DET systems, as Mr. Stewart also confirms

in the same jail-recorded telephone conversation transcript. *See* Exhibit D.

When the Plaintiff called the system "the ADT system," as this court can see from the written and verbal communications between Mr. Stewart and the Plaintiff, which the Plaintiff has provided as Exhibits A, B, and D, Mr. Stewart understood the Plaintiff was referring to the Defendant agency's smaller, narrow-beam version of the DEWs/DETs/etc. and not the larger, wide-beam, military version of the DEW. *See* Exhibits A, B, and D.

The relevance of this is that, in 2003, the U.S. Secret Service was ordered by a U.S. District Court Judge to disclose, in a sworn declaration (which is typically not allowed in criminal cases but was felt by the judge to be appropriate under the circumstances where the Plaintiff in the instant case was steadfastly alleging directed-energy weapon misuse on himself by the Defendant agency), whether or not the U.S. Secret Service possesses, uses, or has ever used on the Plaintiff any directed-energy device or technology.

The declaration was ordered by the Honorable U.S.D.C. Judge, William B. Shubb, during the pendency of a separate federal criminal prosecution of the Plaintiff, in the Eastern District of California, which also directly resulted from U.S. Secret Service personnel forcing the Plaintiff to involuntarily commit unlawful acts.

In the declaration, filed July 22, 2003, the U.S. Secret Service denied possessing or using any directed-energy weapon on anyone, including the Plaintiff. *See* attached, Exhibit "I," a true and correct copy of the sworn declaration by Deputy Assistant Director Donald P. Zimmerman.

11

Deputy Assistant Director Zimmerman states in the declaration, among other things" that there were no records relating to "any investigative technique or equipment utilized by the Secret Service...to control any individual," or to "transmit anonymous spoken messages to any individual."

Most DEWs, specifically the ADT/ADS system (and ones whose effects are similar to it), when used on people, <u>are crowd and individual control devices</u>.  Their entire purpose is to inflict non-lethal, severe pain upon individuals, from a distant location (the maximum range is over 1000 meters), in order to force them to involuntarily do something.  Typically, that something is to force them to immediately stop what they are doing and vacate a specific area as fast as possible. *See* Exhibits E and F.

<u>The part of Zimmerman's sworn declaration regarding the "investigative technique or equipment utilized by the Secret Service to control any individual" is obviously perjured in light of Mr. Stewart's confirmation!</u>

Another factor this court must consider in relation to the perjured declaration is: what was so bad about the Defendant agency possessing and/or using DEWs and DETs that Deputy Assistant Director Zimmerman would commit perjury and risk 10 years in federal prison to conceal it?  Zimmerman violated two statutes under the U.S. Code related to perjury (18 U.S.C. §§ 1621 and 1623), each carrying a 5 year maximum prison term.  What would motivate him to

do that?  It can only be that his DEW/DET-related crimes (and likely the crimes of others) which would be discovered and prosecuted as a result of his telling the truth about the agency's possession and use of DEWs/DETs/etc. are much more serious and carry much longer prison sentences than the 10 years he risked from the perjury he committed.

In an article in the Sacramento Bee dated June 1, 2004 entitled, "Invisible beam tops list of non-lethal weapons" by Greg Gordon (see attached, Exhibit "J," a true and correct copy of that article), it describes the U.S. Air Force's Directed Energy Bioeffects Division development and testing of the U.S. military's version of the DEW millimeter-wave pain-ray.  It states that the air force has spent, as of that date, 11 years and $50 million to develop its large-scale version of the weapon system and that it was still years away from being ready for deployment.  A more recent CBS News article states that as of August 30, 2007 $63 million has been spent on developing the military's ADT/ADS technology and it still is not ready for deployment.

The Sacramento Bee article also contains an interview with an expert on torture, who states that any misuse of directed-energy technologies would constitute torture and that once the directed-energy weapons exist, they are likely to be used for torture.

According to a very recent segment on the same military ADT/ADS weapon system (Called "The Pentagon's Ray Gun" which aired on March 2, 2008) on the CBS news show "60 Minutes" (a 12 minute and 23 second segment from the broadcast program which can be seen at:

13

http://www.cbsnews.com/stories/2008/02/29/60minutes/main3891865.shtml) as of March 2, 2008 the system is still years away from deployment, despite it being badly needed for the war in Iraq.

This court can see an actual demonstration of the larger, military ADT/ADS system by watching the "60 Minutes" segment referred to above at the world-wide-web/Internet address provided, as well as hear descriptions of the effects of exposure to the pain-ray from miltary and civilian personnel who have recently experienced it first-hand.

It is <u>impossible</u> to believe, bearing in mind the 15+ years the military has taken to get as far as they have with their still-not-ready, large-scale system (it uses a 3-meter antenna mounted on top of a truck or humvee), that the U.S. Secret Service concurrently developed, tested, and deployed a completely different and separate, <u>fully protective-mission capable</u> DEW system, including all of the required wall-penetrating targeting and audio and video surveillance system integration, etc. between when Deputy Assistant Director Zimmerman provided the sworn declaration on July 22, 2003 stating that the Defendant had never possessed or used any DEW or DET and when Mr. Larry Stewart said he could identify the trucks the Defendant's DEW/DET and related devices are mounted in <u>on sight</u> on July 26, 2006 (and he had been retired since October 2004, and since that time had been no longer involved in any Secret Service activities, so the time frame for him to have obtained enough personal familiarity with the vehicles to be able to identify them on sight is actually <u>much</u> shorter).

14

Less than 1 year and 4 months (from July 22, 2003 to October 2004) to fully develop a completely new technology and fully test it in real-world conditions, enough to trust it for critical protective-mission use, is <u>simply too inconceivable to be possible</u>.

And the Defendant is <u>still,</u> with its present disclosures, essentially claiming that it does not have or use the DEWs and DETs that Mr. Stewart positively confirmed that the Defendant has and uses!

The Defendant agency, which put a lot of time and resources toward the development and testing of the DEWs and DETs, long before the military did, would have required at least as long as the military to develop its directed-energy systems, if not longer, due to the lesser resources of the Defendant agency in both personnel and funding, the critical nature of the weapon system's purpose, and the agency's desperate need for it to function <u>absolutely reliably and perfectly</u> in every possible life or death situation involving the President of the United States and/or any of the other protectees.

The Defendant agency's version, as Mr. Stewart points out in the telephone transcript, includes much more integrated into the Defendant's DEWs/DETs than the military's version (because of the differences in application and differences in needed effects and capabilities).

Because the Defendant's version and the military's version share very little in common, the Defendant agency absolutely could not have, in the 1.25 years available, used the military's version as a starting point to jump-start development of their own version, in order to save time and thereby have a fully operational and tested system within that 1.25 years.

From the military's time expenditure, it would seem reasonable to assume that the U.S. Secret Service would have required at least 20 years to develop and test the DEW/DET, etc. systems, and quite likely, even substantially longer due to the fact that 15-20 years ago, the technological and engineering knowhow was vastly less than it is now.

The Defendant has essentially made 3 nearly identical releases of various records consisting of published articles from various sources, partially redacted e-mails relating to the agency's vague and potential interest in the ADT/ADS and DEWs, as well as a pair of consulting contracts totaling approximately $1.5 million. There are no records relating to the agency's development, testing, or deployment of the real-life DEWs and DETs that Mr. Larry Stewart has conclusively confirmed that the U.S. Secret Service has in its possession and has deployed in the field domestically.

In addition, because the one part of the sworn declaration is perjured, it is quite possible that one or more other parts are also perjured.

In the Plaintiff's 2000 civil case against the Defendant, the order dismissing the 2000 civil case appearing as Defendant's Exhibit "B," in its "Defendant's Memorandum in Support Motion for Summary Judgment," the Plaintiff alleged that secret microwave technology was being misused by the Defendant to force him to perceive unwanted and unavoidable verbal communications intercranially and that those communications were being used for all sorts of nefarious purposes.

At the time, almost all of the solid and available proof of this type of directed-energy technology's existence and effects was highly classified, however, pursuant to a May 25, 2006 FOIA request by the Plaintiff to the U.S. Army Intelligence and Security Command, a document was finally declassified on December 6, 2006 which fully confirms the existence of the intercranial communications technology and describes it as an offshoot of (and nearly identical to) the same, exact types of electromagnetic radiation-based technologies currently employed by the U.S. Secret Service with its DEWs and DETs, which Mr. Larry Stewart confirms that the U.S. Secret Service possesses and has domestically deployed into the field for use.

The U.S. Army declassified document describes the exact effects of the "Microwave Hearing Effect" which the Plaintiff described in the 2000 civil suit, as well as how the signals can be aimed, directed selectively, etc. See attached, Exhibit "K," a true and correct copy of the U.S. Army declassified document (with the accompanying letter from the FOI/PA office of the

17

U.S. Army Intelligence and Security Command), pages 6-8, under the heading, "Incapacitating Effect: Microwave Hearing."

This court might wonder what the U.S. Secret Service would be doing with an intercranial communications system. The answer is quite simple. After the JFK assassination, the Defendant tried to identify and eliminate any and all possible ways someone could successfully attack any president, and in doing so realized how vulnerable the agents protecting the president would be if their radio communications were jammed or substantially disabled.

Currently, the agents use spread-spectrum, encrypted, two-way radios ("Spread-spectrum" refers to a device that hops frequencies in a quick and specific pattern to avoid jamming. Military RADAR systems operate in the same way) for their primary communications systems (which partly includes the clear, coiled wire leading to their ear from their collar and ear-pieces they are so famous for), however, a wide-spectrum jamming device could still jam the agency's radio communication signals if the device jammed all of the frequencies (simultaneously) that the Defendant's radios were capable of using. A very real possibility, especially in this day and age.

The intercranial communication system is the Defendant's backup communication system in case of an instance where the radios are jammed or non-operational for any reason. Due to the highly directional nature of the microwave frequencies the intercranial

communication system uses and the microwave hearing effect's characteristics, the intercranial system is very difficult to render ineffective and it would allow the Defendant to provide vital information to its agents during an emergency without any possibility of eavesdropping by attackers or anyone else.

The Defendant, by using the wall-penetrating targeting and surveillance equipment which is already integrated into the agency-possessed DEW/DET systems, is easily able to determine who is within the communication system's pulsed microwave beam illumination area and thereby can easily control who 'hears' the communications and who does not. This is accomplished by not transmitting while unwanted persons are within the beam illumination area. The agents simply wait until the beam path is clear in front of and behind the intended recipient, and then they transmit.

By having multiple communications systems in different positions around a given location, say at 90, 180, and 270 degrees from the location and the person or persons being communicated with, there is a high probability that even if one or two of the systems do not have a clear path for the communication's beam, the third will have a clear path and the agents transmitting will be able to communicate using the intercranial communication system without it being eavesdropped upon.

For decades, the U.S. Secret Service Protective Division has been in a critically tenuous crisis state for many reasons, some which the agency's personnel can control and some which they cannot (*see* Exhibit "L," a true and correct copy of a U.S. News and World Report "Special Investigative Report", dated June 17, 2002, hereinafter "Secrets").

Since the assassination of President Kennedy and the attempted assassination of President Reagan, the U.S. Secret Service has been hit with the stark realization that it cannot effectively protect the president or any of the other protectees against all potential threats.  The agency has been desperately trying to identify and develop any and all means to try to correct the deficits in its protective capabilities, while at the same time it has been losing its most skilled personnel and been overrun by corruption and lack of accountability.  *See* Secrets.

It is this situation that has resulted in the current state of the U.S. Secret Service personnel's criminal and professional misconduct with protective mission-related DEWs/DETs and those same personnel's belief that lying about everything and forcing someone to prove it is acceptable behavior.

In the book by Philip H. Melanson, Ph.D., "The Secret Service: the Hidden History of an Enigmatic Agency" (Carroll & Graf Publishers, 2005 Revised and Expanded Edition, hereinafter "Melanson"), in chapter 3, called "Losing Lancer - The JFK Assassination," pages 57-86, Dr. Melanson describes the lies and cover-ups the agency undertook following the loss of President

Kennedy, including how some of the motivation for those lies and cover-ups was to protect protective methods from being disclosed to the public but that a substantial part was also to prevent the agents' mistakes and incompetence in Dallas from being dwelled upon by congress and the public.

At least two agents lied directly to the Warren Commission about how thorough they had been in doing their jobs in the days and hours prior to the president's visit.

Melanson also discusses the Defendant beginning its interest in directed-energy devices and technologies on pages 226-228 of his book. The DEWs and DETs have all of the features the Defendant wants in protective-mission systems, with none of the politically-negative connotations and consequences (when used correctly), which some of the other potential weapons and devices described in Melanson's book as being suggested, might provide. *See* Melanson, Chapter 9, "The Sixth Sense."

The Secrets article describes an agency rife with corruption, a total lack of accountability within its ranks, and an inability of the agency to provide adequate protective services. The article provides first-hand accounts of what the agency's personnel are seeing as nothing short of a critical deficit in the agency's ability to protect the president and the other protectees. The article also refers to a Treasury Department Inspector General's report dated February 2001 which confirms the Defendant's lack of accountability within the agency. *See* Secrets.

The U.S. Secret Service's interest in the DEWs, DETs, and related targeting and surveillance systems stems from several important factors:

1. The DEWs/DETs have a very long effective range (*see* Exhibit "D," page 10, line 13), upwards of over 1000 meters;

2. The DEWs/DETs operate at the speed of light, much faster than anyone can react, and much faster and safer than a bullet;

3. The probability of hitting the target is 100%, since ballistic effects are irrelevant (*see* Exhibit "F," page 3, paragraph 1-2);

4. The U.S. Secret Service does not want to kill (only disable and stop) protectee attackers, since information about why the attack occurred and who was involved in the attack cannot be extracted from a corpse and the DEWs/DETs offer this very desirable alternative to lethal force (*see* Exhibit "F," page 3, paragraph 1 and Melanson, pages 241-242);

5. The Defendant's DEWs/DETs, and their targeting and surveillance systems are very covert, compact, and unobtrusive, fitting within an small to medium-sized (but otherwise unremarkable) truck, making the political-image sensitive agency less likely to attract unwanted public attention to the more obtrusive and unwanted public image that would result from larger, more obvious security equipment (see Melanson, pages 227-228);

6.  Operating the DEWs/DETs is as easy as operating a video game (see Exhibit "F," page 2, paragraph 4 and Exhibit "M," a true and correct copy of a Raytheon Missile Systems commercial, large-scale DEW brochure, page 2 showing a system operator with a video-game-type joystick and monitor as well as describing the "automatic target tracking" system under "System Setup"), and has a much more attractive stopping and deterring capability than the U.S. Secret Service Counter Sniper Team's custom-made .50 caliber sniper rifles, without having to kill an assailant, without killing or possibly permanently injuring an innocent bystander, and without requiring the very rarely encountered sharp-shooting skills necessary to operate those tremendously powerful and devastatingly lethal .50 caliber firearms (*see* Secrets, page 27, which identifies the ongoing and massive loss of agency personnel, particularly from the Counter Assault Team, of which the snipers are members);

7.  Operating a DEW/DET, even at extreme ranges, does not risk hitting innocent bystanders with a potentially lethal bullet when they are in very close proximity to an assailant or attacker in a crowd (a "shot" from a DEW only disables/deters an attacker and any innocent person in close proximity who was hit accidentally by a brief burst, would not be seriously injured);

In addition to all of the items listed directly above, as stated in the Secrets article, one of the primary reasons for the tremendous loss of agency personnel is long work hours and harsh conditions. This is particularly true for the Counter Assault and Counter Sniper Teams, since

they are required to spend substantial amounts of time outside in every conceivable type of weather, for hours at a time, keeping a vigilant watch. The truck-mounted DEWs and DETs relieve most of the extreme climates-caused harshness. Instead of snipers, spotters, and others being outside in extreme heat or cold, rain, snow, sleet, hail, etc. they can instead have agent technicians sitting in climate controlled trucks, monitoring their surroundings with computer enhanced surveillance and monitoring systems, and, if necessary, hit an attacker at extreme distances from the comfort of their seat. This court can easily understand why the Defendant's agency personnel are so interested in the DEWs and DETs for agency use.

Because of the Defendant's constant loss of huge numbers of critical personnel, over the span of many decades (*see* Secrets), and the length of time and cost it takes to train new personnel, the U.S. Secret Service has, for decades, been attempting to develop ways to counteract those losses or at least ameliorate their negative impact on its protective capabilities.

The DEWs/DETs are how the agency is attempting to counteract the loss of large numbers of key personnel. And due to the agency's perception of the criticality of its past and ongoing circumstances, it cut a lot of corners in fielding the DEWs/DETs and illegally developed and tested the DEWs/DETs and targeting/surveillance systems on an unsuspecting public, including the Plaintiff, believing that the covert nature of the devices (and mental illness symptom similarities of any reports of DEW/DET misuse or abuse) would shield the agency from the fallout of being exposed for its criminal and professional misconduct. *See* attached

24

Exhibit "N," a true and correct copy of a scientific study paper entitled, "Security Implications of High-Power Microwave Technology," originally submitted to an Institute of Electrical and Electronic Engineers (IEEE) symposium in 1997, which describes the total lack of evidence which is typically left behind after a DEW/DET attack. *See also* Exhibit "O," a true and correct copy of "Backgrounder," a newsletter published by the very conservative Heritage Foundation, dated April 28, 2006, which proves (page 5, paragraph 4) that high-power microwave (or HPM) devices are another way of describing the ADT/ADS technologies and that they have a severe, negative, pain-inducing effect when used on people, instead of on electronic equipment, as is described in Exhibit N.

These facts are relevant because a person complaining of being attacked with a DEW or DET would have no evidence left behind of such an attack, and if the person complaining persisted in the complaint, despite a lack of physical or eyewitness evidence, he or she could easily be misdiagnosed as being mentally ill, as happened in the Plaintiff's case.

And as the Defendant pointed out, in 2003 the Plaintiff was charged with threatening a federal agent. The Plaintiff was found incompetent to stand trial because he steadfastly refused to rescind his allegation of DEW/DET misuse, and when the U.S. District Court ordered the Defendant agency to provide a sworn declaration regarding its possession and use of DEWs/DETs to try to determine if the Plaintiff's allegations were possibly accurate, instead of telling the truth, the agency lied and denied even having such devices to avoid the immediate

repercussions of the investigation and subpoenas which the Plaintiff's defense counsel would have initiated with the full support and authority of the federal courts behind him and with all of the necessary financial and expert witness resources required to expose the criminal and professional misconduct. *See* attached, Exhibit "P," a true and correct copy of the case decision in U.S. v. Friedman, 366 F.3d 975, page 2, bottom of column 2.

The Defendant knew that the criminal charges and the mental-illness allegations against the Plaintiff would serve to discredit the Plaintiff and make it harder for him to expose the truth about what the U.S. Secret Service has truly been doing with its DEWs, DETs, and related audio and video surveillance technologies.

The Defendant committing perjury in 2003 also serves to prove that it does not have any legitimate governmental purpose or investigation underway which would explain its actions in relation to the Plaintiff. If it had a legitimate purpose of any kind, it would have taken steps at that time to make its activities known to either the prosecuting attorney or the court, and it did neither.

The Defendant forced and allowed the Plaintiff to be illegally imprisoned many times and illegally committed to a Federal Medical Center twice to try to protect its criminal and professional misconduct from becoming public knowledge and to avoid the public scrutiny that

will likely eliminate the DEWs and DETs from being allowed to be used by any law enforcement agency, including the U.S. Secret Service, for any purpose whatsoever.

The Defendants have gotten away with their misconduct for so long and the misconduct is so difficult to prove that the agency personnel involved in the criminal and professional misconduct believe that they will never be caught <u>and</u> due to the total lack of accountability within the agency, they are brazen about their misconduct and about lying about their involvement, even under penalty of perjury.

As this court can see from the items numbered 1-7 above, the Secrets article, chapter 9, pages 227-258, of Melanson's book, and the exhibits which outline the effects and effectiveness of DEWs/DETs, DEWs and DETs provide a seemingly perfect combination of unobtrusiveness/ covertness, effectiveness, range, ease of use, and non-lethality that the U.S. Secret Service covets for its protective mission.

To agency personnel, DEWs/DETs are the answer to all of their prayers, providing an effective workaround to the agency's most pressing current and ongoing personnel-loss and protective-capability-loss problems.

This confidence and belief in the capabilities of DEWs/DETs, the total lack of accountability within the agency, and its fear regarding the repercussions of a full investigation

are what are fueling the agency's willingness to act in bad faith and commit perjury to protect its possession and use/misuse of DEWs/DETs.

The agency's willingness to commit perjury eliminates all of the checks and balances which our democracy requires to remain a healthy and sound form of government and it destroys every notion of any form of agency accountability (the cornerstone of democracy).

Since it was the Defendant agency who chose Deputy Assistant Director Donald P. Zimmerman to respond to the court's 2003 order regarding the agency's possession and use of directed-energy weapons and other, related technologies, it has to be assumed that Deputy Assistant Director Zimmerman was speaking for the entire agency.

## IV. Argument

The Defendant claims that no issues of material fact remain due to it having performed its statutory duty, and as a result that it is entitled to summary judgement in its favor as a matter of law.

As the Plaintiff will show, the Defendant has <u>absolutely not</u> performed its statutory duty and there are still serious questions about the thoroughness of its searches, the completeness of

its releases of documents, the truthfulness of its disclosures and declaration, and the appropriateness of its claim of exemptions..

The Defendant begins its Motion for Summary Judgment by pointing out some selective information about two of the Plaintiff's previous experiences with the federal courts. One, a civil case from 2000, which was dismissed due to the lack of available information regarding a directed-energy technology (because the information was classified at the time), and the second, a criminal case where the Plaintiff was charged with threatening a federal agent.

The Plaintiff was, indeed, found incompetent to stand trial in this case, but only because the Defendant lied about its possession and use of directed-energy technologies. As the Defendant planned and counted on, the court and the examining doctors both relied heavily on the agency's perjured declaration in mis-diagnosing Plaintiff as mentally ill and/or to accept that the Plaintiff was mentally ill and totally dismiss his allegations of agency misconduct as the result of mental illness.

The Plaintiff lost a few days short of 2 full years of his life while he was in custody fighting these charges for which he was completely innocent and the Defendant in the instant case was guilty. The Plaintiff has also been locked up many other times due to the same conduct by the Defendant, being incarcerated 6 out of just the past 10 years as a result, with over 10 years of incarceration total if all improper occurrences are counted.

The Defendant also points out that Plaintiff is a prolific FOIA filer. This is also true, however fully understandable when the Defendant has the records Plaintiff needs to prove its criminal and professional misconduct and the FOIA is the only avenue to obtain them.

### The Defendant's Declaration

The Defendant provided a sworn declaration from SAIC Craig W. Ulmer in support of its motion for summary judgement and cited several cases regarding the sufficiency of agency affidavits and declarations being the basis of granting of summary judgement. However, in the government's own citations, the agency's affidavits and declarations are not sufficient when there is contrary evidence in the record or evidence of agency bad faith.

The Plaintiff has proven through believable and objective evidence that the agency has consistently acted in bad faith in regards to the requested subject matter, going so far as to have a very high-ranking agency employee lie under penalty of perjury in another case to discredit the Plaintiff and to avoid responsibility for a huge amount of criminal and professional misconduct!

This court should carefully consider whether or not the Defendant has simply provided another perjured declaration or one from someone who the Defendant has kept deliberately

ignorant of the agency's possession and use/misuse of the DEWs/DETs/etc. and the related records.

The suggested solution to this very real, even likely, possibility is for this court to order the agency's director to provide all of the declarations for this case, including having him re-write the one which was already submitted in this case and at that time correcting any deficiencies or inaccuracies in the current declaration.

The Search

The government claims that it conducted a reasonable search for records responsive to the Plaintiff's request.

The Defendant has <u>not</u> yet conducted a reasonable search for the records the Plaintiff is requesting and SAIC Ulmer's declaration shows the following deficiencies.

The adequacy of an agency's search under the FOIA is determined by a test of "reasonableness," which may vary from case to case. <u>Zemansky v. EPA</u>, 767 F.2d 569, 571-73 (9th Cir. 1985). And as a general rule, an agency must undertake a search that is "reasonably calculated to uncover all relevant documents." <u>Campbell v. U.S. Dept. Of Justice</u>, 164 F.3d 20, 27 (D.C. Cir. 1998).

31

In the Plaintiff's FOIA request, Plaintiff specifically requested, in a letter stamped received by the Defendant on February 20, 2007, that the vehicles which the DEWs and DETs are mounted or contained in also be searched for records responsive to Plaintiff's request (Sub-Exhibit "F," under Exhibit "A," in the Defendants Motion for Summary Judgement, a true and correct copy of this letter).  SAIC Ulmer's declaration does not mention this part of Plaintiff's request at all, nor does it refer to any such search of the vehicles and/or related records storage locations.

Due to the highly digital nature of most if not all of the records the Plaintiff seeks, it is not inconceivable that the bulk of the agency's records related to its DEW/DET activities could be located on computer hard drives or other computer storage devices in the vehicles and nowhere else.

In order to qualify as a reasonable search, the vehicles must be searched and the agency must provide a declaration identifying that they were searched and which describes the record storage and retrieval system and procedures within the vehicles in order to inform Plaintiff and this court and in order to comply with the FOIA's mandates.

The agency also cannot claim that the Plaintiff's original FOIA request be more specific about where the vehicles are located in order for the Defendant to be required to search those

locations. The FOIA does not allow a requester to be penalized for lapses or deliberate omissions in the Federal Register publication, by any agency, of the locations of any records repositories. *See* 5 U.S.C.A. § 552. The agency has never published in the Federal Register the locations of the central or remote repositories for the Protective Research Division.

In addition, according to SAIC Ulmer's declaration, there was never a search of the agency's Protective Research Division records, as the Plaintiff requested. *See* Sub-Exhibit "F," under Exhibit "A," in the Defendants Motion for Summary Judgement. Mr. Larry Stewart informed the Plaintiff in 2006 that it was the Protective Research Division which originally developed and tested the DEWs/DETs/etc. and this is why the Plaintiff included it in his FOIA request.

In order to qualify as a reasonable search, the Protective Research Division records must be searched and the agency must provide a declaration identifying that they were searched and which describes the record storage and retrieval system and procedures within the agency's Protective Research Division in order to inform Plaintiff and this court and in order to comply with the FOIA's mandates.

In addition, according to SAIC Ulmer's declaration, there was never a search of the agency's procurement and purchasing records, as the Plaintiff requested. *See* Sub-Exhibit "F," under Exhibit "A," in the Defendants Motion for Summary Judgement.

In order to qualify as a reasonable search, the procurement and purchasing records must be searched and the agency must provide a declaration identifying that they were searched and which describes the record storage and retrieval system and procedures within the agency's procurement and purchasing divisions in order to inform Plaintiff and this court and in order to comply with the FOIA's mandates.

There is simply no conceivable chance that there are not tens or hundreds of millions of dollars in expenditures that the Defendant has spent on developing and testing the DEWs/DETs, integrated audio and video surveillance systems, and related technologies and none of those records have yet been disclosed to the Plaintiff.

The military has spent $63 million on their not-yet-ready for deployment DEW system. Where are the records from the Defendant, which are comparable to the military's for their DEW/DET/etc. purchasing, development, and testing expenditures? Or would the Defendant have this court believe that the fully protective-mission capable DEWs/DETs, etc. and the surveillance systems materialized out of thin air, simply falling out of the sky?

The Plaintiff's request for records includes equipment obtained by any means, even if it was borrowed from the military under the Presidential Protection Assistance Act of 1976, codified in the notes of 18 U.S.C.A. § 3056, or by any other means.

### The Vaughn Index

The Defendant's Vaughn index does not adequately describe the withheld records (or portions of records) does not adequately describe how disclosure would damage the interests protected by the claimed exemptions. The Defendant relies on conclusory statements and the use of inapplicable exemptions for a substantial portion of its Vaughn index.

When a law-enforcement agency acts outside of its investigatory powers, as the U.S. Secret Service has done (with impunity, in the instant case), it is precluded from using Exemption (b)(7) to shield its activities (since exemption (b)(7) relates to the several law enforcement-related exemptions exclusively).

"If an agency acts outside its investigatory powers, it is precluded from showing that it acted with a law-enforcement purpose with regard to FOIA exemption. 5 U.S.C.A. § 552(b)(7)." Ramo v. Department of the Navy, 487 F.Supp. 127 (N.D. Cal.1979) *and cited affirmatively in* Pratt v. Webster, 673 F.2d 408 at 416 (C.A.D.C 1982) and the "Freedom of Information exemption for law enforcement investigatory files does not shield materials relating to unauthorized or illegal investigatory tactics. 5 U.S.C.A § 552(b)(7)(A)," Kanter v. Internal Revenue Service, 433 F.Supp. 812 (N.D. Ill. 1977) *and cited affirmatively in* North v. Walsh,

881 F.2d 1088 at 1098 (C.A.D.C. 1989). The Defendant agency relies on (b)(7) extensively in its Motion for Summary Judgment.

## The Exemptions

This court has very little discretion in relation to the Defendant's claims of the application of Exemption (b)(1), however, due to the bad faith activities which the Defendant agency has engaged in, the Plaintiff believes it is prudent for this court to review all records *in camera* to be certain that any claimed exemptions, including Exemption (b)(1), be appropriate and reasonable.

The agency's claim of Exemption (b)(2) in this case is inappropriate for any agency records which relate to its possession or use of DEW or DET technologies, since these matters are of tremendous interest to the public.

When a law-enforcement agency acts outside of its investigatory powers, as the U.S. Secret Service has done, it is precluded from using any Exemptions under (b)(7) to shield its activities (since exemption (b)(7) relates to the law-enforcement exemptions exclusively). "If an agency acts outside its investigatory powers, it is precluded from showing that it acted with a law-enforcement purpose with regard to FOIA exemption. 5 U.S.C.A. § 552(b)(7)." Ramo v. Department of the Navy, 487 F.Supp. 127 (N.D. Cal.1979) *and cited affirmatively in* Pratt v.

Webster, 673 F.2d 408 at 416 (C.A.D.C 1982) and the "Freedom of Information exemption for law enforcement investigatory files does not shield materials relating to unauthorized or illegal investigatory tactics. 5 U.S.C.A § 552(b)(7)(A)," Kanter v. Internal Revenue Service, 433 F.Supp. 812 (N.D. Ill. 1977) *and cited affirmatively in* North v. Walsh, 881 F.2d 1088 at 1098 (C.A.D.C. 1989). The Defendant cites (b)(7)(C), (b)(7)(E), and (b)(7)(F) in its motion, however, it neglects to consider the cases cited in this paragraph and the agency's misconduct which make it impossible for the agency to rely on the cited exemptions to shield the requested records from disclosure.

The entire purpose to the Freedom of Information Act is to shed light on how the government works and what it is doing, especially when it is involved in unconstitutional or illegal misconduct. Conduct which clearly and undeniably "shocks the conscience," which the agency's misuse of the technologies does, violates the Plaintiff's and all of the other victims' 5th amendment constitutional rights. *See* Harbury v. Deutch, 233 F.3d 596 (C.A.D.C. 2000). The Defendant's illegal conduct, with its misuse of the directed-energy technologies to torture and abuse innocent victims for prolonged periods of time, including the Plaintiff, and its perjury to attempt to cover it all up clearly meets this test as clearly and undeniably "shocking the conscience."

In addition, the Defendant's warrantless misuse of targeting and wall-penetrating audio and video surveillance systems which show images of the Plaintiff inside places he has an

37

absolute expectation of privacy violates the Plaintiff's 4th amendment constitutional rights against unreasonable searches and seizures. *See* Oliver v. United States, 466 U.S. 170, 177-78 (1984) and Katz v. United States, 389 U.S. 347, 353 (1967).

### The Records Referred to Other Agencies for Response

In the Defendant's Statement of Material Facts, beginning on Page 4, Paragraph 14, it admits that the Defendant referred a large number of records in its possession which originated at other agencies to those other agencies for a direct response to the Plaintiff. These agencies are the U.S. Coast Guard, Dept. of Energy, the U.S. Air Force, the U.S. Navy, the Dept. of Homeland Security, the Dept. of Justice, the U.S. Army, the FAA, the Dept. of Defense, the Defense Threat Reduction Agency, the U.S. Marine Corps, as well as some additional "Special Access Program" records from the U.S. Air Force.

The Plaintiff has not received any of the records which were referred to other agencies.

The Defendant retains the responsibility of defending any agency action (or inaction) taken on those records if the matter proceeds to litigation. *See* Williams v. FBI, No. 92-5176, 1993 WL 157679, at * 1 (D.C. Cir. May 7, 1993) (Illustrating that in litigation referring agency is nevertheless required to justify withholding of record that was referred to another agency).

<u>Misuse of an FOIA (c)(1) Exclusion</u>

It is likely that the Defendant is misusing one or more FOIA (c)(1) exclusions to improperly shield records from being disclosed to the Plaintiff. It would do this by misusing pretextual investigations of the Plaintiff and/or others to try to avoid having to disclose any incriminating records to the Plaintiff or anyone else. The Plaintiff respectfully requests that this court order the director of the Defendant agency to provide an *in camera*, *ex parte* declaration to this court in relation to this issue which outlines what activities, if any, the agency is participating in related to the Plaintiff and its basis for those activities.

## V. Conclusion

As the Plaintiff has proven, the Defendant's Motion for Summary Judgement is <u>very</u> premature.

There are still many records which have not been disclosed to the Plaintiff which should have been disclosed, there is still an inadequate search for records which the Defendant has conducted, there are still referred-to-other-agencies records which have not been disclosed, there are still misapplied exemptions, and there is evidence that there are still compelling questions about the Defendant's bad faith activities in relation to these matters.

39

The public has a tremendously powerful and compelling need to be informed about the Defendant's misuse of any EMR device to torture and/or abuse anyone or to commit any unlawful act, and this need supercedes any and all other governmental or public policy considerations.

The Defendant absolutely gave up any right to claim that the release of records would impede the agency's ability to provide protective services to anyone when it egregiously misused the technologies on the Plaintiff and hundreds, if not thousands of other innocent people.

The fact is, is that the technologies are so covert and undetectable that the American people may never really know all of the ways they have been misused or all of the times that they have been misused, but every effort must be made to determine all of the ways they have been.

All these items must be resolved before this court should entertain the Defendant's Motion for Summary Judgment and the Plaintiff urges this court to resolve all of these things in the Plaintiff's favor.

**The Plaintiff's Motion for *In Camera* Review of All Agency Records**

Due to the Defendant's clear and unlawful use of perjury in its attempt to prevent it from being embarrassed and its personnel prosecuted, the Plaintiff requests that this court review, *in camera,* all agency records related to this case which have been (*and/or* are in the future, if more are found as a result of this court ordering the agency to conduct further searches) withheld by the Defendant agency.

### Motion for Change of Address

The Plaintiff requests that this court order the court clerk to amend the Plaintiff's address of record to reflect the new home address listed below. The Defendant's personnel who have been misusing the DEWs/DETs are responsible for all of the many changes of address in the instant case.

Respectfully submitted,

Dated:_____

_____

Donald M. Friedman
Plaintiff Pro Se
2001 Bristol Lane, Apt. B
Fairfield, CA 94533
707-266-8564
don.friedman@yahoo.com

## VERIFICATION

I, Donald M. Friedman, declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Dated:_____

_____
Donald M. Friedman
Plaintiff Pro Se

EXHIBIT "A"

April 24, 2006

Mr. Larry F. Stewart
Stewart Forensic Consultants, LLC
793-A E. Foothill Blvd.
Suite 200
San Luis Obispo, CA 93405

Re: Secret Service - Related Forensic Examination
    And Opinion

Dear Mr. Stewart:

I am writing to you because I am representing myself
in a State of California criminal case and I require
the assistance of a forensics expert witness for my
upcoming trial. If you agree to assist me, I will get
the court in Napa County, Ca. to appoint (and pay) you
for your forensic examinations (and testimony in court).

Current agents of the USSS have illegally misused the
most advanced protective technologies the service has
available to torture, coerce, and threaten me into
participating in unlawful acts and now I have to prove
their involvement using only the evidence they left
behind.

Unfortunately, the agents have been using directed energy

Page 2

Weapons on me from a distance and all I have are the marks (burns) they have left on my body using those weapons AND what is left of a shoe which the agents melted/vaporized while I was wearing it.

I'm hoping that you can help me prove the shoe was melted/vaporized and didn't just wear out and possibly help me identify the burns left on my body. The burns are mostly triangular in shape and so must be man-made and not naturally occurring.

Please call my court-appointed private investigator, Mr. Ken Gaudet, of CDO Investigations, at 707-256-3303 and discuss this case. He can answer your questions and will act as my agent for the purposes of providing you with the things we have for examination.

Thank you for your prompt attention to this matter.

Sincerely,

Mr. Donald Friedman
Confidential Legal Correspondence
1125 Third Street
Napa, CA 94559-3015

EXHIBIT "B"

## Stewart Forensic Consultants, LLC



May 12, 2006

Dear Mr. Friedman,

I am in receipt of your written letters, dated April 24, 2006, May 7, 2006 and May 8, 2006. At your request in the April 24 letter, I spoke with Investigator Gaudet.

I will be able to provide you a fair and impartial examination of your evidence and case file. If appointed, to proceed I would need access to the records surrounding your investigation and arrest, as well as any actual evidence to be examined. I would then provide you with an official report of any investigative or forensic findings associated with your case. Courtroom preparation, presentation and testimony would also be available.

To answer your specific questions:
I am familiar with technologies developed for and used by the Secret Service in both their investigative and protective missions. That knowledge stems from my nearly 24 years as an employee of the Secret Service. I began working for them as a forensic scientist and ended my career with them as the Chief Forensic Scientist and Laboratory Director. In that capacity, I worked for both the protective and investigative sides of the Secret Service. As a forensic scientist, I can examine all of the evidence in the case and develop independent conclusions about origin, history, etc.

I hope I have been able to answer your questions. I am enclosing my resume and rates in case you decide to proceed by having Stewart Forensic Consultants appointed to examine the evidence.

Sincerely,

Larry F. Stewart
Chief Forensic Scientist

cc: Mr. Gaudet

793A East Foothill Boulevard, Suite 200, San Luis Obispo, California 93405
Tel. 805-595-3333, FAX 805-595-3333

EXHIBIT "C"

**BIO**

Larry F. Stewart was born in Asheville, North Carolina. He has earned an Associate of Arts degree from Florida Technological University in Orlando, a Bachelor of Science in Forensic Science degree from the University of Central Florida, also in Orlando and a Master of Forensic Sciences degree from Antioch University in Yellow Springs, Ohio. Mr. Stewart has worked for the U.S. Government as a forensic scientist for over 25 years. During that time he has worked on many notable cases to include; the Unabomber, numerous accused Nazi war criminals, e.g. John Demanjuk, a.k.a. Ivan the Terrible, the reinvestigation of the Dr. Martin Luther King murder, the reinvestigation of the Kennedy assassination/CIA conspiracy theory, the Jon Benet Ramsey murder investigation, the 9/11 terrorist attacks and the DC Sniper investigation. In addition, he has been called upon in international disputes regarding weapons of mass destruction and stolen nuclear materials. He has testified as an expert witness in state, federal and military courts of law, as well as in foreign court systems to include; Austria, Australia, Thailand, Sri Lanka and Canada. He has also testified at The Hague in the Netherlands and three times before the U.S. Congress. Mr. Stewart most recently held the position of Laboratory Director and Chief Forensic Scientist for the Department of Homeland Security, United States Secret Service, and has now begun an independent forensic consultant service known as Stewart Forensic Consultants, LLC.

**RESUME**

Larry F. Stewart

**Occupation:**

Chief Forensic Scientist and President – Stewart Forensic Consultants, LLC
San Luis Obispo, California

**Education:**

Associate of Arts Degree - Received June 1976
Florida Technological University
Orlando, Florida

Bachelor of Science in Forensic Science Degree - Received August 1979
Minors in Chemistry and Biology
University of Central Florida
Orlando, Florida

Master of Forensic Sciences Degree - Received June 1983
Antioch University
Yellow Springs, Ohio

**Pertinent Specialized Courses:**

Forensic Microscopy Course - March 1978

*1*



McCrone Research Institute
Chicago, Illinois

Atomic Absorption Spectrophotometry - April 1979
Perkin-Elmer Corporation
Gaithersburg, Maryland

Gas Chromatography Course - December 1979
Virginia Polytechnic Institute and State University
Gaithersburg, Maryland

Advanced Gas Chromatography - March 1980
Perkin-Elmer Corporation

Advanced High Pressure Liquid Chromatography Course - January 1981
Virginia Polytechnic Institute and State University
Washington, DC (course location)

Ink and Paper Analysis Seminar - January 1981
U.S. Air Force
Office of Special Investigations
Washington, DC

High Pressure Liquid Chromatography/Mass Spectrometry - July 1981
U.S. Justice Department, F.B.I.
Quantico, Virginia

High Pressure Liquid Chromatography/Computer Operation - March 1984
Perkin-Elmer Corporation
Rockville, Maryland

Questioned Document Course - February 1985
U.S. Secret Service
Washington, DC

Fourier Transform Infrared Spectroscopy Course - June 1986
Nicolet Analytical Instruments
Lanham, Maryland

Scanning Electron Microscopy - September 1994
Philips Electronic Instruments
Mahwah, New Jersey

ASCLD/LAB Inspector Training Course – January 2000
Portland, Oregon

2

**Work Experience:**
December 1975 through March 1979
Laboratory Technician
University of Central Florida

March 1979 through September 1979
Internship
Bureau of Alcohol, Tobacco and Firearms

September 1979 through July 1982
Forensic Chemist
Bureau of Alcohol, Tobacco and Firearms

July, 1982 through June, 2005
Counterfeit Specialist
Questioned Document Examiner
Lead, Instrumental Analysis Section
Lead, Instrumental and Computer Analysis Section
Senior Document Examiner/National Expert for the United States Secret Service
Chief, Questioned Document Branch
Assistant Laboratory Director
Laboratory Director/Chief Forensic Scientist
United States Secret Service

**Instructor:**
Bureau of Alcohol, Tobacco and Firearms
Rockville, Maryland

United States Air Force, Office of Special Investigations
Special Investigator's Course
Washington, DC

United States Secret Service
Washington, DC

Federal Law Enforcement Training Center
Glynco, Georgia

Drug Enforcement Agency
Washington, DC

International Law Enforcement Academy
Budapest, Hungary

Naval Criminal Investigative Service
Washington, DC

Rochester Institute of Technology
Rochester, New York

**Guest Speaker:**
Montgomery College
October 1980
Rockville, Maryland

Antioch School of Law
November 1980
Washington, DC

Antioch School of Law
February 1981
Washington, DC

Montgomery College
Ink and Paper Analysis/Instrumental Techniques - February 1982
Rockville, Maryland

DocSec'85
Document Security - May 1985
Washington, DC

George Washington University
Ink and Paper Analysis - February 1986
Washington, DC

Inspector Generals Office - Health and Human Services
Tri-regional Conference - January 1991
Mt. Pocono, Pennsylvania

Bolling Air Force Base
Joint Basic Computer Forensic Workshop - September 1993
Washington, DC

Virginia Military Institute
The Uses of Chemistry and Biology in the Forensic Sciences - April 1994
Lexington, Virginia

UCLA
Forensic Examination of Financial and Identity Documents – August 1998

4

American Society of Questioned Document Examiners meeting
Los Angeles, California

Catholic University
Science Under Oath – February 2000
Washington, DC

GATF Conference
Security Printing, Computers and the Forensic Scientist – August 2000
Pittsburgh, PA

Fraud Prevention Workshop
Security Printing – October 27, 2000
U.S. Department of State
Ft. Lauderdale, Florida

International Association for Identification
Forensic Science and Fraudulent Documents – May 2004
Sacramento, California

**Specialized Tours/Training:**
Crane-Weston Paper Mill
Dalton, Massachusetts - July 28, 1982

Philadelphia Mint
Philadelphia, Pennsylvania - July 29, 1982

Bureau of Engraving and Printing
Washington, DC - July 30, 1982

Visa International
San Francisco, California - January 3-6, 1984

Malco Plastics
Garrison Park, Maryland - January 1985

BIS CAP International, Ink Jet Printing Conference
Boston, Massachusetts - September 17-19, 1990

**Achievements:**
Participated as a "referee" in the 1980 Crime Laboratory Proficiency Training Program
Forensic Sciences Foundation, Colorado Springs, Colorado

Testified in May of 1989 and 1990 before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, U. S. House of Representatives. These matters concerned the investigation of fraud in science.

Recipient of the Health and Human Services Inspector General's Integrity Award, 1991.

Appointed Chairman of A.S.T.M. task groups concerned with developing standards for performing "Writing Ink Comparisons" and "Writing Ink Identifications".

United States Delegate at the 14th European Meeting on Currency Counterfeiting, The Hague, The Netherlands, October 9-11, 1991 and the First International Conference on Fraudulent Documents, Ottawa, Canada, April 27- May 1, 1992.

United States Delegate at the 6th European Conference for Police and Government Experts, London, United Kingdom, October 2-4, 1996. Presented a paper on Ink Dating, Relative and Absolute: New Approaches to Old Problems.

Testified on July 22, 1999 before the House Judiciary Committee, Subcommittee on Immigration and Claims, U.S. House of Representatives. This matter concerned detection and prevention of counterfeit documents.

Classified as an "Inspector" for the American Society of Crime Laboratory Directors

Elected to the Board of Directors for the American Society of Crime Laboratory Directors, September 14, 2000.

Elected to the Board of Directors for the Document Security Alliance, December, 2003

**Original Research Publications/Presentations:**
"Detection of Volatile Accelerants in Fire Debris. 1. A Comparative Evaluation... " Richard A. Strobel, Richard A. Tontarski, Larry F. Stewart, Philip Wineman presented at the American Academy of Forensic Sciences, New Orleans, Louisiana, February 1980, and the Mid-Atlantic Association of Forensic Scientists, combined meeting, Louisville, Kentucky, May 1980.

"Artificial Aging of Documents," L.F. Stewart. Published in the Journal of Forensic Sciences, Vol. 27, No. 2, April 1982.

"Ballpoint Ink Age Determination by Volatile Component Comparison," L.F. Stewart, Presented at the American Academy of Forensic Sciences meeting, Orlando, Florida, February 1982, and Mid-Atlantic Association of Forensic Scientists/Northeastern Association of Forensic Scientists joint meeting, Harrisburg, Pennsylvania, April 1982. Published in the Journal of Forensic Sciences, April 1985.

"The Role of the Secret Service in Counterfeit Deterrence," L.F. Stewart. Presented at the Mid-Atlantic Association of Forensic Scientists meeting, Baltimore, Maryland, April 1983.

"The Forensic Analysis of Printing Inks," Larry F. Stewart. Presented at the American Society of Questioned Document Examiners, Lake Tahoe, Nevada, September 1983.

"Counterfeit Credit Card Deterrence," Larry F. Stewart. Presented at the American Society of Questioned Document Examiners/Canadian Society of Forensic Scientists annual meeting, Montreal, Quebec, Canada, September 1985.

"Detection of Counterfeit Currency," Larry F. Stewart. Presented at the International Association of Identification conference, Arlington, Virginia, August 1987.

"Identification of United States Currency Security Fibers by Fourier Transform Infrared Spectroscopy," J.E. Brown and L.F. Stewart. Presented at the Canadian Society of Forensic Scientists annual meeting, Toronto, Ontario, Canada, October, 1988.

"U.S. Secret Service Ink Identification System," J.W. Hargett, J.E. Brown and L.F. Stewart. Presented at the Canadian Society of Forensic Scientists annual meeting, Toronto, Ontario, Canada, October 1988.

"Use of Enlargement Ratios of Negatives and/or Printing Plates to Characterize Counterfeit Currency," L.F. Stewart, R.L. Outland and J.E. Brown. Presented at the Canadian Society of Forensic Scientists annual meeting, Toronto, Ontario, Canada, October 1988.

"Current Status of Ink Age Determination," L.F. Stewart and S.L Guertin. Presented at the Ninth INTERPOL Forensic Science Symposium, INTERPOL Headquarters, Lyon, France, December 12, 1989. Published in INTERPOL International Criminal Police Review, March-April, 1991.

"A.S.T.M. Standard for Writing Ink Comparisons," L.F. Stewart and J.L. Becker Presented at the Mid-Atlantic Association of Forensic Scientists 1991 meeting, Bethesda, Maryland, May 31, 1991.

"Standard Guide For Test Methods For Forensic Writing Ink Comparisons," L.F. Stewart (Task Group Chairman). Published in the American Society For Testing and Materials (ASTM), Standard Designation number E-1422-91, November 1991.

"Counterfeit Documents Produced by Color Copier Systems," L.F. Stewart, Presented at INTERPOL Headquarters, Lyon, France, December 11-19, 1991.

"Sentence Insertions Detected Through Ink, ESDA and Line Width Analysis," S.L. Fortunato and L.F. Stewart. Published in the Journal of Forensic Sciences, November 1992.

"Status of U.S.S.S. Ink Dating Program," J.W. Hargett and L.F. Stewart. Presented at the Humboldt University, Berlin, Germany, April 2, 1993. Published in Kriminalistik und Forensische Wissenschaften, No. 82, 1994.

"U.S.S.S. International Ink Library and Bulletin Board System," L.F. Stewart. Presented at the Mid-Atlantic Association of Forensic Scientists meeting, Baltimore, Maryland, May 20, 1993.

"Standard Guide For Test Methods For Forensic Writing Ink Identifications," L.F. Stewart (Task Group Chairman). Published in the American Society For Testing and Materials (ASTM), Standard Designation number E-1422, 1995.

"The Government Response to Ink Age Determination," L.F. Stewart, J.L. Becker. Presented at the American Academy of Forensic Sciences meeting, Seattle, Washington, February 17, 1995. Published in the International Criminal Police Review - INTERPOL, Spring, 1996.

"Distinguishing Between Relative Ink Age Determination and the Accelerated Aging Technique," L.F. Stewart and S.L. Fortunato. Published in the International Journal of Forensic Document Examiners, January/March, 1996.

"Forensic Examination of Financial Crimes Documents," L.F. Stewart and J.W. Hargett. Presented at the 6th European Conference for Police and Government Document Experts, London, United Kingdom, October 2-4, 1996 and the GFS Conference, Luzerne, Switzerland, September 9-12, 1997.

"Unusual Document Examination Approaches and Their Relationship to the Daubert Challenge," L.F. Stewart. Presented at the American Board of Forensic Document Examiners meeting, Las Vegas, NV, June 23, 2002 and the American Society of Questioned Document Examiners meeting, San Diego, CA, August 14, 2002.

**Professional Affiliations:**
Mid-Atlantic Association of Forensic Scientists
American Academy of Forensic Sciences - Fellow
Canadian Society of Forensic Scientists (past member)
American Society of Crime Laboratory Directors
Document Security Alliance

**Offices Held:**
Mid Atlantic Association of Forensic Scientists
Secretary/Treasurer

8

November 1981 to October 1984.

American Society of Crime Laboratory Directors
Board of Directors
September 14, 2000 to September, 2003

Document Security Alliance
Board of Directors
December 2003 to November 2004

9

EXHIBIT "D"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PEOPLE OF THE STATE OF CALIFORNIA

V

DONALD M. FRIEDMAN

CASE NO. CR 125349

TRANSCRIPT OF JAILHOUSE TELEPHONE RECORDING OF 7/26/06

Call 2

Transcript Prepared By:
Stutchman Forensic Laboratory
421 Walnut St., #120
Napa, CA 94559
707-257-0828

O:      Operator.

R:      Recording

DF:     Don Friedman

LS:     Larry Stewart

\*:      Unintelligible word

\*\*\*:    More than one unintelligible word

O:      You have a collect call from . .

DF:     Don Friedman.

O:      An inmate at the Napa County Department of Corrections.

R:      This call is from a correctional institution and is subject to monitoring and recording. Custom calling features are not allowed during this conversation. The cost for this call is $3.79 for the first minute and $.69 for each additional minute. If you consent to this call being recorded and accept the charges, press zero. \*\*\* call and prevent further calls from – Thank you for using Genetics. Go ahead with your call.

DF:     I guess you got a call waiting call in.

LS:     Yeah.

DF:     Anyway, like I was saying before, what is your feeling about how certain you're going to be able to nail this thing down?

LS:     I don't know at this point, Don. I'm going to do what I told you before which is I'm gonna do all the history and research and everything else I can to help you have a valid case and to go forward with it, but I can't tell you how it'll be because all the evidence isn't in yet.

DF:     O.K. All righty. Well,

LS:     And the other thing, Don, I'm being cognizant of money and the taxpayers and stuff. I'm not trying to pull time that I'm not using or anything.

DF:     Oh, now, I understand that. I – I've gotten, I was talking to Ken about what his, his experience was in this county as far as people getting money authorized and I was a little

1   LS:     Right, we will get – we'll have comparison shoes at that point to be able to do similar

2   tests on them.

3   DF:     Now are we gonna actually vaporize the new shoes in a similar size pattern, you

4   know, size and pattern and all that and then be able to figure out what the temperature is in

5   there?

6   LS:     Right. We'll try to create the same damage and see what it took to do it.

7   DF:     O.K. Awesome. Sounds like we are making definite progress. How long do you

8   think it'll take once you get back from Nike to do the other tests and to get that stuff done?

9   LS:     If there's no other tests that I can do at that point, based on their response, and I'll give

10  you and answer right away. If there are additional experiments I can do, then we'll

11  formulate 'em, I'll schedule 'em, I'll give you a call and we'll work out a time frame and It'd

12  probably be another week of experiments I would guess.

13  DF:     O.K. So that would be when you actually start melting the other shoes?

14  LS:     Yeah.

15  DF:     O.K. Well, we're definitely within the time frame that, I mean, any time frame that's

16  gonna eventually break the information loose is a good time frame. At least if it's sooner

17  than later. All right

18  LS:     Well, we will – I'll give you word as soon as I get any information that I can pass on to

19  you.

20  DF:     O.K. Is the afternoons the best time to reach you?

21  LS:     It depends on what I'm working on, Don. There's some stuff that I do that is

22  investigation stuff and I'm out all kind of different hours * it, so it's just kind of a catch me

23  when you can thing and unfortunately you just coming through the telephone as a collect call

24  and I don't have a method for forwarding it.



25  DF:     Right. Let me ask you something. Would it be in our best interest to actually go out

26  and try and locate – have you actually seen the platform that the Secret Service uses for their

27  protective surveillance, whatever it is that the equipment is mounted in?



28  LS:     Yes.

1   DF:   O.K. I assume that it's a truck of some kind. Would it be to our advantage for Ken

2   Gaudet to go out and find that vehicle cuz it's gotta be within a thousand meters or so of me

3   now.

4   LS:   If you want to ask him to do that, then that would, you know . .

5   DF:   If I have him call you, can you describe generally what the vehicle looks like?

6   LS:   Uh, huh.

7   DF:   O.K. that would be great because if he can get pictures of the vehicle and you can say,

8   yeah, that's what the vehicle looks like, that would probably go a long way to helping Jan to

9   say, o.k., let's do something about this.

10   LS:   O.K. Yeah, if you work it out with Ken just have him call me.

11   DF:   Awesome, very cool. I know he wants more hours so that would also give him a

12   chance – now am I right that the range is about thousand meters cuz that's what  – in the

13   publications is says the ADT system is, the millimeter wave system is about thousand meters.

14   LS:   They're fully adjustable, so it could be. That's typical of what you'd find, yes.

15   DF:   O.K. You know about the other systems that are required. They've got the microwave

16   microphones going, cuz I've been in places where there's no windows and they've been able

17   to hear what has been going on. They've got the thermal imaging. They've got the

18   millimeter wave cameras. They've got all that stuff. If you can give him an idea of what their

19   likely distance is from me, that would probably help even though I'm not sure that – I'm not

20   sure from your perspective that you may want to do that. You may just want to let him find

21   them and then, you know, whatever, but if you could give him at least a maximum range or

22   an idea of a maximum range for the whole package as a ballpark figure, that might help him

23   narrow down the places where he can look. Cuz Napa's a really small town.

24   LS:   O.K.

25   DF:   There's a – there's not all that many places that they can hide and, personally, I have a

26   feeling that the local police or the local sheriff's department or something has already had

27   contact with them because of the town – they undoubtedly have to run a generator almost all

28   the time and cops in this town would probably have stopped and made inquiries at that type

1 of vehicle, so we may also want to contact them and find out what the heck is going on and

2 whether or not they've had contact and maybe issue a couple of subpoenas to find out. But I

3 will have Ken call you and we'll do our best to try and locate the vehicle locally and get some

4 pictures of it and maybe you could also include in the declaration later on that yeah, that's

5 the vehicle or at least that appears to look like the vehicle or the type of vehicle they use and

6 so on and so forth.

7 LS:     O.K.

8 DF:     O.K.?

9 Ls:     No problem.

10 DF:    Appreciate it and he should be calling you within a day or two.

11 LS:    O.K.

12 DF:    All right.

13 LS:    Take care, Don

14 DF:    Thanks.  Bye

15 (end of tape)

I, Miriam Ridling, certify that I am a transcriber employed by Stutchman Forensic Laboratory.  Our company received nine jailhouse audio recordings for transcript preparation.  The recordings were transferred to CDs for transcription.  I personally and to the best of my ability placed into writing all oral statements which could reasonably be heard and understood into the foregoing verbatim record consisting of 11 pages.  Identification of any parties reflected within the transcript were stated therein.

Signed and sworn this 6th Day of November, 2006, at Napa, CA.

_Miriam Ridling_

Signature

EXHIBIT "E"



**Sandia National Laboratories**

# NEWS RELEASES

FOR IMMEDIATE RELEASE
June 30, 2005

## Team investigates Active Denial System for security applications

### Millimeter-wave device puts the 'heat' on adversaries

ALBUQUERQUE, N.M. — A multi-organizational team is adapting for DOE use a technology that can help keep security adversaries out of DOE sites that contain nuclear assets.

The DOE Office of Security and Safety Performance Assurance (SSA) is exploring the potential to use directed energy weapons technology sponsored by the Department of Defense (DoD), named Active Denial Technology (ADT), to help protect DOE nuclear assets.

SSA is sponsoring Sandia National Laboratories, a National Nuclear Security Administration lab, to investigate how the technology can be used on adversaries by developing a new small-sized Active Denial System (ADS) to meet the unique and rapidly evolving security needs of DOE.

To help solve the many technical issues associated with this challenge, Sandia has partnered with Raytheon and the Air Force Research Laboratory (AFRL), because both organizations have significant experience with earlier ADS system developments.

ADS systems are a new class of nonlethal weaponry using 95 GHz-millimeter-wave directed energy. This technology is capable of rapidly heating a person's skin to achieve a pain threshold that has been demonstrated by AFRL human subject testing to be very effective at repelling people, without burning the skin or causing other secondary effects.

The device is an alternative to lethal force.



**Nonlethal weaponry — Sandia researchers Willy Morse and James Pacheco fine-tune the small-sized Active Denial System.** (Photo by Randy Montoya)
**Download 300dpi JPEG image, "nonlethal-weaponry.jpg," 988K** (Media are welcome to download/publish this image with related news stories.)

In the mid 1990s the Air Force funded development of an ADT system demonstrator that was led by AFRL

and built by Raytheon in partnership with Communications & Power Inc. (CPI) and Malibu Research. The success of this demonstration system has resulted in several ongoing DoD-sponsored projects, such as the Joint Non-Lethal Weapons Directorate's Vehicle Mounted Active Denial System (VMADS) and the Office of Force Transformation's (OFT's) project SHERIFF.



**ADS — The new class of nonlethal weaponry uses 95 GHz-millimeter-wave directed energy.** (Photo by Randy Montoya)
Download 300dpi JPEG image, "directed-energy.jpg," 644K (Media are welcome to download/publish this image with related news stories.)

Steve Scott, manager of Sandia's Access Delay Technology Department, says, "DOE and Sandia have been closely tracking ADT developments and have recognized its potential to enhance the protection of DOE nuclear facilities. This has been confirmed by conducting a feasibility study in 2002, under the supervision of researcher Jim Pacheco."

Acting on the feasibility study's conclusions, SSA's Carl Pocratsky (SO-20) initiated an effort at Sandia to explore and develop a small Active Denial System (ADS) that is more suitable for DOE fixed-site applications. To date, DoD efforts have focused on larger systems, considered by many to be better suited for military applications at extended ranges.

In 2004, the AFRL's Human Effectiveness Directorate (HEDR) completed a study that analyzed pre-existing test data to estimate the potential effectiveness of an ADS that has a smaller beam. Also in 2004, Sandia conducted simulations of how the smaller ADS might be used and how it would perform against adversary attack scenarios within a DOE facility using the Joint Conflict and Tactical Simulation (JCATS) software modeling tool.

"The results of the AFRL small beam ADS effectiveness study and the JCATS study were very encouraging and provided a strong basis for continuing the development of a comparitively small ADS for DOE fixed-site applications," says Pacheco.

"Recently there has been significant progress with this project," says Willy Morse, Sandia's principal investigator. "On May 5 we took acceptance of the SSA ADS prototype system built by Raytheon's Advanced Electromagnetic Technologies (AET) Center in partnership with CPI and Malibu Research. Initial characterization and performance tests were completed at the end of May."

On May 19 a memorandum of understanding was completed between DOE-SSA, Sandia, DoD-OFT, and AFRL. This memorandum establishes a formal partnership between the DoD and DOE in developing small-sized ADSs. During the next six months the AFRL's Human Effectiveness Directorate, Brooks City-Base, is being funded by the OFT to complete human effects testing. This testing will use the SSA ADS system to determine its effectiveness for DOD applications and validate the conclusions of the 2004 small-beam-size effectiveness study sponsored by SSA.

Testing results from Sandia, AFRL, and OFT will guide the operational concept and design of a second-generation small-size ADS system expected to be fielded at several DOE nuclear facilities as early as 2008. DOE-SSA and Sandia will continue to actively seek opportunities to collaborate with other government

agencies on technical issues associated with developing and deploying ADS systems.

**System uses beam of electromagnetic energy to heat human**

Active Denial Technology (ADT) provides an effective nonlethal active-response mechanism to disperse, disturb, distract, and establish the intent of intruders.

ADT emits a 95 GHz non-ionizing electromagnetic beam of energy that penetrates approximately 1/64 of an inch into human skin tissue, where nerve receptors are concentrated. Within seconds, the beam will heat the exposed skin tissue to a level where intolerable pain is experienced and natural defense mechanisms take over.

This intense heating sensation stops only if the individual moves out of the beam's path or the beam is turned off. The sensation caused by the system has been described by test subjects as feeling like touching a hot frying pan or the intense radiant heat from a fire. Burn injury is prevented by limiting the beam's intensity and duration.

DoD-sponsored millimeter-wave human effectiveness testing, initiated in 2001, has demonstrated ADT as both effective and safe without any long-term effects. It is expected that the DoD-funded human effectiveness testing of the small-beam ADS by the AFRL HEDR during the next six to eight months will validate its effectiveness and safety as a nonlethal weapon system.

*Sandia is a multiprogram laboratory operated by Sandia Corporation, a Lockheed Martin company, for the U.S. Department of Energy's National Nuclear Security Administration. Sandia has major R&D responsibilities in national security, energy and environmental technologies, and economic competitiveness.*

**Sandia media contact:** Michael Padilla, mjpadil@sandia.gov, (505) 284-5325

© 2007 Sandia Corporation | Questions and Comments | Privacy and Security

EXHIBIT "F"



# Active Denial Technology

**Active Denial Technology is a breakthrough non-lethal technology that uses millimete wave electromagnetic energy to stop, deter, and turn back an advancing adversary from relatively long range.**

**AFRL's Directed Energy Directorate, High Power Microwave Division, Applications Branch, Kirtland AFB NM**

AFRL scientists and sponsors from the Joint Non-Lethal Weapons Directorate (JNLWD) announc the existence of a revolutionary non-lethal directed energy technology called Active Denial Technology (ADT) at a Pentagon press conference in March 2001. The Marine Times said that A was potentially the biggest breakthrough in weapons technology since the atom bomb.

ADT enables a new class of weaponry using directed energy. This technology uses a beam of millimeter waves to heat an adversary's skin, causing intense pain without damage. This makes the adversary flee.

AFRL began research into non-lethal weapons in the mid-1980s. This research resulted in the building and testing of a low power repel demonstrator funded by the Air Force. Congress directed the Department of Defense (DoD) to create a joint organization to develop non-lethal technology and capabilities in 1996. The Marine Corps is the executive agent for the DoD. The JNLW program funded AFRL to produce two vehicle-mounted repel demonstrators based on previous research.

ADT exploits intolerance of thermally induced pain. Pain intolerance depends on pain intensity and duration. The intensity of pain depends on skin temperature, starting at a threshold of 45°( and increasing rapidly until pain intensity is maximized at a skin temperature of 55°C. ADT use: beam of energy to heat the skin. The frequency has favorable scaling in several respects. A powerful and efficient millimeter-wave source technology exists. As frequency increases, the ability of an antenna to concentrate energy increases with the square of the frequency. The der of energy deposition in tissue is 0.3 mm, the same depth as pain-sensing nerves.

ADT does not burn and does not cause prolonged or unnecessary suffering, permanent damage or long-term effects. A large safety margin exists between causing intolerable pain and burning the operational range of ADT. This margin allows exploitation of pain intolerance while avoiding damage. Researchers explored the possibility of eye damage and skin cancer and have eliminat these as a concern. The eye has many pain receptors on the cornea and an aversion response protects the eyes. Experiments also demonstrated that millimeter-wave energy does not promo cancer. Scientists continue performing extensive volunteer human testing in strict accord with approved laws and regulations requiring informed consent. An institutional review board and th

*/*

Air For  e Surgeon General's Research Oversight Council approve human and animal research protocols.

An ADT system consists of an electrical power source, a device producing a beam of millimeter-wave energy, an antenna directing energy towards a target, and a beam transport connecting t source and antenna. Raytheon constructed a full-power, full-range demonstration system for vehicle-mounted technology integrating these elements (see Figure 1). Users can assess the potential operational utility of ADT, demonstrate key technologies in a field environment, and perform large spot effects tests using the demonstration system.

Communications and Power Industries of Palo Alto, California, designed and built the gyrotron millimeter-wave source. In the gyrotron, a superconducting magnet with a cryocooler generates rotating electron beam in a strong magnetic field (~3.4 Tesla). The electrons interact resonantly with electromagnetic waves in a cavity. This interaction bunches the electron beam and electron energy converts into millimeter waves. The millimeter-wave energy is extracted from the cavity and mode-converted to a quasi-gaussian beam. The beam, shaped by mirrors, passes through a window made of polycrystalline diamond, which has low loss, high thermal conductivity, and hig mechanical strength.

The antenna is similar in configuration to satellite television receivers. The shape of the secondary mirror optimally illuminates the two-meter primary reflector. This gives high-apertur efficiency and increases power density on target. Malibu Research designed and built a flat parabolic surface (FLAPS™) as the primary aperture. The FLAPS™ surface is a Fresnel mirror constructed from an array of dipoles that achieves high gain with reduced mechanical tolerance

The antenna is mounted on an azimuth-elevation turret. Spatial stabilization allows antenna operation in buffeting winds. A boresighted low-light video camera and thermal imager are mounted on the antenna. The operator maneuvers the antenna with a joystick and depresses a trigger to fire the beam. Since the operator sees the target and surrounding area, he knows exactly what the beam will hit when he fires it. The atmosphere slightly absorbs the millimeter-wave beam and heavy rain can degrade performance. These effects are not considered important, however, since the operator must see the target to engage it.

Testing of the ADT demonstration system took place at Kirtland AFB, New Mexico. Figure 2 is a thermal image of a high-power beam of millimeter waves hitting two silhouette targets consistin of a microwave-absorbing material. The beam does not affect the nearby silhouette target. This test was the final phase of a Force Protection Battlelab demonstration. The exit criteria from the Battlelab demonstration that were met or exceeded included a characterization of peak power density on target at range, dwell time, and beam width. Earlier phases of the demonstration us modeling and simulation, and live force-on-force exercises to study the operational benefits of ADT. The Battlelab demonstration showed that ADT has significant operational potential.

Use of the demonstration system in a series of experiments will aid researchers in studying the repel effect on animals and people. The program will then transition to the Electronic Systems Center at Hanscom AFB, Massachusetts for development of a vehicle-mounted version of ADT (see Figure 3). The demonstrator will be used as a test bed and for additional effects studies.

2

In the final analysis, ADT is meant to save lives. Active denial is a revolutionary force protection technology that will help fill the US non-lethal capability gap. ADT systems will provide field commanders with a non-lethal force option in situations where the use of lethal force is authorized, but not preferred.

One of the attractive features of ADT is that the probability of hit is 100% since ballistics effects are irrelevant. The energy beam travels at the speed of light. As long as electricity is available, continuous or pulsed beam of energy can be projected. Operators can direct this beam toward individual targets, sweep it across many targets, dwell it to suppress snipers, or create an energy barrier. The range of ADT considerably exceeds the range of conventional non-lethal technologie and is meant to outrange small arms fire. Possible applications of ADT are airborne, maritime, fixed site, or man-portable. Researchers are studying all applications for their operational benef and technical feasibility.



**Figure 1. ADT field demonstration system**



**Figure 2. Infrared image of silhouette targets**



**Figure 3. Vehicle-mounted ADT concept**

*Dr. Kirk E. Hackett of the* <u>Air Force Research Laboratory's</u> Directed Energy Directorate *and Lt C*
*Charles W. Beason of the* <u>Human Effectiveness Directorate</u> *wrote this article. For more*
*information contact TECH CONNECT at (800) 203-6451 or place a request at*
http://www.afrl.af.mil/techconn/index.htm. *Reference document DE-01-01.*

DISTRIBUTION A
PUBLIC RELEASE
HOME | ABOUT AFRL | CONTACT US | DISCLAIMER
The information within this website is hosted by ABP International



\* INCLUDED TO SHOW WHAT "AFRLHORIZONS.com" IS AND HOW IT RELATES TO THE PREVIOUS 4 PAGE ARTICLE, EXHIBIT ~~PREE~~ ~~H~~ ⁴ᵗ ⁱˡ

\*



# Air Force Research Laboratory

## T E C H N O L O G Y
# HORIZONS®

### R E S E A R C H   F O R   A M E R I C A ' S   F U T U R E

Disclaimer
Cleared for Public Release - Distribution is Unlimited

## Features

LOCAAS™ Flight Test

Active Vision to Control Agile Maneuvering Air Vehicles

VECTOR

AFRL Demonstrates HURT Technology

Radar Direction-Finding Technique Using Spiral Antennas

Students Celebrate Projects' Return From Space

## Departments

Air Force Research Laboratory -Who We Are and What We Do

Transitions

## Resources

**Technical Articles**
the latest innovations in electronics, computing, materials, manufacturing, and more.

**Technical Support Packages**
detailed descriptions of the technologies summarized in AFRL Horizons.

**Embedded Technology**
This supplement presents articles and product briefs on embedded systems and commercial off-the-shelf (COTS) solutions for a variety of applications including military, homeland defense, and aerospace.

**Job Network**
**New!** Enhance your career on our new defense, aerospace and homeland security job board network.

**Subscribe**
start or renew your subscription to Technology Horizons magazine and e-mail newsletters.

**Get More Information...FAST**
about products and companies featured in

ads and articles.

**Advertise**
learn how *AFRL Technology Horizons'*

AFRL Search:

Search
Search help

Now you can get a fully searchable PDF version of NASA Tech Briefs with live hot links. Click here for a free sample.

Spin-Offs

Commercial
Technology Team

Commercialization
Opportunities

Facility

Available Literature

Air Force Small
Business Impact

In the Know

Headliner

Air Force Leadership

Patents

AFRL and Air Force
Battlelabs

Support to The
Warfighter

Showcase

Did You Know?

marketing tools can help build your
business.

# **Connections**

**AFRL Homepage**

**Tech Connect**
an AFRL Technology Clearinghouse

**NASA Tech Briefs**
Engineering Solutions for Design &
Manufacturing

DISTRIBUTION A
PUBLIC RELEASE
HOME | ABOUT AFRL | CONTACT US | DISCLAIMER
The information within this website is hosted by ABP International

EXHIBIT "G"

# Thermography

From Wikipedia, the free encyclopedia
(Redirected from Thermal imaging)

**Thermography** can refer to a printing process and an imaging process. A **thermogram** is an image produced by thermography.

## Contents

- 1 Thermographic Imaging
- 2 Thermographic Printing
- 3 See also
- 4 External links

## Thermographic Imaging

**Thermography**, or **thermal imaging**, is a type of infrared imaging. Thermographic cameras detect radiation in the infrared range of the electromagnetic spectrum (roughly 900–14,000 nanometer or 0.9–14μm) and produce images of that radiation. Since infrared radiation is emitted by all objects based on their temperature, according to the black body radiation law, thermography makes it possible to "see" one's environment with or without visible illumination. The amount of radiation emitted by an object increases with temperature, therefore thermography allows one to see variations in temperature, hence the name. With a thermographic camera warm objects stand out



Image of a small dog taken in mid-infrared ("thermal") light (false color)

well against cooler backgrounds. Humans and other warm-blooded animals become easily visible against the environment day or night, hence historically its extensive use can be ascribed to military and security services.



Thermographic image of a snake



Thermographic image of two ostriches



Thermographic image of a tarantula



Thermographic image of a lion

Case 1:06-cv-02125-RWR     Document 47-2     Filed 05/02/2008     Page 36 of 108

Thermal imaging photography finds many other uses. For example, firefighters use it to see through smoke, find persons, and localize hotspots of fires. With thermal imaging, power lines maintenance technicians locate overheating joints and parts, a telltale sign of their failure, to eliminate potential hazards. Where thermal insulation becomes faulty, building construction technicians can see heat leaks to improve the efficiencies of cooling or heating air-conditioning. Thermal imaging cameras are also installed in some luxury cars to aid the driver, the first being the 2000 Cadillac DeVille. Some physiological activities, particularly responses, in human beings and other warm-blooded animals can also be monitored with thermographic imaging. [1] (http://www.sadcom.com/night/night1.htm)

The appearance and operation of a modern thermographic camera is often similar to a camcorder. Enabling the user to see in the infrared spectrum is a function so useful that ability to record their output is often optional. A recording module is therefore not always built-in.

Instead of CCD sensors, most thermal imaging cameras use CMOS Focal Plane Array FPA. The most common types are InSb, InGaAs, QWIP FPA. The newest technologies are using low cost and uncooled microbolometers FPA sensors. Their resolution is considerably lower than of optical cameras, mostly 160x120 or 320x240 pixels, up to 640x512 for the the most expensive models. Thermographic cameras are much more expensive than their visible-spectrum counterparts, and higher-end models are often export-restricted. Older bolometers or more sensitive models as InSB require cryogenic cooling, usually by a miniature Stirling cycle refrigerator or liquid nitrogen.

**See also:** infrared camera, infrared detector

# Thermographic Printing

Thermographic printing refers to two types of printing, both of which rely on heat to create the letters or images on a sheet of paper.

The simplest type is where the paper has been coated with a material that changes colour on heating. This is called thermal printing and was used in older model fax machines and is used in most shop till receipt printers. This is called direct thermal.

More complex is thermographic printing that melts print off a ribbon and onto the sheet of paper (thermal ink transfer printing). This is called thermal transfer.

Thermography printing is also a post print process done inline with the printing. Thermography powder is sprayed on a sheet of paper after it leaves an offset printing press. It is then vacumed off of the sheet. The powder is left only where there was an image, or printed ink. The sheet then travels through a heat tunnel; there the heat causes the powder to melt and leave behind a raised image like on business cards, or envelopes.

# See also

- Infrared camera
- Infrared thermometer

# External links

- UK Thermography Association (http://www.ukta.org/)
- Mid-infrared Network



Wikimedia Commons has media related to:
*Thermography*

(http://www.lancs.ac.uk/users/spc/mirnet/keywords/thermogr.htm)
- physical basics (http://www.infratec.de/en/infratec/submenu/theory/basics.html)

Case 1:06-cv-02125-RWR    Document 47-2    Filed 05/02/2008    Page 37 of 108

Retrieved from "http://en.wikipedia.org/wiki/Thermography"

Categories: Thermodynamics | Measurement | Infrared imaging

- This page was last modified 12:18, 7 September 2006.
- All text is available under the terms of the GNU Free Documentation License. (See **Copyrights** for details.)
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc.

EXHIBIT "H"



Millimetrix's imaging
device can easily
see if you have
anything to hide.

# The All-Seeing
# EM Wave

by Charles Overbeck
Matrix Editor
EASTERISLE@parascope.com

There's a new weapon in the arsenal of those who believe safety is more
important than freedom.

The Associated Press reported recently that Millimetrix Corp. has developed a
device called the "Passive Millimetre Wave Imager." The device uses
electromagnetic waves emitted by human flesh to detect concealed weapons,
plastic explosives or drugs underneath a citizen's clothing. These materials
block waves emitted by a human body, enabling police to "see" weapons or
banned materials.

National Institute of Justice awarded $2.1 million in 1995 to three companies to
develop weapon detectors for airports, stores and public buildings. The Clinton
Administration has spent millions to adapt technology which was originally
developed for military use and apply it to "anti-terrorism" countermeasures in
the civilian world. The Passive Millimetre Wave Imager is one high-tech result
of that funding.

The larger version of the device, about the size of a shoebox, can be mounted on
a patrol car, displaying the image on a monitor inside the vehicle. The smaller,
battery-operated version is hand-held, like a radar gun.

Plans to test the device on the streets are in full swing, despite the serious
Constitutional issues of illegal search and seizure. Police must have reasonable
suspicion to justify frisking a subject; the Millimetrix device is designed for
efficient mass surveillance. A police officer can aim the hand-held unit into a

crowd up to 90 feet away.

The device can even be used outside a room to scan individuals inside. But don't worry -- Millimetrix points out that although the imager can see through clothing, it still leaves citizens "some privacy" and "does not reveal intimate anatomical details of the person."

Gee, thanks. Personally, I'd prefer to walk around buck naked with my rights intact, but Americans in general seem more concerned about the possible threat of terrorism than the very real threat to their Constitutional rights. In a poll conducted by the *Los Angeles Times* in August, 58 percent of those surveyed said they would curtail some "civil liberties" if it would help thwart terrorists. Thirteen percent said "it would depend on what rights were at stake."

The obvious problem here is that neither the Associated Press, the *Los Angeles Times*, Millimetrix Corp. nor the National Institute of Justice seems to understand the difference between a civil liberty and a civil right, and that one's Fourth Amendment rights are inalienable. And the idea of letting police use a device which can literally see you naked -- even if your "anatomical details" are not fully displayed -- is indicative of the totalitarian "end justifies means" mindset that is guiding America's law enforcement apparatus.

Sources: Associated Press wire reports.

[x] Virtual Prisons and Satellite Wardens

[x] The Mark of the Beast: A Technological Reality?

[x] What do you think? Tell us in the message boards!

[x] Navigation Bar

EXHIBIT "I"

1  McGREGOR W. SCOTT
   United States Attorney
2  PHILIP A. FERRARI
   Assistant U.S. Attorney
3  501 I Street, Suite 10-100
   Sacramento, California 95814
4  Telephone: (916) 554-2744

5

6

7

8              IN THE UNITED STATES DISTRICT COURT FOR THE

9                     EASTERN DISTRICT OF CALIFORNIA

10

11 UNITED STATES OF AMERICA,        )
                                     )
12          Plaintiff,               )  CR.S-03-060 WBS
                                     )
13                                   )  DECLARATION OF DONALD P.
                                     )  ZIMMERMAN, DEPUTY ASSISTANT
14 DONALD M. FRIEDMAN,              )  DIRECTOR, OFFICE OF
                                     )  INVESTIGATIONS, USSS
15          Defendant.               )
                                     )  18 U.S.C. § 1746
16 ─────────────────────────────    )

17                          DECLARATION

18     I, Donald P. Zimmerman, hereby declare and state the

19 following:

20     1.      I am the Deputy Assistant Director, Office of

21 Investigations, United States Secret Service, Department of

22 Homeland Security (hereinafter "Secret Service"). I have held

23 this position since December, 2002. I have been a Special

24 Agent with the Secret Service since May, 1983.

25                               1

26

**ORIGINAL FILED**

**JUL 2 2 2003**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

2.    In my capacity as Deputy Assistant Director I am
charged with the supervision of the Secret Service's major
field offices, including the San Francisco Field Office.
Additionally, I have oversight of the investigative techniques
and equipment utilized by the Secret Service in fulfilling its
investigative mission.  Finally, I am familiar with the
investigative techniques and equipment utilized by the Secret
Service since 1983.

3.    According to Secret Service records, more than one
individual served as the Special Agent In Charge of the San
Francisco Field Office during the period of January, 1996
through May, 2000.

4.    At my direction, the appropriate Secret Service
records were reviewed for information pertaining to:  (1) any
investigative technique or equipment utilized by the Secret
Service to transmit electromagnetic radiation to control any
individual; and (2) any investigative technique or equipment
utilized by the Secret Service to transmit anonymous spoken
messages to any individual.  This search revealed no records
indicating either the existence of any such investigative
techniques or equipment or their use against anyone, including
Donald M. Friedman.

2

1      5.     I have no personal knowledge of the use or existence

2 of any such investigative techniques or equipment.

3    / / /

4    / / /

5    / / /

6

7      6.     I declare under penalty of perjury, pursuant to 28

   U.S.C. S1746, that the foregoing statements are true and

8    correct to the best of my knowledge and belief.

9

10

11      Executed on July 21, 2003 at Washington, D.C.

12

13              BY: _____

14               DONALD P. ZIMMERMAN
              Deputy Assistant Director

15               Office of Investigations
              United States Secret Service

16

17

18

19

20

21

22

23

24

25                   3

26

## CERTIFICATE OF SERVICE BY MAIL

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Eastern District of California and is a person of such age and discretion to be competent to serve papers; that on July 22, 2003, she served a copy of the attached **DECLARATION OF DONALD P. ZIMMERMAN, DEPUTY ASSISTANT DIRECTOR, OFFICE OF INVESTIGATIONS, USSS** by placing said copy in a postpaid envelope addressed to the person(s) hereinafter named, at the place(s) and address(es) stated below, which is/are the last known address(es), and by depositing said envelope and its contents in the United States Mail at Sacramento, California.

**Served By US Mail:**                    **Served By Inter-Office Mail and Fax:**
Addressee(s):

Caro Marks, Esq.
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
FAX: 916-498-5710

GWEN LINCOLN
Legal Assistant

EXHIBIT "J"

Case 1:06-cv-02125-RWR    Document 47    Filed 05/02/2008    Page 47 of 138



The Sacramento Bee

This story is taken from Metro/Regional News at sacbee.com.

# Invisible beam tops list of nonlethal weapons

## By Greg Gordon -- Bee Washington Bureau
## Published 2:15 am PDT Tuesday, June 1, 2004

WASHINGTON - Test subjects can't see the invisible beam from the Pentagon's new, Star Trek-like weapon, but no one has withstood the pain it produces for more than three seconds.

People who volunteered to stand in front of the directed energy beam say they felt as if they were on fire. When they stepped aside, the pain disappeared instantly.

The long-range column of millimeter-wave energy is known as the "Active Denial System" for its ability to prevent an aggressor from advancing. Senior military officials, who plan to deliver the device for troop evaluation this fall, say years of testing has produced no sign it will lead to health effects beyond perhaps causing skin to temporarily redden.

It is among the most potent of a new generation of futuristic, "less-than-lethal" weapons being developed by the Defense Department - tools that could dramatically alter the way police control riots and soldiers fight wars.

Other nonlethal devices undergoing tests include "superlubricants" that could make a road or runway too slippery for car or airplane tires to gain traction; directed sound waves to drive people away from an area; and nets able to stop cars.

Marine Col. David Karcher, who heads the Pentagon's Joint Non-Lethal Weapons Directorate, says the energy beam is aimed at helping troops and police in confusing situations by offering options "between bullets and a bullhorn."

Marine Capt. Dan McSweeney, a spokesman for the Non-Lethal Weapons Directorate, pointed to "instances in Iraq where crowd situations have unfortunately ended in violence" and death.

Karcher and other military officials are trying to alleviate fears that the device might be misused to harm civilians or converted into a torture machine that leaves no marks.

In an attempt to anticipate how the world would greet the new weapon, the Air Force this month asked social science graduate students at the University of Minnesota and other colleges for help.

Researchers were offered $12,000 to spend the summer reviewing literature and assessing how Americans and other cultures might react to its use.

In the solicitation, Maj. Jonathan Drummond of the Air Force's Directed Energy Bioeffects Division noted that the Active Denial System could provide U.S. forces "with a nonlethal capability in military operations other than war." Among possible uses, he listed peacekeeping, humanitarian operations and crowd control.

Introduction of such a device in either noncombat or wartime situations could raise thorny questions: Would it be acceptable to inflict so much pain on unruly protesters? How would such a weapon be viewed if used on crowds in Third World countries? Would it violate international humanitarian principles if used in battle? Might it be used secretly during interrogations to torture suspected terrorists into cooperating?

Karcher said the Active Denial System "is absolutely not designed or intended or built" to be a torture device.

"To use this as any sort of torture device would be in direct violation of" the Pentagon's definition of nonlethal weapons, he said. "Nor, as professionals, would any of us sign up for it."

But in an era of secret interrogations of al-Qaida suspects and revelations of U.S. abuse of prisoners at Iraq's Abu Ghraib prison, Executive Director Doug Johnson of the Minneapolis-based Center for Torture Victims is skeptical.

"It seems fundamentally a weapon that's designed to create a great deal of pain and fear," Johnson said. "The concern I would have is ... once this kind of technology is available and there's a perception that it's safe and nonlethal, it seems like a natural device to be used in interrogations.

"Is it torture if it only creates a sensation of pain, but leaves no marks and no long-term damage? I would say yes. Torture is primarily a psychological device, and finding different ways to use the body against the mind has been the struggle of torture technologies for thousands of years."

He said "human history would demonstrate" that once a potential torture technology is available, it usually is put into action.

Karcher and other military officials stressed that the device has received interim approvals from international treaty conventions, has twice passed Pentagon legal reviews and will be subject to clear rules of engagement.

Eleven years in the making at a cost of more than $50 million, the Active Denial System is still years from deployment. It weighs about 4 tons and consists largely of a big dish and antenna that are mounted on a Humvee multipurpose vehicle.

But researchers are hoping to miniaturize it, Karcher said. Air Force officials want to work with the prime contractor, the Raytheon Corp., to design a version that could be mounted on a military transport plane so its beam could cut a broader swath on a battlefield.

Once an operator has aimed the antenna using a scope, the press of a button sends out a column of millimeter-wave, electromagnetic energy at the speed of light. Pentagon officials say that the weapon's exact reach and its column size are classified, but that it can extend beyond the 550-meter effective range of bullets. Its intensity is the same at any distance.

Susan Levine, the Pentagon's project manager for the energy beam, said years of tests on

humans and animals enabled researchers to establish a margin of safety. After several seconds, the device automatically shuts off to avoid burning its target, she said.

When the beam hits an individual, it penetrates 1/64th of an inch beneath the skin and heats water molecules to 130 degrees in less than a second.

"It tricks the pain sensors into thinking they're on fire," said Rich Garcia, a spokesman for the Air Force Research Laboratory at Kirtland Air Force Base in Albuquerque, N.M.

Garcia knows firsthand. He was among hundreds of test volunteers, standing in a doorway with his back facing the device.

"They did a full body back shot," he said. "It hit in the small of my back first. For the first millisecond, it just felt like the skin was warming up. Then it got warmer and warmer and you felt like it was on fire."

He said he lunged out of the doorway.

"As soon as you're away from that beam your skin returns to normal and there is no pain," Garcia said. "I thought to myself, 'Why you wimp. You know it's not causing any damage. You'll be able to override it.' Each of the next three times, I was on there a little bit longer.

"The fourth one was the longest. It was about two seconds. It felt like my hair was on fire."

The beam easily penetrates clothing, he said, because clothes are porous, though a thin suit of armor would block it.

### About the Writer
----------------------------

The Bee's Greg Gordon can be reached at (202) 383-0005 or ggordon@mcclatchydc.com.

  Go to: Sacbee / Back to story

This article is protected by copyright and should not be printed or distributed for anything except personal use.
The Sacramento Bee, 2100 Q St., P.O. Box 15779, Sacramento, CA 95852
Phone: (916) 321-1000

Copyright © The Sacramento Bee, (916) 321-1000

EXHIBIT "K"



**DEPARTMENT OF THE ARMY**
UNITED STATES ARMY INTELLIGENCE AND SECURITY COMMAND
FREEDOM OF INFORMATION/PRIVACY OFFICE
FORT GEORGE G. MEADE, MARYLAND 20755-5995

REPLY TO
ATTENTION OF:

DEC 1 3 2006

Freedom of Information/
Privacy Office

Mr. Donald Friedman
Confidential Legal Correspondence
1125 Third Street
Napa, California  94559-3015

Dear Mr. Friedman:

    References:

    a.  Your Freedom of Information Act (FOIA) request dated May 25, 2006, to the Department of the Army, Freedom of Information/Privacy Act Division (DA FOIA/PA DIV), for all documents pertaining to the microwave auditory effect, microwave hearing effect, Frey effect, artificial telepathy, and/or any device/weapon which uses and/or causes such effect; and any covert or undisclosed use of hypnosis.  On September 5, 2006, the DA FOIA/PA DIV referred a copy of your request to this office.  Your request was received on September 11, 2006.

    b.  Our letter of September 13, 2006, informing you of the search for records at another element of our command and were unable to comply with the 20-day statutory time limit in processing your request.

    As noted in our letter, the search has been completed with another element of this command and the record has been returned to this office for our review and direct response to you.

    We have completed a mandatory declassification review in accordance with Executive Order (EO) 12958, as amended.  As a result of this review, it has been determined that the Army information no longer warrants security classification protection and is releasable to you.  A copy of the record is enclosed for your use.

    Fees for processing your request are waived.

-2-

If you have any questions concerning this action, please feel free to contact this office at (301) 677-2308. Refer to case #614F-06.

Sincerely,

Susan J. Butterfield
Director
Freedom of Information/Privacy Office
Investigative Records Repository

Enclosure

SECRET
NOFORN 

# Bioeffects of Selected Nonlethal Weapons(fn 1)

This addendum to the Nonlethal Technologies--Worldwide (NGIC-1147-101-98) study addresses in summary, some of the most often asked questions of nonlethal weapons technology, the physiological responses observed in clinical settings of the biophysical coupling and susceptibility of personnel to nonlethal effects weapons. These results identify and validate some aspects of maturing nonlethal technologies that may likely be encountered or used as nonlethal effectors in the future including:

- Laser and other light phenomena.
- Radiofrequency directed energy.
- Aural bioeffects.

The study of electromagnetic fields and their influence on biological systems is increasing rapidly. Much of this work is taking place because of health concerns. For example, increased concern has arisen regarding the effects of operator exposure to the electromagnetic fields associated with short-wave diathermy devices, high power microwave ovens, radar systems, magnetic resonance imaging units, etc. In addition, much concern has arisen about extremely low frequency (60 Hz power frequency) electric and magnetic fields that originate from high-voltage transmission lines, industrial equipment, and residential appliances. Both occupational and residential long-term exposure have been the focus of epidemiological studies. The studies have suggested possible adverse effects on human health (e.g., cancer, reproduction, etc.). Laboratory research is still being pursued to identify possible mechanisms of interaction. However, other than thermal heating for microwave frequencies, there is no yet agreed-upon mechanism of action. As a consequence, our knowledge base is developed entirely with phenomenological observations. Because of this fact, it is not possible to predict how nonthermal biological effects may differ from one exposure modality to another. It is especially difficult, because of the small data base for fast pulses, to predict biological effects that might be associated with high-power pulses of extremely short duration.

There is, however, a growing perception that microwave irradiation and exposure to low frequency fields can be involved in a wide range of biological interactions. Some investigators are even beginning to describe similarities between microwave irradiation and drugs regarding their effects on biological systems. For example, some suggest that power density and specific absorption rate of microwave irradiation may be thought of as analogous to the concentration of the injection solution and the dosage of drug

REGRADED UNCLASSIFIED per
ON 6 Dec 06
BY USAINSCOM FOI/PA
Auth Para 4-102 DOD 5200.1R

administration, respectively. Clearly, the effects of microwaves on brain tissue, chemistry, and functions are complex and selective. Observations of body weight and behavior revealed that rats, exposed under certain conditions to microwaves, eat and drink less, have smaller body weight as a result of nonspecific stress mediated through the central nervous system and have decreased motor activity. It has been found that exposure of the animals to one modality of radiofrequency electromagnetic energy substantially decreases aggressive behavior during exposure. However, the opposite effects of microwaves, in increasing the mobility and aggression of animals, has also been shown for a different exposure modality. Recent published data implicates microwaves as a factor related to a deficit in spatial memory function. A similar type of effect was observed with exposure to a "resonance tuned" extremely low frequency magnetic field. Thus, the data base is replete with phenomenological observations of biological systems "affected" by exposure to electromagnetic energy. (The fact that a biological system responds to an external influence does not automatically nor easily translate to the suggestion of adverse influence on health.) The objective of the present study was to identify information from this developing understanding of electomagnetic effects on animal systems that could be coupled with human biological susceptibilities. Situations where the intersection of these two domains coexist provide possibilities for use in nonlethal applications.

## Incapacitating Effect: Microwave Heating

Body heating to mimic a fever is the nature of the RF incapacitation. The objective is to provide heating in a very controlled way so that the body receives nearly uniform heating and no organs are damaged. Core temperatures approximately 41° C are considered to be adequate. At such temperature a considerably changed demeanor will take place with the individual. Most people, under fever conditions, become much less aggressive; some people may become more irritable. The subjective sensations produced by this buildup of heat are far more unpleasant than those accompanying fever. In hyperthermia all the effector processes are strained to the utmost, whereas in fever they are not. It is also possible that microwave hyperthermia (even with only a 1° C increase in brain temperature) may disrupt working memory, thus resulting in disorientation.

## Biological Target/Normal Functions/Disease State

The temperature of warm-blooded (homeothermic) animals like the human remains practically unchanged although the surrounding temperature may vary considerably. The normal human body temperature recorded from the mouth is usually given as 37° C, with the rectal temperature one degree higher. Variation between individuals is typically between 35.8° C and 37.8° C orally. Variations also occur in any one individual throughout the day--a difference of 1.0° C or even 2.0° C occurring between the maximum in the late afternoon or early evening, and the minimum between 3 and 5 o'clock in the morning. Strenuous muscular exercise causes a temporary rise in body temperature that is proportional to the severity of the exercise; the level may go as high as 40.0° C.

2

Extreme heat stress, such that the body's capacity for heat loss is exceeded, causes a pathological increase in the temperature of the body. The subjective sensations produced by this buildup of heat are far more unpleasant than those accompanying fever. In hyperthermia all the effector processes are strained to the utmost, whereas in fevers they are not. The limiting temperature for survival, however, is the same in both cases--a body temperature of 42° C. For brief periods, people have been known to survive temperatures as high as 43 ° C.

In prolonged hyperthermia, with temperatures over 40° C to 41° C, the brain suffers severe damage that usually leads to death. Periods of hyperthermia are accompanied by cerebral edema that damage neurons, and the victim exhibits disorientation, delirium, and convulsions. This syndrome is popularly referred to as sunstroke, or heatstroke, depending on the circumstances. When the hyperthermia is prolonged, brain damage interferes with the central thermoregulatory mechanisms. In particular, sweat secretion ceases, so that the condition is further exacerbated.

**Mechanism to Produce the Desired Effects**

This concept builds on about 40 years of experience with the heating effects of microwaves. Numerous studies have been performed on animals to identify characteristics of importance to the understanding of energy deposition in animals. As a result of the physics, the relationship between the size of the animal and the wavelength of the radiofrequency energy is most important. In fact, the human exposure guidelines to radiofrequency radiation are designed around knowledge of the differential absorption as a function of frequency and body size. The challenge is to minimize the time to effect while causing no permanent injury to any organ or the total body and to optimize the equipment function. The orientation of the incident energy with respect to the orientation of the animal is also important.

In a study of the effect of RF radiation on body temperature in the Rhesus monkey, a frequency (225 MHz) is purposely chosen that deposits energy deep within the body of the animal. A dose rate of 10 W/kg caused the body temperature to increase to 42° C in a short time (10-15 min). To avoid irreversible adverse effects, the exposure was terminated when a temperature of 42° C was reached. A lower dose rate of 5 W/kg caused the temperature to increase to 41.5° C in less than 2 hours. The reversible nature of this response was demonstrated by the rapid drop in body temperature when RF exposure was terminated before a critical temperature of 42° C was reached. It is estimated for rats that the absorbed threshold convulsive dose lies between 22 and 35 J/g for exposure durations from less than a second to 15 minutes. For 30-minute exposure, the absorbed threshold dose for decrease in endurance is near 20 J/g, the threshold for work stoppage approximately 9 J/g, and the threshold for work perturbation ranges from 5 to 7 J/g. All of the above measures, except convulsions, are types of nonlethal incapacition.

A rough estimate of the power required to heat a human for this technology is on the order of 10 W/kg given about 15 to 30 minutes of target activation. Actual power levels

depend on climatic factors, clothing, and other considerations that affect the heat loss from the individual concerned. A method for expressing dose rate in terms of body surface area (i.e., watts per square meter) rather than body mass (i.e., watts per kilogram) would permit a more reliable prediction of thermal effects across species. However, there are large uncertainties in the ability to extrapolate thermoregulatory effects in laboratory animals to those in human beings.

This technology is an adaptation of technology which has been around for many years. It is well known that microwaves can be used to heat objects. Not only is microwave technology used to cook foods, but it is also used as a directed source of heating in many industrial applications. It was even the subject of the "Pound Proposal" a few years ago in which the idea was to provide residential heating to people, not living space. Because of the apparently safe nature of body heating using microwave techniques, a variety of innovative uses of EM energy for human applications are being explored. The nonlethal application would embody a highly sophisticated microwave assembly that can be used to project microwaves in order to provide a controlled heating of persons. This controlled heating will raise the core temperature of the individuals to a predetermined level to mimic a high fever with the intent of gaining a psychological/capability edge on the enemy, while not inflicting deadly force. The concept of heating is straightforward; the challenge is to identify and produce the correct mix of frequencies and power levels needed to do the remote heating while not injuring specific organs in the individuals illuminated by the beam.

A variety of factors contribute to the attractiveness of this nonlethal technology. First, it is based on a well-known effect, heating. Every human is subject to the effects of heating; therefore, it would have a predictability rating of 100%. The time to onset can probably be engineered to between 15 and 30 minutes; however, timing is the subject of additional research to maximize heating while minimizing adverse effects of localized heating. The onset can be slow enough and/or of such frequency to be unrecognized by the person(s) being irradiated. Safety to innocents could be enhanced by the application and additional development of advanced sensor technologies. Incapacitation time could be extended to almost any desired period consistent with safety. (Given suitable R&D, temperature or other vital signs could be monitored remotely, and temperature could be maintained at a minimum effective point).

**Time to Onset**

The time to onset is a function of the power level being used. Carefully monitored uniform heating could probably take place in between 15 and 30 minutes. Time to onset could be reduced but with increased risk of adverse effects. Minimum time is dependent on the power level of the equipment and the efficiency of the aiming device.

**Duration of Effect**

Assuming that the heating is done carefully, reversal of elevated body temperature would begin as soon as the source of heat is removed.

## Tunability

This concept is tunable in that any rate of heating, up to the maximum capacity of the source, may be obtained. Thus it is suitable for use in a gradual force or "rheostatic" approach. If the situation allows, and the source is sufficiently powerful, there is the possibility to use this technology in a lethal mode as well. Prolonged body temperature above 43° C is almost certain to result in permanent damage to the brain and death.

## Distribution of Human Sensitivities to Desired Effects

No reason has been identified to suggest that anyone would be immune to this technology. Individuals with compromised thermoregulatory mechanisms would be susceptible with a lower incident energy density. This would include people with organic damage to the hypothalamus, the part of the brain that integrates the autonomic mechanisms which control heat loss as well as people with compromised somatic features of heat loss (e.g., respiration, water balance, etc.).

The technologies needed for the thermal technology concept are relatively well developed because of the known biophysical mechanism, the universal susceptibility of humans to the mechanism of heating, and because of a well developed technology base for the production of radiofrequency radiation. Because the human body is inhomogeneous, certain organs are, by virtue of their size and geometry, more easily coupled with one radiofrequency wavelength than another. Therefore, to avoid permanent damage to the suspect or to innocent bystanders, it may be necessary to vary the frequency to avoid localized heating and consequent damage to any organ. Additionally, it will be necessary to avoid the conditions thought to be associated with the induction of cataracts. Thus, while the technology of microwave heating in general is mature, adaptation as a nonlethal technology will require sophisticated biophysical calculations to identify the proper regimen of microwave frequencies and intensities; it will also be necessary to optimize existing hardware to meet the biophysical requirements.

## Possible Influence on Subject(s)

If the technology functions approximately as envisioned, the targeted individual could be incapacitated within 15 to 30 minutes. Because this technology is focused on a relatively slow onset, it should only be used in situations where speed is not important. The very uncomfortable nature of a high body temperature may be useful in negotiations or possibly for controlling crowds. It would be equally useful on single persons or crowds. Evidence also indicates a disruption of working memory, thus disorientation may occur because of an inability to consolidate memory of the recent (minutes) past.

## Technological Status of Generator/Aiming Device

Equipment needed to explore this concept in the laboratory is available today. Design and construction of the RF/microwave generator will depend on the constraints posed by the calculations, potential generation devices, and energy-directing structures. A variety of

options exist for both of these equipment needs. The use of advanced frequency and modulation-agile RF generation and amplification circuitry will be required to assess fully the frequency/power/time envelope of RF heating profiles required. Although much equipment is commercially available, it is likely that custom hardware and software will be necessary because available equipment has not been designed with the need for frequency/intensity variability, which will probably be needed for safety purposes. In addition, the design of antennas and other energy-directing structures will almost certainly involve unique configurations. Since this technology utilizes radiofrequency energy, it can be defeated by the use of shielding provided by conductive barriers like metal or metal screen.

### Incapacitating Effect: Microwave Hearing

Microwave hearing is a phenomenon, described by human observers, as, the sensations of buzzing, ticking, hissing, or knocking sounds that originate within or immediately behind the head. There is no sound propagating through the air like normal sound. This technology in its crudest form could be used to distract individuals; if refined, it could also be used to communicate with hostages or hostage takers directly by Morse code or other message systems, possibly even by voice communication.

### Biological Target/Normal Functions/Disease State

This technology makes use of a phenomenon first described in the literature over 30 years ago. Different types of sounds were heard depending on the particulars of the pulse characteristics. Various experiments were performed on humans and laboratory animals exploring the origin of this phenomenon. At this time, virtually all investigators who have studied the phenomenon now accept thermoelastic expansion of the brain, the pressure wave of which is received and processed by the cochlear microphonic system, to be the mechanism of acoustic perception of short pulses of RF energy. One study (in 1975) using human volunteers, identified the threshold energy of microwave-auditory responses in humans as a function of pulse width for 2450 MHz radiofrequency energy. It is also found that about 40 $J/cm^2$ incident energy density per pulse was required.

### Mechanism to Produce the Desired Effects

After the phenomenon was discovered, several mechanisms were suggested to explain the hearing of pulsed RF fields. Thermoelastic expansion within the brain in response to RF pulses was first studied and demonstrated in inert materials and was proposed as the mechanism of hearing of pulsed RF fields. A pressure wave is generated in most solid and liquid materials by a pulse of RF energy--a pressure wave that is several orders of magnitude larger in amplitude than that resulting from radiation pressure or from electrostrictive forces. The characteristics of the field-induced cochlear microphonic in guinea pigs and cats, the relationship of pulse duration and threshold, physical measurements in water and in tissue-simulating materials, as well as numerous theoretical calculations--all point to thermoelastic expansion as the mechanism of the hearing phenomenon.

Scientists have determined the threshold energy level for human observers exposed to pulsed 2450-MHz fields (0.5-to 32 micron pulse widths). They found that, regardless of the peak of the power density and the pulse width, the per-pulse threshold for a normal subject is near 20 mJ/kg. The average elevation of brain temperature associated with a just-perceptible pulse was estimated to be about $5 \times 10^{-6\circ}$ C.

**Time to Onset**

The physical nature of this thermoelastic expansion dictates that the sounds are heard as the individual pulses are absorbed. Thus, the effect is immediate (within milliseconds). Humans have been exposed to RF energy that resulted in the production of sounds.

**Duration of Effect**

Microwave hearing lasts only as long as the exposure. There is no residual effect after cessation of RF energy.

**Tunability**

The phenomenon is tunable in that the characteristic sounds and intensities of those sounds depend on the characteristics of the RF energy as delivered. Because the frequency of the sound heard is dependent on the pulse characteristics of the RF energy, it seems possible that this technology could be developed to the point where words could be transmitted to be heard like the spoken word, except that it could only be heard within a person's head. In one experiment, communication of the words from one to ten using "speech modulated" microwave energy was successfully demonstrated. Microphones next to the person experiencing the voice could not pick up the sound. Additional development of this would open up a wide range of possibilities.

**Distribution of Human Sensitivities to Desired Effects**

Because the phenomenon acts directly on cochlear processes, the thermoelastic pressure waves produce sounds of varying frequency. Many of the tests run to evaluate the phenomenon produced sounds in the 5 kHz range and higher. Because humans are known to experience a wide range of hearing loss due to cochlear damage, it is possible that some people can hear RF induced sounds that others with high frequency hearing loss cannot. Thus, there is a likely range of sensitivity, primarily based on the type of pulse and the condition of the cochlea. Bilateral destruction of the cochlea has been demonstrated to abolish all RF-induced auditory stimuli.

**Recovery/Safety**

Humans have been subjected to this phenomenon for many years. The energy deposition required to produce this effect is so small that it is not considered hazardous experimentation when investigating responses at the just-perceptible levels.

7

**Possible Influence on Subject(s)**

Application of the microwave hearing technology could facilitate a private message transmission. It may be useful to provide a disruptive condition to a person not aware of the technology. Not only might it be disruptive to the sense of hearing, it could be psychologically devastating if one suddenly heard "voices within one's head."

**Technological Status of Generator/Aiming Device**

This technology requires no extrapolation to estimate its usefulness. Microwave energy can be applied at a distance, and the appropriate technology can be adapted from existing radar units. Aiming devices likewise are available but for special circumstances which require extreme specificity, there may be a need for additional development. Extreme directional specificity would be required to transmit a message to a single hostage surrounded by his captors. Signals can be transmitted long distances (hundreds of meters) using current technology. Longer distances and more sophisticated signal types will require more bulky equipment, but it seems possible to transmit some type of signals at closer ranges using man-portable equipment.

**Range**

The effective range could be hundreds of meters.

**Incapacitating Effect: Disruption of Neural Control**

The nature of the incapacitation is a rhythmic-activity synchronization of brain neurons that disrupts normal cortical control of the corticospinal and corticobulbar pathways, this disrupts normal functioning of the spinal motor neurons which control muscle contraction and body movements. Persons suffering from this condition lose voluntary control of their body. This synchronization may be accompanied by a sudden loss of consciousness and intense muscle spasms.

**Biological Target/Normal Functions/Disease State**

The normal function of the brain is to control all forms of behavior, voluntary control of body, and the homeostatic parameters of the organism. In normal conditions, all the brain structures, neuron populations, networks, and single units function with specific rhythmic activity depending on the incoming sensory information, information from mnemonic structures, and signals from visceral organs. Each single neuron provides specific processing of information it receives and forms a specific pattern of impulse firing as outgoing information. Synchronization of neuron activity is a natural mechanism of the brain function that uses such controlling processes as motivation, attention and memory (experience) in order to organize behavior. For example, motivational processes are considered as activating ascending signals that synchronize the neuron activity of specific brain structures and neuron networks; this activation/synchronization in turn activates specific forms of behavior such as sexual, aggressive, ingestive activities.

8

In normal functioning the degree of neuronal synchronization is highly controlled. From experiments that record the neuronal activity in different brain areas simultaneously in animals, it is known that correlation of spike activity between neurons (measured by the correlation level of synchronization) changes depending on the stage of behavior, motivation, attention, or activation of the memory processes. However, under some conditions, such as physical stress, heat shock, or strong emotional stress, the level of synchronization may become higher, involving nonspecific large populations of brain neurons and the synchronization may become uncontrollable.

Depending on at which frequency the synchronization rhythm occurs and how many neurons are involved, it may produce different physical effects; muscle weakness, involuntary muscle contractions, loss of consciousness, or intense (tonic) muscle spasms. The higher level of synchronization takes place in persons affected with epilepsy when they experience periodic seizures since they have a pathologic source (e.g., from injury to the brain) of rhythmic synchronization. Because the neurophysiological mechanisms of epileptiform synchronization are better documented, this incapacitating technology is described in terms of epileptogenesis.

The neurophysiological mechanisms active in epileptogenesis involve changes in membrane conductances and neurotransmitter alterations as they affect neuronal interaction. In the process of epileptogenesis, either some neurons are discharging too easily because of alterations in membrane conductances or there is a failure of inhibitory neurotransmission. The actual discharges have been recognized to result from a neuronal depolarization shift with electrical synchrony in cell populations related in part to changes in membrane conductances. The ionic basis and biochemical substrate of this activation have been areas of considerable study but still leave many questions unanswered. What are the basic cellular properties, present in normal cells and tissue, that could contribute to the generation of abnormal activity? What parts of the systems are low threshold and function as trigger elements?

One of the current hypotheses is involved with microcircuitry, particularly local synaptic interactions in neocortical and limbic system structures. In the hippocampus, the role of the trigger element has been long attributed to the CA3 pyramidal cells--a hypothesis based on the fact that spontaneous synchronous burst discharge can be established in CA3 neurons Some studies describe an intrinsically bursting cell type in the neocortex that plays a role similar to that of CA3 cells in the hippocampus and that of deep cells in the pyriform cortex. The intrinsic nature of these cells appears to be an important contributor to the establishment of synchronized bursting in these regions. Another apparent requirement in such a population is for a certain degree of synaptic interaction among neurons, such that discharge of even one cell enlists the activity of its neighbors. Given the presence of these bursting cells and the occurrence of excitatory interactions among them in normal tissue, it may actually be the morphologic substrate for epileptiform discharges.

Another hyptothesis has focused particularly on the role of N-methyl-D-aspartate (NMDA) receptors. Various factors regulate the efficacy of NMDA receptors: their

9

voltage-dependent blockade by magnesium and modulation by glycine and polyamines. For example, in the low magnesium model, spontaneous synchronous burst discharge in hippocampal pyramidal cell populations is sensitive to NMDA antagonists. That finding suggests that it is the opening of NMDA channels, by relieving the magnesium blockade, that facilitates epileptiform activity.

Significant attention in the literature is also being given to gamma-amino butyric acid (GABA) receptors for the potential role in control of excitability. Changes in GABA inhibitory efficacy can lead to important effects on the excitability of the system. GABAergic inhibitory post-synaptic potentials (IPSPs) have been shown to be quite labile in response to repetitive activation of cortical cell populations, as may occur during epileptiform discharge. Scientists have shown that even a small percentage change in GABA inhibition can have profound effects on neocortical epileptogenesis. These changes in GABAergic inhibition may be the key to an explanation of how repetitive discharge patterns give rise to ictal discharge. Further, there appears to be a significant increase in excitatory postsynaptic potential (EPSP) frequency prior to seizure initiation an observation that is consistent with loss of IPSP efficacy prior to ictal onset.

The above hypotheses describe different mechanisms of epileptogenesis, but it is quite possible that all of these mechanisms take place, and they reflect large variety of types of epileptic seizures. The common principle of the mechanisms proposed is the change of membrane properties (i.e., conductance, permeability etc.) of certain neurons which results in depolarization and burst discharging. Some factors (e.g., trauma) can affect these specific neurons and initiate synchrony for neurons that control internal communication and communication with various muscle systems not associated with vital functions (i.e., heart beating, breathing). High strength pulsed electric fields could also be such a factor.

## Mechanism to Reproduce the Desired Effects

Application of electromagnetic pulses is also a conceptual nonlethal technology that uses electromagnetic energy to induce neural synchrony and disruption of voluntary muscle control. The effectiveness of this concept has not been demonstrated. However, from past work in evaluating the potential for electromagnetic pulse generators to affect humans, it is estimated that sufficiently strong internal fields can be generated within the brain to trigger neurons. Estimates are that 50 to 100 kV/m free field of very sharp pulses (~ 1 nS) are required to produce a cell membranic potential of approximately 2 V; this would probably be sufficient to trigger neurons or make them more susceptible to firing.

The electromagnetic pulse concept is one in which a very fast (nanosecond timeframe) high voltage (approximately 100 kV/m or greater) electromagnetic pulse is repeated at the alpha brain wave frequency (about 15 Hz). It is known that a similar frequency of pulsing light can trigger sensitive individuals (those with some degree of light-sensitivity epilepsy) into a seizure and it is thought that by using a method that could actually trigger nerve synapses directly with an electrical field, essentially 100% of individuals would be susceptible to seizure induction. The photic-induced seizure phenomenon was borne out

IC

demonstrably on December 16, 1997 on Japanese television when hundreds of viewers of a popular cartoon show were treated, inadvertently, to photic seizure induction (figure 31). The photic-induced seizure is indirect in that the eye must receive and transmit the impulses which initially activate a portion of the brain associated with the optic nerve. From that point the excitability spreads to other portions of the brain. With the electromagnetic concept, excitation is directly on the brain, and all regions are excited concurrently. The onset of synchony and disruption of muscular control is anticipated to be nearly instantaneous. Recovery times are expected to be consistent with, or more rapid than, that which is observed in epileptic seizures.

## Time to Onset

No experimental evidence is available for this concept. However, light-induced seizures latency onset in photosensitive epileptics varies from 0.1 to about 10 seconds. Because of the fact that the electrical impulses triggered by light must spread to other parts of the brain, photic-induced seizures are expected to have a generally slower onset than neural synchrony induced by high-strength pulsed electric fields.

## Duration of Effect

For epileptic individuals, the typical duration of a petit mal event or a psychomotor event is 1 minute or 2, possibly longer, while the duration of a grand mal seizure is 1 to 5 minutes. In a non-epileptic individual who is induced by electromagnetic means, the durations of the different events are expected to be roughly the same as the epileptic individual's events after the external excitation is removed.

## Tunability

There are many degrees of epileptic seizure in diseased persons, and it seems reasonable that electromagnetic stimulation of neural synchrony might be tunable with regard to type and degree of bodily influence, depending on the parameters associated with the chosen stimulus. Because there are no actual data to build on, these statements must be considered tentative. It is known that in the study of photic-induced seizures, parameters can be varied so that the individual under study does not actually undergo a grand mal seizure. This knowledge gives confidence that the proposed technology would be tunable.

## Distribution of Human Sensitivities to Desired Effects

It is anticipated that 100% of the population would be susceptible. The mechanism is one that could act on many individual neuronal cells concurrently and hence does not depend on spreading regions of electrical activity as in the disease state.

## Possible Influence on Subjects(s)

If the technology functions approximately as envisioned, the targeted individual could be incapacitated very quickly. Because there have been no reported studies using the

conditions specified, experimental work is required to characterize onset time. Different types of technologies could be employed to influence wide areas or single individuals. Because this technology is considered to be tunable, the influence on subjects could vary from mild disruption of concentration to muscle spasms and loss of consciousness. The subject(s) would have varying degrees of voluntary control depending on the chosen degree of incapacitation.

## Technological Status of Generator/Aiming Device

An electric field strength of roughly 100 Kv/m over a time period of 1 nanosecond is approximately the condition thought to be necessary to produce the desired effect when provided to an overall repetition rate of 15 Hz. Such a field may be developed using a radar-like, high-peak-power, pulsed source or an electromagnetic pulse generator operated at 15 Hz. These technologies exist today sufficient to evaluate the disabling concept. Power requirements are not high because the duty factor is so low. Aiming devices are currently available, but a high degree of directionality at long distances will require development. It may be necessary to provide bursts of these nanosecond pulses in order to stimulate the desired effect. As the duty time increases so does the average power requirement for power source. Because there were no open literature reports from which to make inferences, there is some uncertainty about the power levels required.

## Range

The effective range could be hundreds of meters.

## Defeat Capabilities/Limitations

Shielding can be provided by conductive barriers like metal or metal screen. There are a number of drugs that are capable of inducing convulsive seizures and others, like phenobarbital, diphenyllhydantoin, trimethadione, 2-4 dinitrophenol, and acetazolamide, which are anticonvulsive. Anticonvulsive drugs are known to be helpful in reducing the effect of seizures in epileptic patients, but their ability to reduce the effect of the proposed technology is unknown (possibly no effect) but expected to be less than for photic-induced seizures.

## Incapacitating Effect; Acoustic Energy

The nature of the incapacitation consists of severe pressure sensations, nystagmus (a spasmodic, involuntary motion of the eyes), and nausea caused by high intensities of 9140-155 dB). Nystagmus occurs when convection currents are produced (cupula movement) in the lateral ear canal. This cupula movement causes the eyes to move involuntarily; hence, the external world is interpreted as moving. The subject "sees" his surroundings turning round him and at the same time experiences a sensation of turning. Persons exposed to these levels of sound experience nausea.

## Biological Target/Normal Functions/Disease State

2

The two lateral semicircular canals, one located in each inner ear, alert a person to the fact that his upright head is experiencing angular acceleration. Within the ampulla of the canal are several so called hair cells. The cilia of these cells protrude into the lumen of the ampulla where they are encased in a mass of jelly-like material (the cupula) which is attached to the opposite wall of the canal. As the head accelerates, the cilia are bent by an inertial force of the cupula and the viscous liquid in the canal lumen. The bending of the cilia excites hair cells which in turn excite afferent neurons; these then alert the brain that a change of position of the head has occurred. Similar events occur when the head stops moving. The result of a strong hair cell stimulus to the brain is a rapid eye movement, call nystagmus, a feeling of dizziness and disorientation, and a possibility of nausea and vomiting.

Normal hearing is in the range between the frequencies of 20,000 to 16,000 Hz with the optimal sensitivity for most people between the frequencies of 500 to 6000 Hz.

## Mechanism to Produce the Desired Effects

Because the end organs for acoustic and vestibular perception are so closely related, intense acoustic stimulation can result in vestibular effects. The hypothesis is that the sound of normal intensity produces oscillations of the endolymph and perilymph, compensated for by oscillations of the round window. High intensity sound produces eddy currents, which are localized rotational fluid displacements. High intensity sound can also produce nonlinear displacement of the stapes, causing a volume displacement, the result of which can be a fluid void in the labyrinth. To fill the void, fluid may be displaced along the endolymphatic duct and/or block capillary pathways, which, in turn, could stimulate vestibular receptors. Stimulation of the vestibular receptors may lead to nausea and vomiting if the sound pressure level is high enough. Conclude that both eddy currents and volume displacement serve to stimulate vestibular receptors in humans, when exposed to high levels of noise.

One study found nystagmum in guinea pigs exposed to high levels of infrasound via stimulation of the vestibular receptors. However, the same lab was unable to produce nystagmus in human subjects at 5- and 10-second exposures to a pure tone at 135 dB, broadband engine noise, or a 100 Hz tone at 120 dB, pulsed three times/s or 2 minutes. The same research was unable to elicit nystagmus at levels up to 155 dB, and also equally unable to produce nystagmus using infrasound levels of 112-150 dB in guinea pigs, monkeys, and humans. However, research with audible components in the sound spectrum with guinea pigs and monkeys produced nystagmus. Other researchers report other vestibular effects in addition to nystagmus at the following thresholds: 125 dB from 200-500 Hz, 140 dB at 1000 Hz, and 155 dB at 200 Hz. Decrements in vestibular function occur consistently for broadband noise levels of 140 dB (with hearing protection).

Human subjects listened to very high levels of low-frequency noise and infrasound in the protected or unprotected modes. Two-minute duration as high as 140 to 155 dB produced a range of effects from mild discomfort to severe pressure sensations, nausea, gagging,

and giddiness. Effects also included blurred vision and visual field distortions in some exposure conditions. The nature and degree of all effects was dependent on both sound level and frequency with the most severe effects occurring in the audible frequency range (as opposed to infrasound), at levels above about 145 dB. The investigators found no temporary threshold shift (TTS) among their subjects, and the use of hearing protectors greatly alleviated the adverse effects.

Since the early days of jet-engine testing and maintenance, anecdotal evidence has appeared linking exposure to intense noise, with such complaints as dizziness, vertigo, nausea, and vomiting. As a result of siren noise at 140 dB, subjects consistently reported a feeling of being pushed sideways, usually away from the exposed ear, and one subject reported difficulty standing on one foot.

These effects were not as dramatic as from the jet-engine (broadband) noise at 140 dB. This research concludes that the threshold of labyrinthine dysfunction is about 135 to 140 dB and that these effects occur during, but not after, exposure.

**Time to Onset**

No times to onset of nausea or nystagmus were identified in the literature but is presumed to be relatively immediate based on effects to the labyrinth system occurring during, but not after, exposure to sound pressure levels of 135 to 140 dB.

**Duration of Effect**

The incapacitation lasts only as long as the incapacitating sound is present.

**Tunability**

Based on the data presented above, it is unclear whether the degree of nausea or nystagmus is tunable, but similar symptoms caused by other stimuli are variable in degree.

**Distribution of Human Sensitivities to Desired Effects**

It is most probable that all individuals will be susceptible to this stimulus with the exception of those with a disease or defect (i.e., deaf mutes) of some part or parts of the vestibular system. Data showed no consistent decrease in vestibulo-ocular reflects with increased age.

**Recovery/Safety**

Normal subjects are likely to recover immediately and experience no or unmeasurable changes in hearing unless well known frequency-intensity-time factors are exceeded. This is based on studies which found no temporary threshold shift in hearing of subjects tested at low frequency. Occupational safety personnel generally recognize that 115

14

dB(A) is to be avoided and that 70 dB(A) is assumed safe. Is believed that the noise energy with predominating frequencies above 500 Hz have a greater potential for hearing loss than noise energy at lower frequencies. Occupational standards for noise state that a person may be exposed continuously for 8 hours to 90 dB(A) or 15 minutes to 115 dB(A).

## Possible Influence on Subject(s)

Induction of nystagmus and nausea will have variable effects on individuals. Effects may be sufficiently incapacitation to allow offensive advantage; the perception of sickness may make a subject susceptible to persuasion. It would be difficult to target single individuals at the present level of sound directing technology. This technology may be better suited for groups of people.

## Technological Status of Generator/Aiming Device

Sound generating technology is well developed but not highly portable. Aiming devices are poorly developed.

## Range

Under normal circumstances the sound pressure level decreases 6 dB(A) when the distance from the source is doubled. For example if the sound is 100 dB(A) at 100 ft, at 200 ft the sound would be 94 dB(A). At very high sound levels, certain conditions may lead to nonlinear effects in propagation and greatly increase range accuracy.

## Defeat Capabilities/Limitations

Negative effects of audible sound are greatly decreased if hearing protection is worn. High frequency sound is more easily blocked than low frequency sound due to wavelength effects.

## Laser-Induced Biological Effects

Their are three basic damage mechanisms associated with exposure to laser radiation: chemical, thermal, and mechanical or acoustic-mechanical.

The laser-induced, chemical alterations in irradiated tissue are referred to as photochemical damage. The likelihood of laser radiation in the blue-light portion of the electromagnetic spectrum (.380 to .550 microns) inducing photochemical reactions progressively decreases with increasing wavelength. Photochemical effects are not observed upon exposure to radiation with wavelengths exceeding .550 to .650 microns because the kinetic energy associated with these photons is insufficient to initiate a photochemical change.

On the other hand, the thermal effect is a primary mechanism for laser-induced injury. The extent of the injuries induced depends upon the wavelength and energy of the incident radiation, duration of exposure, and the nature of the exposed tissue and its absorption characteristics. Generally, this mechanism predominates in the visible and the near-infrared (.760 to 1.4 microns) portions of the electromagnetic spectrum and for almost all CW and pulsed exposures between 0.1 milliseconds and 1 to 5 seconds.

The third injury mechanism associated with exposure to laser radiation is the mechanical or acoustical-mechanical effect. The radiant energy is absorbed into the tissue and, as a result of rapid thermal expansion following a short (1 nanosecond to 0.1 millisecond) laser radiation pulse, a pressure wave is generated that may result in explosive tissue injury.

Generally, all three mechanisms operate concurrently in an irradiated animal. Thermal effects currently predominate for continuous wave (CW) lasers, while mechanical effects are of increased significance for pulsed-mode lasers. With even higher power, one must also consider nonlinear phenomena such as multiphoton absorption and electromagnetic field effects.

The organs most susceptible to external laser radiation are the skin and eyes. The severity of injury is affected by the nature of the target, the energy density delivered to the target, the frequency and power of the laser, atmospheric attenuation of the beam, and the use of filtering or amplifying optics by the target, etc.

The primary effect on the skin is thermal damage (burns). The severity varies from slight erythema or reddening to severe blistering or charring, depending on such factors as total energy deposition, skin pigmentation, and the tissue's ability to dissipate heat.

The eye is particularly susceptible to intense pulse of laser radiation because of its unique sensitivity to light. The focusing effect is similar to that of a magnifying lens, which focuses the energy on a particular spot. Since the cornea and lens of the eye amplify the intensity of the light incident upon the retina, the retina is extremely sensitive to visible and near-infrared light, and damage to the retina may result in temporary or permanent loss of visual acuity. Laser eye injuries vary according to incident power, spot size, beam angle, temporal mode (CW or pulsed), and pulse repetition frequency. Reported effects include corneal lesions, burns, cataracts, and retinal lesions.

Some high-power lasers can cause antipersonnel effects by the deposition of thermal energy. These lasers must operate at a wavelength that is readily absorbed by the skin or the cornea. These generally include the far- and mid-IR regions (10 to 12 microns and 3 to 5 microns) as well as the ultraviolet region (<0.4 microns). However, ultraviolet wavelengths generally do not propagate well in the atmosphere, so the primary threat wavelengths to be considered are between 3 and 12 microns. Although relatively modest amounts of far-IR laser power are required to produce superficial burns on the skin at short ranges, and efforts to design rheostatically lethal laser weapons are on going.

16

Nonlethal blinding laser weapons generally use collimated beams with very low beam divergence, and the energy contained in the beam diminishes relatively slowly over great distances. Imaging systems such as eyes and EO vision systems have focusing optics that bring the incident plane wave of light to focus at the sensor plane. This results in a high optical gain (greater than 100,000 for eyes), which makes the associated sensor vulnerable to relatively low fluences of laser energy.

The effects of lasers on eyes are threefold:

- Dazzling or induced glare.
- Flashblinding or loss of night adaptation.
- Permanent or semipermanent blinding.

The severity of laser eye injuries varies according to the incident power, spot size, beam angle, pupil diameter (ambient light conditions), temporal mode (CW or pulsed), and PRF of the laser. Reported effects include corneal burns, cataracts (a permanent cloudiness of the lens), and retinal burns and perforations. Low-energy laser weapons are capable of causing the latter.

Exposure to relatively low laser energies can produce temporary changes in the ability to see without producing permanent injury. Exposure to laser light can produce an effect called glare or dazzle, which is similar to the temporary loss of vision experience when viewing the headlights of an oncoming car. The visual effects last only as long as the light is present in the field of view (FOV). At slightly higher energy exposures, the same laser radiation can saturate or flashblind the photoreceptor cells, resulting in after images that fade with time after exposure. Only visible radiation will induce veiling glare or after images; near-IR radiation will not produce these effects even though the radiant energy reaches the photoreceptor cells. Flashblindness and dazzle, while not permanent injuries, can cause discomfort and temporary loss of vision. Some studies have shown that dazzle and flashblindness can seriously impact mission performance, especially in highly visual tasks such as piloting an aircraft or aiming.

Blinding is the permanent or semipermanent loss of visual acuity. The effect can last from several hours onward and generally is evidenced by a dark spot in the field of vision. This spot is called a scotoma. The impact of the scotoma on visual acuity will vary with the size and position of the injury. Human vision is greatly affected when the laser damage is to the central vision area of the retina called the fovea. Nonfoveal laser damage may be less severe or even go unnoticed because it affects only the peripheral vision. The most serious retinal injuries occur when the incident light is so intense that a perforation in the retina is formed, resulting in a hemorrhage into either the subretinal layer or, in the most severe cases, the vitreous humor of the eye. Less severe exposures result in lesions on the retina.

*Footnote:*

1-(U) This appendix is classified FOR OFFICIAL USE ONLY in its entirety.

17

Information Cutoff Date: 17 February 1998

~~Derived from: Multiple Sources~~
~~Declassify on: Source marked "OADR"~~
~~Date of Source: 17 February 1998~~

REGRADED UNCLASSIFIED PER NGIC
ON 6 Dec 06
BY USAINSCOM FOI/PA
Auth Para 4-102 DOD 5200.1R

~~*SECRET*~~
~~*NOFORN*~~



EXHIBIT "L"

# SECRETS OF

## Pressures and problems confront the



# THE SERVICE

## police agency that protects the president



**Agents at New York's Kennedy Airport wait for President Bush.**

DAVID BURNETT—CONTACT

## By Chitra Ragavan and Christopher H. Schmitt

n Oct. 8, 1993, Secret Service Special Agent Kenneth Banner was working a fraud investigation in Los Angeles when he got a call from a female informant named Akilah Ife Hasan. She was a small-time crook with a long rap sheet, a modest talent for scams, and an unfortunate weakness for drugs. Hasan had some dirt on a case Banner was working, she said. Banner, a supervisor in the Secret Service's L.A. office, agreed to meet Hasan at a lounge called the Current Affair. One thing led to another, and the agent and informant wound up sharing drinks, then returning to Banner's Inglewood apartment for sex. Afterward, when Hasan didn't return from a visit to the bathroom, Banner went and found her on the floor, lifeless, according to a police report. He called paramedics, who transported Hasan's nude body to a local hospital. Hasan, 43, had died of a brain hemorrhage in Banner's apartment because of a "history of cocaine abuse," police and coroner's reports said. Police concluded there was no foul play. Banner, now a private investigator, acknowledged to *U.S. News* that an inci-

dent took place. But despite the official reports, he said, "No one died at my residence. That did not happen."

In Houston two years ago, Secret Service Agent Sonna Prince Young tapped an old school pal who worked in the Texas state attorney general's office to help her steal money from a federal welfare program meant to feed poor kids. Court documents show that Young was illegally approved for the food vouchers, even though her combined annual income with her husband was more than three times as high as the eligibility level. She pleaded guilty to one count in federal court and was put on probation, fined $250, and ordered to pay $288 in restitution. She left the service.

This February, a team of Secret Service agents assigned to Vice President Cheney's protective detail on a visit to the San Diego area finished their shift and decided to wind down at a local bar. The outing ended in a drunken brawl between four Secret Service agents and a horde of locals outside a lounge called the Daley Double. During the fracas—in which the agents were outnumbered 15 to four and had to flee on foot—one of Cheney's agents bit off the tip of one of the locals' ears. It was never recovered. Police were summoned to sort things out, and the officers filed a report listing the agents' address—1600 Pennsylvania Avenue, Washington, D.C.

For more than 137 years, the Secret Service has presented an image to the world of bravery, excellence, and patriotism. Few who saw it will ever forget Special Agent Timothy McCarthy taking a bullet, or Jerry Parr hurling his body on top of President Reagan, as John Hinckley emptied his .22-caliber revolver outside a Washington hotel two decades ago. Or Special Agent Rufus Youngblood covering Lyndon Johnson's body with his own after Lee Harvey Oswald opened fire with his Mannlicher-Carcano sniper rifle in Dealey Plaza in Dallas. Created in 1865 as a tiny Treasury Department agency to root out counterfeit-currency rings, the Secret Service was given the mission of protecting presidents more than 35 years later. Today, the Secret Service's protective mission extends to all retired presidents, the vice president, visiting heads of state, foreign missions, and a host of executive branch offices and residences. Just last week, President Bush proposed moving the Secret Service into a new cabinet-level Department of Homeland Security.



Over the years since the Secret Service assumed its protective duties, thousands of plainclothes agents and officers in the agency's Uniformed Division have proudly upheld its official motto, "Worthy of Trust and Confidence." In 1999, in a speech dedicating the Secret Service's new headquarters in Washington, where the motto is boldly emblazoned, President Clinton lauded the values the service embodies. "Regardless of the times or the tasks," said Clinton, "there has always been a thread of honor and integrity, trust, and true, confident performance."

But a *U.S. News* investigation shows that, at a time when the stakes for the Secret Service are higher than ever, the agency is rife with problems and resistant to oversight and correction. The troubles range from alcohol abuse and misuse of government property to criminal offenses and allegations of extramarital relationships by Secret Service personnel with White House employees. In response to questions from *U.S. News*, the Secret Service provided a detailed, four-page letter but declined to make senior managers, including Director Brian Stafford, available for interviews. "The Secret Service takes any



CHARLIE ARCHAMBAULT FOR USN&WR

allegations of breaches of professional conduct seriously and has a long history of addressing such issues," wrote Assistant Director Paul Irving, who heads the Office of Government and Public Affairs. Irving acknowledged that "without question," over the past 25 years, "we have had employees who have been involved in professional misconduct and in some cases, criminal behavior."

Such incidents, current and former Secret Service personnel say, are tarnishing the image of an agency long lionized as the elite of the elite. And they have led many agents to raise questions about their organization's ability to fulfill its unique mission: protecting America's leaders. In a move scarcely known outside the agency, the Secret Service has recently begun implementing a new "protective method-



"We are like a giant ship, teetering on toothpicks, waiting to collapse."
PLAINCLOTHES SECRET SERVICE AGENT



Members of the service's Counter Assault Team on the White House South Lawn

ology" that calls for using fewer agents and officers to cover "protectees." The plan is being viewed skeptically by some veteran agents and is at odds with the Secret Service's traditional strategy of "360-degree coverage." The agency declined to comment on any details regarding protection—citing security concerns. The change is being implemented at the same time the agency is taking on new duties by providing security at major events—more than a dozen since 1998—like the Super Bowl and the Winter Olympic Games in Salt Lake City. "Just as it has always done," Irving wrote, "the Secret Service is continuing its need for additional resources in the post-September 11th environment."

From its modest beginnings, the Secret Service today has grown into an $857 million annual operation, with a budget that has soared by 50 percent in the past five years. The Secret Service carries out its mission with a relatively small workforce, nearly 3,000 plainclothes agents and fewer than 1,000 Uniformed Division officers. The overworked and traditionally underappreciated officers are leaving in droves now, many

to join the new Transportation Security Administration, created after the September 11 attacks. The service has lost 130 uniformed officers to TSA since January, according to Irving, who attributes these losses to a higher pay rate. "A large number of retired Secret Service agents now work for the Transportation Security Administration," Irving wrote, "and have been recruiting from the ranks of our agency." He says the service is hoping to increase its pay scale to prevent further attrition but concedes that more departures are inevitable. Defections in the elite corps of White House countersnipers, who stand watch on the roof of the presidential mansion, and even by K-9 officers, are further testing the agency's limits, sources say. After the TSA was created in November, so many uniformed officers began applying for jobs online from White House computers that the Secret Service blocked access, allowing officers to view application forms but not complete them. Secret Service brass refused time off for some officers to go to TSA for job interviews, according to service insiders. So one night, frustrated TSA recruiters showed up at the Secret Service Uniformed Division guard booth at the northwest gate of the White House to speak with job candidates. In a servicewide E-mail dated May 24, provided to U.S. News, Secret Service Director Stafford acknowledged the "continuous loss of personnel" due to "enormous overtime burdens." Said Stafford: "I'm well aware that the attrition rate of the Uniformed Division is at a critical level."

The strains are manifest throughout the agency. The service has been forced to pull firearms instructors from its training academy and uniformed officers guarding foreign missions to work protective details, sources say. U.S. News has learned that plans are underway to post plainclothes agents in and around the White House, to replace departing uniformed officers. But plainclothes agents including experienced senior supervisors also are retiring—more than 60 since January alone. For the first time, young agents, too, are leaving in significant numbers. Internal statistics show that in all, nearly 85 agents have retired or quit and nearly 20 have transferred to other agencies since January. The attrition has caused alarm. "It's all smoke and mirrors," says a plainclothes agent. "We are like a giant ship teetering on toothpicks, waiting to collapse." Says another: "Our protective mission is in crisis." Despite the attrition and the increased responsibilities, Irving wrote, "[w]e are confident that we are able to carry out our investigative and protective responsibilities."

U.S. News conducted in-depth interviews with more than a dozen veteran Secret Service agents and employees with intimate knowledge of the agency's inner workings. The magazine also spoke with dozens more state, local, and federal law enforcement officials who interact with the Secret Service. Most of the Secret Service personnel, fearing retaliation by supervisors, spoke on condition of anonymity but provided U.S. News with sworn statements of their accounts. The magazine supplemented that information with an ex-

tensive review of property, death, divorce, and police records, court pleadings, and evidentiary documents.

The magazine's examination found violations of basic policies outlined in Secret Service training manuals. For instance, the agency's Special Investigation and Security manual says that when it comes to job applicants or senior officials, "extramarital sexual relationships are of concern in suitability or security determinations," especially giving access to "sensitive compartmentalized information" or highly classified information. The manual warns that such relationships, from a security standpoint, "can be important when the potential for undue influence or duress exists." Special Agent A. T. Smith was the head of Hillary Rodham Clinton's White House detail after serving on the Presidential Protective Detail (PPD). According to several sources and a divorce pleading filed by Smith's wife at the time alleging adultery, Smith was conducting a widely known extramarital relationship with Cather-

while protecting Clinton during the Lewinsky scandal, were widely believed to be involved in extramarital relationships with women who worked in the White House. In a June 2000 legal deposition in a federal employment discrimination lawsuit against the service, former Special Agent in Charge Ralph Grayson alleged that though the service knew about Stafford's relationship with the staffer, the agency promoted Stafford. Several agents said that these alleged relationships—Merletti's, Stafford's, Smith's, and those involving other agents on the PPD—were the subject of widespread discussion within the Uniformed Division, among agents at Secret Service headquarters, in several field offices, and among White House staffers. These agents, who asked not to be identified, say that there was speculation among agents and officers that the service was claiming the "protective function privilege" in order to prevent these relationships from coming to light. The former White House staffer allegedly involved with Merletti is-



"We wanted to...interview those with information."

KENNETH STARR, *former independent counsel*

**Former Directors Lewis Merletti (left) and David Carpenter, with President Clinton**

ine Cornelius, President Clinton's cousin. Cornelius worked in the White House scheduling office around the time of the Monica Lewinsky affair. Smith accompanied Cornelius to numerous White House social events and eventually married her after the divorce from his wife. Smith declined a request for comment.

Smith's relationship with Cornelius, and those of other agents on Clinton's detail with White House staffers, became an issue within the Secret Service, several current and former officials say. This was especially true after the Lewinsky scandal broke in January 1998 and Independent Counsel Kenneth Starr sought to question Secret Service officers and agents under oath regarding Clinton's relationship with Lewinsky. The service and its director at the time, Lewis Merletti, resisted testifying, asserting a "protective function privilege." In a legal fight the Secret Service eventually lost in the Supreme Court, Merletti said in court papers that if agents were forced to testify, it would compromise their anonymity and jeopardize their proximity to the president. Many agents believed Merletti's fight was *mostly* a principled one. But others were suspicious that Merletti had other concerns: that Starr's inquiry would turn up information about personal indiscretions allegedly involving top personnel at the Secret Service, including Merletti himself. Merletti at one time was head of Clinton's detail. So was Stafford. In affidavits provided to *U.S. News*, six current Secret Service agents stated that Merletti and Stafford,

sued a written denial of any relationship. Merletti, in a letter to *U.S. News*, "emphatically" denied any relationship. "The claim of privilege," said Merletti, "was invoked precisely and exclusively as publicly stated and strongly supported by every living former director of the United States Secret Service as well as former President Bush."

Merletti told *U.S. News* that "rumors of the type you have raised were in fact inquired into by the Office of the Independent Counsel and were debunked and found absolutely lacking in credibility or foundation." But Solomon Wisenberg, a former top Starr prosecutor, rejected that claim. "That's preposterous," said Wisenberg, who is now in private practice. While not confirming that Merletti had been questioned, Wisenberg said, "it was never a part of our mandate to look into the sexual peccadilloes of Secret Service employees." In his letter, Irving also emphasized that the privilege was invoked "because of an overarching national interest that requires the most zealous protection." The former White House staffer named in Grayson's deposition as having had a relationship with Stafford did not return phone calls. Stafford, through a spokesman, also declined to respond.

In the end, Starr's lawyers questioned more than 30 Uniformed Division officers and agents and one supervisor of the PPD, Larry Cockell, who took over the presidential detail from Stafford in 1998, when Stafford assumed the directorship. Neither Merletti nor Stafford testified before the

FROM LEFT: MARK DUNCAN—AP; BRIAN PALMER FOR USN&WR

grand jury. "We wanted to be able to interview those with information, while being sensitive to and balancing the needs of the agency," Starr said in an interview. "We didn't want to needlessly intrude into their work."

The Lewinsky episode clearly took a toll on the Secret Service, but current and former service personnel say they are more concerned now about what they describe as a growing number of personal and professional lapses. In mid-February, Secret Service agents visited Clayton Greenhalgh's Salt Lake City snowboard shop to pick up some souvenir Olympics hats. After they left, Greenhalgh was shocked to find a step-by-step plan for protecting Vice President Cheney at the closing ceremony of the winter games. The document ran to more than a dozen pages. Details included where Cheney would sit, who would be near him, and how he would enter and depart the facility, Rice-Eccles Stadium. The document also described precisely where Cheney's protective detail would be located and how it would be armed. It included specifics of Cheney's movements in stairwells and enumerated what rooms would be closed off from the time Cheney arrived until the moment he departed. "Basically," Greenhalgh told *U.S. News*, it covered "Vice President Cheney's every move . . . I happened to be in the right place at the right time, but if the right bad person found that, something really bad could have happened."

As embarrassing as the breach was, the Secret Service wasn't terribly interested in getting its security plan back, Greenhalgh recalls. Alarmed by what he'd found, Greenhalgh called the Salt Lake City Secret Service office. "They said they'd send someone right over," he says. Nearly an hour later, no one had shown up. Greenhalgh called again. "They said, 'If you could bring it down to us, maybe that would be better.'" Greenhalgh obliged. After turning the document over, he asked an agent if he might get a picture of the vice president for his troubles. "She said, 'I work for him, and I can't get a picture, so why should you?'" Greenhalgh recalls. The next day, two agents showed up at Greenhalgh's shop to grill him. "They were both terribly rude," Greenhalgh says. "They were talking to me like I did something wrong. I was put off 100 percent." Irving said that employees "should have demonstrated greater care, in safeguarding this information." But, he added, "the information contained was not classified and, even if compromised, would not have altered or affected our overall security plan." He said none of the agents has been disciplined.

Other, less public incidents raise questions about the levels of stress many Secret Service employees must contend with and the ability of agency supervisors to monitor problems. Some examples:

I In Los Angeles, an agent guarding former President Ronald Reagan was found guilty in 1997 of having sex with a 16-year-old girl, possession of methamphetamine, and violently resisting arrest. The case came to light when the girl's father— a close friend of Agent Timothy O'Brien's—saw his daughter returning from the agent's house next door one morning, wearing only pajamas. Testimony indicated that O'Brien had sex





**ON DUTY.** Stafford, waiting for President Clinton, 1998

# The service's man to see

One of the things that's true about nearly every police agency is a high level of innuendo, chatter, and speculation that center on the person at the top. That seems especially true of the Secret Service, and even more so lately, under its current director, Brian Stafford, and his two predecessors, Lewis Merletti and David Carpenter. Each, current and former agents say, played a critical role in selecting his successor. Each headed the Presidential Protective Detail before rising to director. Each held key posts during the Monica Lewinsky episode and/or the subsequent impeachment inquiry. So they have had their share of controversies.

Especially Stafford. A favorite in the Clinton White House, he loves country music and riding motorcycles, and recently even inquired about buying a Harley-Davidson dealership, friends say. His loyalty to friends is legendary but has sometimes gotten him into sticky situations. On Oct. 27, 1993, officers from the Florida Highway Patrol were preparing to arrest a man named German Pena, whom they had recorded on audiotapes acting as a go-between to obtain fraudulent driver's licenses. The Highway Patrol was working on the case after being notified by the Secret Service, which had launched the investigation. But it turned out that Pena was the brother of a Secret Service agent who worked for Stafford, then the No. 2 official at the Secret Service's Miami office. One night, according to knowledgeable sources, as FHP officers waited for the right moment to arrest Pena. Stafford turned up in a Mercedes-Benz convertible the service had confiscated in an unrelated investigation. Stafford told FHP officers, the sources say, that if they ever expected the Secret Service to refer another case their way, they should turn German Pena into a "cooperating witness"—someone who would not be charged with a crime in exchange for working with law enforcement. With their taped evidence against Pena, however, the FHP didn't *need* a cooperating witness, but officers felt they had little choice. Stafford declined to comment on the matter, as did Pena. When they went to interview their new "cooperating witness" in his office, sources say, they found presidential pictures plastered all over the walls. As for Stafford, he was soon on his way to Washington. *–C.R.*

SPECIAL REPORT

with the girl for hours, often night after night, then gave her tabs of methamphetamine, or "speed," to help keep her awake during school the next day. When the girl's father confronted O'Brien, the agent drew his service weapon and threatened to shoot him, says William Pounders, the Los Angeles Superior Court judge who presided over O'Brien's trial. O'Brien was arrested at gunpoint but only after a brawl with two officers, in which one was injured. While O'Brien was not charged with perjury, in court, he lied repeatedly, says Richard Rosenthal, the Los Angeles County prosecutor who handled the case. "He was the worst perjurer I think I saw," Rosenthal said, "in 15 years of being a prosecutor." Pounders says, "In 18 years as a judicial officer, I have never had another case involving so many violations of so many different laws by someone who should have been above reproach." Testimony indicated that O'Brien—who said he had done advance work for President George H. W. Bush and been given specialized counterterrorism training—had taken methamphetamine while on a training trip to

Washington. He had not been drug-tested since 1991. "The testing was minuscule—shockingly minimal, considering the circumstances," says James Blatt, O'Brien's attorney. "This was an eye-opener for all of us. We all thought of the Secret Service as this mystical agency that could do no wrong. It's not the case." O'Brien, fired by the Secret Service, was sentenced to six years in prison.

In August 1999, Washington police were called to Lulu's Bar in Washington, "where every day is Mardi Gras," as the bar proclaims. Two men had gotten into an altercation in the restroom, patrons said, and it ended in a shooting that left both men injured. One was an Air Force enlisted man. The other was Secret Service Agent Manuel Puente, recently transferred to join the PPD. The injuries were not life threatening. Puente was told to leave the force. Efforts to reach him were unsuccessful.

In October 1999, Kenneth Blake, a thief who scoured Chicago-area hotels to steal handbags, dropped in at the Fairmont Hotel, where then first lady Hillary Clinton was stay-



DOUG MILLS—AP

## RACE RELATIONS

# Many black agents are seeing red

**W**hen George W. Bush was campaigning for president in the summer of 2000, he asked the supervisor of his newly assigned Secret Service detail a question: Why were there so few minorities protecting him? Just weeks earlier, 10 African-American agents had filed a well-publicized race-discrimination lawsuit on behalf of a class of more than 250 agents against the Department of the Treasury. Bush's comments quickly filtered through the Secret Service Bush operation in Texas to the candidate nominee operations office in Washington. "They started looking for ways," says a source. "To take minority agents from other details like Bradley and McCain." The campaigns of those candidates had by then fizzled.

But in the end, not much changed on the Bush detail, say knowledgeable sources, and today the lawsuit is gathering dust on a federal judge's desk in Washington. Each plaintiff is seeking up to $300,000 in back pay and other compensation and a court order directing the service to change the "racially hostile work environment" that the plaintiffs allege in sworn declarations dates to 1974.

**PLAINTIFFS.** At a Washington, D.C., press conference, agents discuss the reasons they decided to file their racial-bias suit.

Some allegations:

Overt acts of racism go unpunished. The plaintiffs charge that colleagues and supervisors have used racial epithets in their presence to describe minority suspects nabbed in criminal investigations, and even toward black dignitaries. Special Agent Zandra Flemister alleges in her sworn declaration that white special agents "used the word 'nigger,'" to refer to the president of Senegal. Flemister says agents used the same pejorative to describe the president of Grenada.

Black agents with superior performance-evaluation scores and major protective responsibilities say they are overlooked for promotions by supervisors who give top jobs to white agents with connections at headquarters.

**Good old boys.** Ronald Schmidt, an attorney for these agents, say they feel the deck is stacked. "This suit is about making the good-old-boy network relinquish power," he adds. "And the agency is going to resist that to the bitter end."

The president's detail is an example, Schmidt says. An avid jogger, Bush can outrun many agents assigned to protect him. According to the declaration of one plaintiff, Paula Reid, Bush "is able to exceed the physical fitness standards" the service requires for its special agents. Reid says physically fit and qualified black agents who can keep up with Bush are passed over for "whip" or acting supervisory positions, which are given to white agents who claim to keep up with Bush but often can't.

Service officials have said that they are proud of their record on diversity issues. They say that two of seven assistant directors are African-American and that minorities head seven of the 11 largest field offices in the country. "It is offensive," Secret Service Director Brian Stafford said in an E-mail after the lawsuit was filed, "for anyone to question our commitment to equal employment opportunities for all of our employees."

Schmidt and his colleague David Shaffer said the E-mail would have a "chilling effect" on those wanting to join the suit. Judge Richard Roberts agreed. At his urging, Stafford issued a follow-up E-mail. "Each employee . . . should feel free to exercise his or her rights under the equal employment laws," he wrote. "My previous teletype certainly was not meant to suggest otherwise." *C.R.*

ing. Secret Service Agent Mary Drury, a member of the Clinton detail, was at a hotel bar with another agent around 11 p.m., in violation of a strict service policy against agents drinking while carrying a gun. When Blake pilfered her purse, he took her .357-caliber Sig Sauer service weapon. It was the second time Drury had lost her gun, several knowledgeable sources say, and she had been promoted a grade between the first and second incident. In another incident, in 1993, Drury was driving home from a Chicago bar when she rammed her government car into a Chicago Transit Authority bus so hard that several items flew out of the trunk. Drury has not received any significant sanction from the Secret Service. Drury did not return phone calls. The service declined to comment. Blake received a 40-month prison term.

Law enforcement is among the world's most demanding professions, and given their unique responsibilities, Secret Service personnel can face higher stress levels than most cops. Special agents outside Washington spend long stretches away from their families, traveling for at least 30 days every 10 weeks. Many in the capital say they're burned out from the long hours they've put in since September 11. Many uniformed officers have been told they must work on one of their normal days off. Agents posted at the service's 118 field offices nationwide regularly wind up dropping criminal investigations they're working on to take their turn on the PPD in Washington. If an agent working with or on the PPD is exhausted, angry, or compromised in some way, current and former agents worry, it could jeopardize the safety of the president or other protectees.

The concerns are not ill founded. Several years ago, members of Clinton's protective advance team were alarmed to find that an unidentified group was following them and tracking their movements. Current agents declined to discuss any protective matters, but several sources say that since then, the Secret Service has implemented a new policy of sending a separate team of agents to watch the backs of the agents doing the advance planning for trips by high-level protectees. They have modeled their new security plan on the British Secret Service.

## FITNESS FOR DUTY

Threats like that, even before September 11, are precisely why so many still in the service, and others who have recently left, are concerned by the lapses they say they're seeing now. In just the past few months, there have been several instances of Secret Service agents' driving under the influence of alcohol, even *to* their posts at the White House. One agent received no punishment. The other agent was taken off the PPD. He had had a previous incident involving alcohol, sources say, an incident that not only went unsanctioned but that didn't prevent a promotion to the president's detail. In the San Diego bar-fight incident, the service says, it took no formal disciplinary action against the agents. According to a 20-page report by the Treasury Department's inspector general, the Secret Service has tol-

erated alcohol-related misconduct by employees. In August 1995, according to the report, an officer received a "fitness for duty" exam only after four incidents of suspected drunken driving in an eight-month period. In one of those cases, police at the scene confiscated the officer's service weapon for fear of what the officer might do. Still, the officer remained on the force—until he was convicted, in February 1999, of driving while intoxicated. Only then did the service issue him a "proposal for removal" for "conduct unbecoming" an officer. Other details of the case could not be learned.

Showing up for work intoxicated could obviously result in a security breach. But some instances of public drunkenness involving Secret Service personnel simply blemish the Secret Service's storied history of service and valor. In late January, a contingent of about 20 Secret Service agents bunked in at the Western Inn motel in Provo, Utah, on security assignment to the Winter Olympics in nearby Salt Lake City. In the wee hours of



"We are able to carry out our protective [duties]."

PAUL IRVING, *Secret Service spokesman*

On a visit to Mexico, agents surround President Bush.

February 1, some of the agents hosted a loud party, leading resident manager Casey Clements to plead for quiet. Clements also asked the agents, who he said were clearly inebriated, to stop smoking. "They said, 'We don't have to do anything we don't want,' " Clements recalls. An hour later, the noise grew louder. Clements called the room. Someone hung up. He made another visit, pushing against a partially open door behind which an agent was peering out. "That upset him," Clements says. "He pushed me out of the door and said if I did that again, he'd throw me to the ground, put a gun to my head, and I'd be sorry." Days later, it was learned that the agents may have been drinking with several teenage girls. Local police have been investigating whether a sexual assault took place, after hearing of the incident indirectly. The service had not reported to Utah authorities any involvement of the agents with the girls. The Utah County attorney's office is investigating; the Secret Service is cooperating. The episode left Clements with a bad feeling. "I guess I don't trust law enforcement like I used to," he says. "The agents that threatened me, they were just, like, 'We're above the law.' " Spokesman Irving says one of the three special agents resigned. The other two remain "in an administrative leave status," says Irving, "pending possible prosecutorial action."

## TEMPTATION

The *U.S. News* inquiry revealed other problems. Secret Service agents assigned to the elite Counter Assault Team (CAT), which

CHARLIE ARCHAMBAULT FOR USN&WR

responds to any attack on the president, sometimes watch pornography on White House satellite channels in the "band room" in the basement of the executive mansion. That's where the CAT stashes its weapons and the Marine Band keeps its instruments. When the president and first lady retire for the night, several sources say, agents will often "put some skin on." Other agents watch pornographic videotapes on the ground floor of the mansion but only after posting an agent as a lookout, the sources add. If a female Uniformed Division officer approaches, the posted agent clicks three times in an agent's earpiece, to give him time to change channels.

In Miami and Ohio, according to sworn affidavits by several agents, Secret Service supervisors brought professional strippers into the offices. In Miami, Special Agent-in-Charge Jack Kippenberger reportedly permitted a male stripper into Secret Service offices for a female employee's bridal shower. The incident might have passed unnoticed had it not been for Kippenberger's prior refusal—on security grounds—to allow another agency employee to bring in a guest to organize games for *her* bridal shower. The incident brought a swarm of inspectors from Washington, and Kippenberger, sources say, was given a two-week suspension. He chose to take it at the end of the year, during the Christmas holidays, just before he retired. Kippenberger did not return phone calls. In Columbus, Ohio, Special Agent-in-Charge Irwin Dietel allegedly paid for a stripper from the Strip-a-Gram agency (motto: "You've been strip-a-grammed!") into the Secret Service office there to celebrate the birthday of another agent. Penny Steward, who ran the now defunct striptease service, recalls being whisked in and out of the federal building. "I'm sure we weren't supposed to be there," Steward recalls. Someone in Cohen's office sent pictures of the incident—obtained by *U.S. News*—to service headquarters, sources say, but no action was taken. Cohen declined to comment to *U.S. News* except to say "those things were discussed years ago."

What is most disturbing to many current and former Secret Service employees is when agents or officers violate the fundamental trust underlying their jobs.

ı Two years ago, Michael Cohen, a veteran agent mentoring a group of rookie agents in the Philadelphia office, embezzled some $2,800 from the Secret Service in two incidents. According to court documents and an interview with prosecutors, Cohen claimed to be a couple of thousand dollars short on a house-closing payment; when agents turned over $3,173 seized in a criminal investigation, Cohen kept some $2,000 and faked a $1,159 receipt for the balance. The case troubled prosecutor Amy Kurland. "He was so cavalier about taking $2,000," recalls Kurland. "Somebody who does that so easily is not someone who hasn't done that before. It wasn't a one-time, spur-of-the-moment, take-the-opportunity kind of theft." According to court testimony and an interview with Cohen's attorney, when Cohen was drawing in one of the other young agents into his scam, and the agent expressed concerns, Cohen said, "This is the way we did it all the time in Kansas City." Cohen drew a 33-month prison term. He is free pending appeal.

ı In October 2000, based on information from a confidential informant, two Secret Service agents were criss-crossing Miami-area streets, monitoring a pair of thieves as they methodically ripped off cash from ATM machines. At the end of the day, it came time to make the arrests. But the agents had a dilemma: how not to blow the cover of their informant, who was accompanying the thieves. According to court documents and interviews with attorneys, the agents decided to allow the informant to run away, giving the appearance of an escape. That's what they did. But when the agents reported the case to the U.S. attorney's office, they told prosecutors there were three

ATM thieves, not two. A possible motive: James Smith, a high-ranking officer in the agency's Miami office, pocketed $1,309 of the cash nabbed from the ATM thefts, perhaps the informant's share. Prosecutors began investigating. The agents' story soon unraveled. The prosecutors were forced to void the convictions of the ATM thieves. Earlier this year, Smith got five months' prison time.

With their jobs providing ready access to cash, temptation isn't far away for Secret Service agents. Office funds meant to pay confidential informants was an obvious lure for William Ebert, a career agent who by the early 1990s had worked his way up through the ranks to a critical posting: head of the Secret Service's counterfeiting division. This was back when "supernotes," high-quality counterfeit bills, were beginning to show up in quantity around the country, eluding the best detection efforts. Ebert got tripped up in a scheme in which he was submitting phony vouchers and pocketing money meant for confidential informants and others. He had been buying expensive airline tickets and then getting refunds; double-billing on other tickets; and claiming phony payments to informants, in the United States and overseas. Ebert was sentenced to five months in prison followed by home confinement. He agreed to pay $29,900 in restitution and received a five-month prison term.

## ACCOUNTABILITY ✳

Many believe that at the root of such problems is a lack of accountability within the Secret Service. A government official familiar with the agency says the service has effectively used its Office of Inspection to sweep problems under the rug, seeking to prevent the inspector general (IG) of the Treasury Department—the service's parent agency—from opening and conducting investigations. In the past, this official says, the service circumvented the IG by classifying misconduct allegations as "management issues," thus keeping problems in-house, or in agency parlance, "in the family." Within the service, many current and former officials say, the "code of silence" is a time-honored tradition. Inspector General Jeffrey Rush says his office *could* have missed investigating some misconduct. In another area, a Treasury Department report, dated Oct. 31, 2001, concluded that investigators from the inspector general's staff "encountered a Secret Service policy hindering our access to its employees and records." That policy required agents and officers contacted by the Treasury IG's office to notify Secret Service headquarters. "It's like the cat and the bell," says Rush. "The mice like it, but the cat's got a job to do." Rush says he complained about the policy to Congress. The new policy still requires notification—not by agents but by the IG himself—before employees are contacted.

But the IG's office also is partly to blame for the inadequate oversight of the Secret Service. Rush acknowledges that, until he recently made changes, the IG routinely reviewed only cases involving complaints against senior managers, while ignoring things like complaints against Secret Service inspectors—the officials charged with policing the agency. Weak oversight and the ability of Secret Service inspectors to handle many problems in-house have contributed to morale problems in the agency, current and former employees say, because of a widespread belief that punishment for misconduct is administered arbitrarily. A February 2001 review by the Treasury IG of the Secret Service Inspection Division came to the same conclusion. The report said that in nearly a quarter of the 75 discipline files reviewed, discipline was not administered either consistently or in a timely manner. "We found that the USSS [U.S. Secret Service] has no centralized tracking or reporting system for em-

SPECIAL REPORT



CHRIS USHER—APIX

The shadow of a PPD agent in the White House colonnade

"It's like the cat and the bell. The mice like it, but the cat's got a job to do."
JEFFREY RUSH, *Treasury Department inspector general*

ployee misconduct allegations," said the report. "And they are therefore unable to track misconduct allegations that were handled as management issues."

## DOUBLE STANDARD ✳

All this is not to say that wrongdoers are *never* punished. Secret Service managers have taken many agents to task, but many remain on the force and continue to rise, despite lapses and abuses. What is galling, some agents and officers say, is a double standard that exists for employees who have relationships with Secret Service brass. If you have a "hook," the saying goes, you can sometimes get off the hook. If you don't and you incur the service's wrath, beware. In those instances, some service personnel say, the agency can go to extraordinary lengths to investigate suspected wrongdoing. Patrick Cruise is a former special agent in the Secret Service's Miami field office. In lawsuits filed against the service, Cruise alleges the special agent in charge suspected that he was abusing drugs because Cruise was dating a young part-time administrative employee who the service suspected was doing drugs. On Sept. 29, 1999, when Cruise wound up in the hospital sick with suspected hepatitis, he says, the service asked another agent's wife who worked as a clerk in that hospital to steal his medical records so it could confirm the suspicions about drugs. A toxicology test, which included

a routine screening for drug use, was presumed positive. Cruise says the hospital failed to do the necessary follow-up test to confirm the result. His supervisor visited him in the hospital soon afterward, Cruise says, bringing Ben & Jerry's chocolate brownie ice cream and a *Maxim* girlie magazine. But the real reason for the visit, Cruise says, was to get him to sign a medical release so the Secret Service could obtain the toxicology test results *legally* so it would have the paper records it would need in any legal proceeding after firing him. After Cruise was diagnosed with mononucleosis and discharged, Cruise says, the Secret Service ordered him to submit to a urinalysis and a forensic hair test that can detect drug use dating back months. Both were negative. Several weeks later, says Cruise, he was fired for leaving his duty post and going to the bathroom. Cruise has sued the hospital for malpractice and negligence and has filed a federal equal employment opportunity complaint against the service. He also has a federal suit pending to get his job reinstated. "Years ago if you would have spoken to me, I would have nothing negative to say about them. They were the best thing in the world," says Cruise. "I would defend the Secret Service until I was blue in the face. Now, I have nothing good to say."

*With Marianne Lavelle, Edward T. Pound, Anne Bradley, Sheila Thalhimer, and Carol Hook*

EXHIBIT "M"

**Raytheon**

# Silent Guardian™ Protection System
## Less-than-Lethal Directed Energy Protection



Silent Guardian™ Protection System saves lives,
stops aggressors, protects assets and is proven safe.

**Benefits**

- Provides a zone of protection that saves lives and protects assets

- Minimizes collateral damage

- Provides real-time ability to establish intent and de-escalate aggression

- Does not cause physical harm; prevents injury and death

- Provides precise effects at a longer range than current less-than-lethal systems

- Fills the gap between shout and shoot

Silent Guardian™ Protection System employs millimeter wave technology to repel individuals without causing injury. This capability enables users to stop, deter and turn back adversaries without the use of lethal force. The system also disrupts an assailant's ability to effectively use a weapon. Silent Guardian provides extraordinary tactical ability to control outbreaks of violence, minimize collateral damage and ultimately saves lives.

The system's antenna emits a focused beam of millimeter wave energy. The beam travels at the speed of light and penetrates the skin to a depth of 1/64 of an inch, producing an intolerable heating sensation that causes the targeted individuals to instinctively flee or take cover. The sensation ceases immediately when an individual moves out of the beam or the operator steers the beam away. Silent Guardian does not cause injury because of the shallow penetration depth of the millimeter wave.

Substantial government testing has been conducted to characterize the effects of millimeter waves on the human body. These tests have confirmed the technology's safety and have established there is a significant margin between safe and harmful exposure levels.

The system can be operated across a broad range of scenarios, including maritime and desert environments. Silent Guardian has been sealed for dust and supports operations in conditions up to 125 degrees Fahrenheit ambient. The antenna is capable of sustaining multiple bullet holes with minimum system performance degradation and is also protected from environmental damage caused by rain, dust and salt fog.

Silent Guardian is easily transportable on standard military tactical vehicles and can also be integrated into combat vehicles. The system's magazine is only limited by fuel availability.

Silent Guardian is designed, developed and manufactured by Raytheon Company. Raytheon is the only company producing this millimeter wave capability. The system is available now and ready for action.





Stationary firing position with 360-degree coverage.



Easy-to-use joystick control with auto-tracking capabilities.



Penetrates skin to 1/64 of an inch.



Various applications for law enforcement, facility protection and homeland security.



The focused collimated beam allows precise targeting of specific individuals.

## Silent Guardian™ Specifications

|  | Height | Width | Length | Weight |
|---|---|---|---|---|
| **AC/DC Converter** | 65 in | 45 in | 74 in | 3,870 lb |
| **Transmitter Unit** | 95 in | 83 in | 94 in | 6,440 lb |
| **Transmitter with Antenna** | 136 in (level) | | | |
|  | 147 in (maximum inteference) | | | |
| **Antenna** | 45 in² | | | |

### System Characteristics

| Range: | Greater than 250 meters* |
|---|---|
| **Targeting:** | Stationary firing position with 360-degree coverage |
|  | Integrated sensors with joystick control |
|  | Single-man operation |
| **System Setup:** | Automatic target tracking |
|  | Modular architecture |
|  | Secure antenna stabilization platform – able to operate in 40 mph winds |
| **Mission Profile:** | Less than 2-second retargeting capability |
|  | Shoot-and-scoot capability |
|  | Less than 2 seconds to switch from standby mode to armed |
| **Contractor Support:** | Complete logistics support package available to include: |
|  | • Return and repair maintenance |
|  | • System training |
|  | • Web-enabled supply support |
|  | • Supports Army two-level maintenance system |

*The Joint Non-Lethal Weapons Directorate has stated that the long-range active denial systems (ADS) are effective beyond small-arms range, typically up to 500 meters.
The Raytheon-funded mid-range Silent Guardian ADTS' range is greater than 250 meters.



Military applications, including checkpoint security, perimeter and point defense, force protection and peacekeeping missions.



Images courtesy The Defense Visual Information Center

Raytheon Company
**Missile Systems**
Directed Energy
P.O. Box 11337
Tucson, Arizona
85734-1337 USA
520.794.9340 phone
520.794.7915 fax

www.raytheon.com

## Raytheon

*Customer Success Is Our Mission*

Cleared for public release. Copyright © 2006 Raytheon Company. All rights reserved.
Printed in the U.S.A. RMS 6/06 4K 60345R

EXHIBIT "N"

# Security Implications of High-Power Microwave Technology

## IEE International Symposium on Technology and Society 1997

A.E. Pevler
Texas Engineering Solutions
Dallas, Texas 75244 USA

The development of high-power microwave (HPM) weaponry, and its proliferation into subversive organizations, offers the means to commit the "perfect crime." HPM attacks typically leave no residual evidence and their effects can range from nuisance to catastrophic.

This paper highlights some of the unusual aspects of HPM technology and raises issues regarding security of airliners, commercial power systems and other targets. It also discusses strategies to begin mitigating the risks.

## I.    Introduction – HPM Maturation

High-power microwave (HPM) technology was merely a theoretical possibility until the 1970s. In the last twenty years, advances in plasma physics, energy storage and fast switching devices have made HPM systems effective and the technology is migrating outside classified government research and development laboratories.

The maturation of technologies required for HPM feasibility is shown in Fig. 1. Since the technology is relatively new, and was closely guarded until the demise of the Soviet Union, the societal ramifications of HPM have received little analysis.

Within the past few years, non-military applications have been sought for HPM. These applications often are referred to as "non-lethal technologies." One such employment is the use of HPM by police to disable automobiles in a high-speed chase. Such discussions have further highlighted the capability of HPM, and presumably raised the general awareness of the technology's capability.

## II.    HPM Effects

The most widely acknowledged effect of high-power microwave energy is disruption of electronic systems. This perturbation is extremely short in duration, generally on the order of a few hundred nanoseconds. This brief disturbance can be sufficient to reset computers, cause complete loss of stored data and/or cause microprocessors to switch operating modes.

Advanced electronic systems are increasingly vulnerable to upset by electromagnetic radiation. Many Department of Defense (DoD) and Department Of Energy (DOE) studies indicate Radio Frequency (RF) power is a threat to the proper operation of modern systems. As circuits have become more densely packaged, more energy efficient and operate at higher speeds, they have experienced an associated increase in vulnerability and susceptibility to perturbations from non-ionizing radiation.

This inherent vulnerability to RF power has spawned international research in optimizing transmitters for use as weapons. NATO and former Soviet nations have developed HPM weapons. These weapons are designed to exploit this inadvertent vulnerability to RF power by concentrating as much power as possible into a controlled field. This has proven very effective, and anecdotal data suggest successful combat deployment.

1

0-7803-3982-7/97/$10.00 © 1997 IEEE

108



**Fig. 1 – Evolution of high-power microwaves [1]**

The effects of a successful HPM weapon attack are unpredictable. The primary goal is merely disruption of the victim system, the results of which are of secondary importance. Consequently, the result varies widely depending upon the victim system. In some cases, computers may be reset. In other cases, local oscillators may be driven off frequency, navigation systems misguided, safety sensors incorrectly set or reset, faulty data recorded and control systems given erroneous inputs.

The significance of the perturbation is proportional to the importance of the system corrupted. A portable compact disc player may react by garbling music or changing the track it was playing. A similar amount of energy directed at a commercial aircraft could corrupt the plane's control and navigation systems enough to cause a crash.

Another important similarity shared by vulnerable systems involves post-attack evidence. Typically, there is none. Although the perturbation of the victim system is indisputable while subjected to the electromagnetic field, the affected circuits are rarely permanently damaged. This makes identification of the cause extremely difficult. Failures appear to be anomalies with no traceable cause. An interesting aspect of a successful HPM weapon attack is that no evidence remains to incriminate the perpetrator.

Another feasible effect of an HPM attack, under proper conditions, is an unexplained explosion. The ability of electromagnetic energy to create a spark is undisputed. Inadvertently leaving a metal "twist tie" on a package placed in a common microwave oven can present impressive evidence of this phenomenon. An even more impressive proof can be achieved by filling the oven with an explosive vapor before activating the magnetron with the twist tie in the oven.

Whether there will be resulting evidence of a microwave-induced spark causing the resulting explosion is arguable.

Other experiments familiar to scientists and technicians further prove the ability of microwave energy propagating through space to transform to other forms of energy. Tossing steel wool into the main lobe of a search radar's antenna can produce a spectacular explosion. Fluorescent light bulbs can be lit without any wired connection at a considerable distance from a radar emitter.

After transoceanic flights, airliners often have more vapors than fuel in their tanks. These tanks also have conductive wiring harnesses inside the fuel tanks. If any of the wires immersed in this explosive vapor has an imperfection resulting in a sharp point, all the conditions are set for an HPM induced spark resulting in an unexplainable explosion. The origin of such an explosion would likely be impossible to discover from residual evidence.

Conditions similar to these were present when TWA 800 exploded shortly after takeoff in 1996. The center fuel tank contained mostly vapor, for reasons based in weight and economics. Although the reason the fuel tank exploded has not been determined, investigators are certain that the forces of that ignition made the incident unsurvivable. This has resulted in consideration within the aviation regulatory community of prohibiting the common practice of flying aircraft with mostly empty fuel tanks. Such a regulation might mitigate the risk on take off, but does not address the situation of tanks emptied in flight.

III.   Technological Growth and Proliferation

Most HPM experts acknowledge that at the end of the Cold War the Soviet Union was ahead of Western laboratories in the development of HPM weaponry. This is logical since Western weapon systems (planes, missiles, etc.) tended to be more sophisticated than their Soviet bloc counterparts. Since HPM vulnerability tends to be proportional to a victim system's reliance on microprocessors, the technology would be more attractive to NATO adversaries. Implementation of HPM against sophisticated weaponry transforms that sophistication from an asset to an "Achilles heel".

With the demise of the USSR, the research and the scientists who performed it became less well controlled. This is particularly alarming since, unlike traditional weapons of mass destruction, there are no controllable components in an HPM weapon.

1995 saw the first known use of HPM technology by subversives. Chechnyan rebels used HPM to defeat a Russian security system and gain access to a controlled area. [2]

IV.   Ineffectiveness of Traditional Security Measures

Traditional means of improving security are ineffective in preventing an HPM attack. Ordinarily, the integrity of a region, building or other asset can be maintained by limiting physical access to the object of interest. This access control generally takes the form of guards, physical barriers and/or surveillance systems.

An HPM attack, however, uses invisible electromagnetic energy as "ammunition". This implies speed of light velocity, a very "deep magazine", and an effective range that is limited only by the weapon's effective radiated power and the victim system's susceptibility.

It is generally unnecessary, then, for an attacker to expose themselves to the secure environment provided by traditional security measures. They can instead remain outside the sterile environment and still disrupt electronic systems a great distance away.

3

110

While there are many variables that must be considered to determine the range of an HPM weapon, a reusable system able to disrupt systems hundreds of meters away is certainly achievable.

The important point is that a clandestine attack can be mounted using HPM without having to breach or even account for existing security systems. A less obvious result is that there is very little risk involved in unsuccessful attacks or "dry runs." Unlike traditional attacks, precise execution and planning is unnecessary and tactics can be tested and refined until the perpetrators achieve the desired effect.

## V.    Groups Most Attracted to HPM

Considering the intrinsic qualities of an HPM attack, it is useful to analyze what groups or individuals would be most likely to find such a weapon attractive. Further analysis can concentrate on whether such a population exists in today's society.

The bombing of Pan Am 103 in 1988 was a crime that was intended to be unsolvable. Although physical evidence has provided solid information identifying the bombers, those implicated have denied involvement. Indeed, the critical piece of evidence that led investigators to discover the explosion's origin was about the size of a fingernail.

HPM offers a means of attack that doesn't even leave evidence as small as that incriminating the bombers of Pan Am 103. For those desiring anonymity, there can be no better tool than an HPM weapon. Its effects are transient and leave no evidence in their wake.

This invisibility may be extremely attractive to an organization wishing to maintain plausible deniability. This is even truer if the subversives are religious fundamentalists. If science cannot attribute a catastrophe's cause, religious zealots can credit an angry Supreme Being.

As an example, a religious leader with ties to Libya could prophesize a communication from his deity denouncing the freezing of Libyan assets in response to Pan Am 103. In his public prophecy, he could express confusion about the meaning, while relaying the message that unless those assets were released by a certain date his god will cause "a large bird to fall from the sky." This prediction could then be followed by an unexplainable and unattributable airliner crash. This process could be repeated as necessary until the Western world capitulates. Of course, the demands would likely only be accelerated after that capitulation.

Other potential users of the technology are rouge countries seeking to expand their borders. If Iraq had even a single reusable HPM weapon in 1990, the United States and its allies could have been excluded from responding to the annexation of Kuwait.

Most troops were transported to the Desert Shield/Desert Storm theatre using commercial aircraft. If Saddam Hussein had HPM capability, those airliners might have crashed on final approach. Public pressure would have then pressured the U.S. to withdraw. Failing that, opposing troops would have been killed by the hundreds, seat belted to their airline seats, before they ever had a chance to fire a shot.

## VI.    A 1997 Scenario

As this paper was being written, Peruvian soldiers ended a four-month hostage crisis by storming the Japanese ambassador's residence in Lima and killing 15 Marxist rebels. Negotiations with the members of Tupac Amaru stalled over a single point of freeing imprisoned guerillas previously convicted of subversive activity.

Tupac Amaru could have achieved their goals if, instead of holding hostages, they used HPM weapons to disrupt crucial infrastructure assets. By attacking the commercial power grid, hospitals, and/or financial centers the small band of

4

subversives could have caused an intolerable environment without any direct loss of life. If Peru remained defiant, similar attacks could be launched against Peruvian allies until world pressure coerced the prisoners' release.

## VII.    Overt Attack

There will also be countries or groups who are not as interested a surreptitious attack as they are maximizing the resulting disruption. Those goals can also be met with an entirely different deployment of HPM technology.

Instead of using a reusable, focused and transportable system, these users may use expendable, explosively driven devices.

A virtual cathode oscillator (VIRCATOR) can easily be packaged into a guided missile or free fall bomb. Although these weapons are apparent because of the explosion that drives the HPM device, the electromagnetic emissions will still be extremely difficult to detect.

Explosively driven HPM devices can have footprints that disrupt electronic systems for several hundred meters in all directions. Such a system can be built from commonly available material for less than $2,000 [3].

## VIII.    Conclusion

HPM represents unique opportunities for subversives. Reusable systems, used against fly by wire airliners, can produce a "virtual windshear" on demand. Single shot, expendable systems can produce "virtual lightning strikes" over a large geographic region. In either case, modern electronic systems are vulnerable to catastrophic disruption.

For centuries, security systems have concentrated on exclusion and detection of intruders. Sophistication has ranged from moats with drawbridges to infrared and laser motion detectors.

In today's world, intrusion detectors and other modern security devices may become as antiquated as the moat without supplemental detection of electronic attacks.

The technology to launch an HPM attack exists, and is cost effective and easily obtainable. Security experts must counter this threat immediately. Until such detection technology is deployed, the opportunity endures to wreak tremendous havoc without fear of identification or recrimination – the perfect crime.

## IX.    References

[1]  James Benford and John Swegle, *High-Power Microwaves*, Artech House, Inc. 1992

[2]  Major General Vladimir M. Loborev, Russian Federation Ministry of Defense Central Institute of Physics and Technology; "HPM Terrorism," *AMEREM '96*

[3]  Carlo Kopp, "The Electromagnetic Bomb -- A Weapon of Electrical Mass Destruction" USAF CADRE Air Chronicles, 1996

## X.    Biography

A.E. Pevler was born in New York May 16, 1955. He graduated from Southern Methodist University with a BSEE. His employment experience includes the United States Marine Corps, Omni-Spectra, Inc., Texas Instruments, Inc., EG&G Special Projects, Inc. and he founded Texas Engineering Solutions. Mr. Pevler is an expert in the uncooperative detection of high-power microwave emissions and has developed several systems for unique collection environments.

5



Home | Login | Logout | Access Information | Alerts |

□ Abstract

◄ View TOC

BROWSE          SEARCH          IEEE XPLORE GUIDE

✉ e-mail

You are not logged in.

Guests may access Abstract
records free of charge.

You must log in to access:
• Advanced or Author Search
• CrossRef Search
• AbstractPlus Records
• Full Text PDF
• Full Text HTML

## Login

Username

Password

»»

» Forgot your password?

Please remember to log out
when you have finished your
session.

**Access this document**

📄 Full Text: PDF (392 KB)

» Buy this document now

» Learn more about
  purchasing articles

» Learn more about
  purchasing standards

Rights and Permissions
» Learn More

Download this citation
Available to subscribers and
IEEE members.

◄ View TOC  |  Back to top ▲

# Security implications of high-power microwave technology

Pevler, A.E.
Texas Eng. Solutions, Dallas, TX;

This paper appears in: Technology and Society. 1997. 'Technology and society at a Time of
Change'. Proceedings., 1997 International Symposium on
Publication Date: 20-21 Jun 1997
On page(s): 107-111
Meeting Date: 06/20/1997 - 06/21/1997
Location: Glasgow, UK
ISBN: 0-7803-3982-7
References Cited: 3
INSPEC Accession Number: 5856771
Digital Object Identifier: 10.1109/ISTAS.1997.658868
Posted online: 2002-08-06 21:08:03.0

**Abstract**
The development of high-power microwave (HPM) weaponry, and its proliferation into subversi
offers the means to commit the "perfect crime." HPM attacks typically leave no residual evidenc
effects can range from nuisance to catastrophic. The paper highlights some of the unusual asp
technology and raises issues regarding security of airliners, commercial power systems and oth
discusses strategies to begin mitigating the risks



**Index Terms**
Available to subscribers and IEEE members.

**References**
Available to subscribers and IEEE members.

**Citing Documents**
Available to subscribers and IEEE members.

Help    Contact Us    Privacy & S

Indexed by
卬 Inspec

© Copyright 2006 IEEE –



From IEEE Website    TO SHOW SOURCE OF ARTICLE

6

EXHIBIT "O"

# Backgrounder

No. 1931
April 28, 2006

Published by The Heritage Foundation

# The Viability of Directed-Energy Weapons

*Alane Kochems and Andrew Gudgel*

When directed-energy weapons are mentioned, most people think of "death rays" or Hollywood's latest science fiction movie. However, directed-energy weapons (DEWs) are a reality, and several have already been tested under battlefield conditions. They may begin to appear on the battlefield within the next decade, bringing a revolution in weapons and how war is waged.

While DEWs are not the solution to all combat situations, these technologies would provide the U.S. military with additional flexibility in tailoring its response to different types of threats. However, considerable work still needs to be done before they can be deployed. These technologies need the full support of the armed services, and the Department of Defense (DOD) needs to generate clear guidelines for their use.

The Pentagon believes that DEWs are legal under international law, but human rights groups are arguing that DEWs could be used inhumanely. Putting the proper protocols in place should mitigate these concerns. While DEWs are not a panacea, the armed services should fully support research and development of these useful technologies.

## Weapons Revolutions

From the Stone Age until the Middle Ages, a weapon's power was limited by the strength of the man wielding it or, in the case of bows, by the strength of material from which it was made. In the late Middle Ages, a revolution in the weaponry occurred when chemical-powered (gunpowder)

## Talking Points

- Directed-energy weapons (DEWs) use the electromagnetic spectrum (light and radio energy) to attack pinpoint targets at the speed of light. They are well-suited for defending against threats such as missiles and artillery shells, which DEWs can shoot down in mid-flight. In addition, controllers can vary the strength of the energy put on a target, unlike a bullet or exploding bomb, using them as nonlethal means to neutralize human threats.

- DEW technologies, while not the solution to all combat situations, provide the U.S. military with additional flexibility in responding to different types of targets.

- The armed services need to move from just saying that DEWs are a good idea to fully supporting their development. The Defense Department needs to establish clear guidelines for their use.

This paper, in its entirety, can be found at:
www.heritage.org/research/nationalsecurity/bg1931.cfm

Produced by the Douglas and Sarah Allison
Center for Foreign Policy Studies
of the
Kathryn and Shelby Cullom Davis
Institute for International Studies

Published by The Heritage Foundation
214 Massachusetts Avenue, NE
Washington, DC 20002–4999
(202) 546-4400 • heritage.org

Nothing written here is to be construed as necessarily reflecting the views of The Heritage Foundation or as an attempt to aid or hinder the passage of any bill before Congress.



The Heritage Foundation

# Backgrounder

weapons began to replace swords and bows. This revolution changed the nature of warfare: not just tactics, but also the usefulness of armor, castles, and then-popular weapons.

Since the invention of gunpowder, a weapon's effectiveness has no longer depended on the wielder's strength, but on the chemical energy of the propellant or explosive. While centuries of technological advances have improved the power of these materials, the basic operating principle of chemical-powered weapons ultimately remains the same. Modern battlefield weapons are the descendents of muskets and cannon.

Another revolution in weaponry is currently underway, with directed-energy weapons on the cusp of replacing chemical-powered weapons on the battlefield. DEWs use the electromagnetic spectrum (light and radio energy) to attack pinpoint targets at the speed of light. They are well-suited to defending against threats such as missiles and artillery shells, which DEWs can shoot down in mid-flight. In addition, controllers can vary the strength of the energy put on a target, unlike a bullet or exploding bomb, allowing for nonlethal uses.

## The Beginning of Directed-Energy Weapons

Both the Allies and the Axis powers conducted basic research and studies into primitive directed-energy weapons before World War II. However, British scientists calculated that the electronic systems of the time could not generate the power necessary for a "death ray," and research was redirected into early radar detection systems.[2]

During the Cold War, the U.S. and the Soviet Union studied the possibility of creating particle-beam weapons, which fire streams of electrons,

protons, neutrons, or even neutral hydrogen atoms. The kinetic energy imparted by a particle stream destroys the target by heating the target's atoms to the point that the material literally explodes. These weapons were considered for both land and space-based systems. However, because beam strength degrades rapidly as the particles react with the atoms in the atmosphere, it requires an enormous power plant to generate a weapons-grade beam. The countries abandoned particle-beam weapon research as impractical.[3]

## How Lasers Work

Albert Einstein described the theoretical underpinnings of lasers in 1917. However, the first working laser was not built until 1960, opening an entirely new avenue of directed-energy research. Lasers produce narrow, single-frequency (i.e., single-color), coherent beams of light that are much more powerful than ordinary light sources.

Laser light can be produced by a number of different methods, ranging from rods of chemically doped glass to energetic chemical reactions to semiconductors. One of the most promising laser devices is the free-electron laser. This laser uses rings of magnetically confined electrons whirling at the speed of light to produce laser beams that can be tuned up and down the electromagnetic spectrum from microwaves to ultraviolet light.[4]

Lasers produce either continuous beams or short, intense pulses of light in every spectrum from infrared to ultraviolet. X-ray lasers may be possible in the not too distant future. The power output necessary for a weapons-grade laser ranges from 10 kilowatts to 1 megawatt. When a laser beam strikes a target, the energy from the photons in the beam heats the target to the point of combustion or melting. Because the laser energy travels at the speed of light, lasers are particularly well-suited

1. On August 24, 2004, the Tactical High Energy Laser (THEL) system destroyed a salvo of mortar rounds in midair during a test. "Mobile/Tactical High Energy Laser (M-THEL) Technology Demonstration Program," *Defense Update*, at *www.defense-update.com/directory/THEL.htm* (March 10, 2006).

2. David E. Fisher, *A Race on the Edge of Time: Radar—The Decisive Weapon of WWII* (New York: McGraw-Hill, 1988), pp. 15–31.

3. Richard M. Roberds, Ph.D., "Introducing the Particle-Beam Weapon," *Air University Review*, July–August 1984, at *www.airpower.maxwell.af.mil/airchronicles/aureview/1984/jul-aug/roberds.html* (March 15, 2006).

4. *Encyclopedia Britannica*, 15th ed., s.v. "laser."



# Backgrounder

for use against moving targets such as rockets, missiles, and artillery projectiles.

One problem that affects laser beam strength is a phenomenon known as "blooming," which occurs when the laser beam heats the atmosphere through which it is passing, turning the air into plasma. This causes the beam to lose focus, dissipating its power. However, a variety of optical methods can be used to correct for blooming. Laser beams also lose energy through absorption or scattering if fired through dust, smoke, or rain.

The number of "shots" a laser weapon can produce is limited only by its power supply. Depending on the type of laser, this means that the weapon can have an almost "endless magazine" of laser bursts. In addition, a laser shot (including the cost of producing the energy) is much cheaper than a shot from a chemical-powered weapon system. For example, when deployed, the anti–ballistic missile Airborne Laser will cost approximately $1,000 per shot,[5] while each Patriot missile currently costs $2 million to $3 million.[6]

## Current Laser Technology

Because they were invented several decades ago, lasers are the most mature of the DEW technologies. Laser dazzlers—devices that use laser light to temporarily blind sensors, optics, and personnel—are already available for law enforcement and military use. In 1995, the Chinese military marketed the ZM-87 laser interference device, a tripod-mounted battlefield laser dazzler designed to blind enemy soldiers and optics temporarily. In March 2003, North Korea may have used a ZM-87 to "paint" two U.S. Apache helicopters patrolling the Demilitarized Zone.[7]

The two U.S. laser weapons systems closest to actual deployment are the Tactical High-Energy Laser (THEL) and the Airborne Laser (ABL).

Development of the THEL began in 1996 as a joint program between the United States and Israel to develop a laser system capable of shooting down Katyusha rockets, artillery, and mortar shells. The THEL system uses radar to detect and track incoming targets. This information is then transferred to an optical tracking system, which refines the target tracking and positions the beam director. The deuterium fluoride chemical laser fires, hitting the rocket or shell and causing it to explode far short of its intended target.[8]

In August 2004, the THEL system shot down multiple mortar rounds during testing. However, the Army felt the fixed-base laser system was too large and cut funding for the program after the demonstration phase. Research was also conducted on a mobile version of the THEL called the MTEL.[9]

The ABL is a system that uses a megawatt chemical laser mounted on a modified Boeing 747 to shoot down theater ballistic missiles. The system consists of several modules: an infrared detection system to detect the missile's launch; the Tracking Illumination Laser (TILL); the Beacon Illuminator Laser (BILL); and the Chemical Oxygen Iodine Laser (COIL).[10]

Once tracked by the TILL, the BILL measures the atmospheric distortion between the COIL and the missile. These data are then passed on to the mirror

5. Suzann Chapman, "The Airborne Laser," *Air Force Magazine*, Vol. 79, No. 1 (January 1996), at *www.afa.org/magazine/jan1996/0196airbo.asp* (March 15, 2006).

6. GlobalSecurity.org, "Patriot Advanced Capability–3 (PAC-3)," at *www.globalsecurity.org/space/systems/patriot-ac-3.htm* (March 15, 2006).

7. Bill Gertz, "N. Korea Fired Laser at Troops," *The Washington Times*, May 13, 2003, at *newsmine.org/archive/war-on-terror/north-korea/nkorea-fired-laser-at-troops.txt* (March 15, 2006).

8. "Mobile/Tactical High Energy Laser (M-THEL) Technology Demonstration Program."

9. *Ibid.*

10. Press release, "Airborne Laser Progress Continues as Northrop Grumman Runs Full-Power COIL Tests, Delivers Beacon Illuminator Laser," Northrop Grumman Corporation, January 4, 2006, at *www.irconnect.com/noc/pages/news_printer.mhtml?d=91869* (March 15, 2006).


The Heritage Foundation

# Backgrounder

system, which makes appropriate corrections so that, when the COIL fires, maximum energy is transmitted to the target. The skin of the missile heats up, melts, and deforms, and the target breaks up in midair.[11]

The megawatt-class laser was tested at full power in early 2006. The Beacon Illuminator Laser system, which measures and corrects for atmospheric distortion, has also been shipped to Boeing for testing.[12] A complete prototype ABL weapons system will be assembled in 2006.[13]

A related project is the Advanced Tactical Laser (ATL) system, which uses a less powerful version of the ABL's COIL laser, instead of missiles, to attack ground targets. The laser is being built and will be tested in mid-2006. Boeing has received a C-130H transport aircraft from the Air Force and is modifying it for installation of the laser system. The full system will be fitted to the aircraft by 2007 and test-fired against ground targets.[14]

One shortcoming of laser weapons is that their beams travel only in straight lines, which means they have no indirect-fire mode and cannot shoot beyond the system's visual horizon. The DOD Office of Force Transformation (OFT), in conjunction with the Air Force Research Laboratory, is developing the Tactical Relay Mirror System (TRMS), which would use a mirror system mounted on an aerostat or UAV (unmanned aerial vehicle) to redirect the beams from laser weapons such as the ATL and ABL. Design specifications are already being determined.[15]

## How Microwave Weapons Work

Written off as impractical during World War II, technological advances have now made microwave weapons feasible. However, current research focuses on using them as a means of nonlethal area defense and as anti-electronic weapons rather than as "death rays."

High-power microwave (HPM) weapons work by producing either beams or short bursts of high-frequency radio energy. Similar in principle to the microwave oven, the weapons produce energies in the megawatt range.[16] When the microwave energy encounters unshielded wires or electronic components, it induces a current in them, which causes the equipment to malfunction. At higher energy levels, the microwaves can permanently "burn out" equipment, much as a close lightning strike could.

Semiconductors and modern electronics are particularly susceptible to HPM attacks. Electronic devices can be shielded by putting conductive metal cages around them; however, enough microwave energy may still get through the shielding to damage the device.

The short, intense bursts of energy produced by HPM devices damage equipment without injuring personnel. Mounted on properly shielded aircraft or ships, or dropped in single-use "e-bombs," HPM weapons could destroy enemy radars, anti-aircraft installations, and communications and computer networks and even defend against incoming anti-aircraft and anti-ship missiles. With the ever-increasing use of electronics in weapons systems, HPM devices could have a devastating but nonlethal effect on the battlefield.

## Current Microwave Weapons

HPM weapon technology is based on the same technology as radar devices, which already have a long history of research and development. However, no military has yet openly deployed HPM

---

11. *Ibid.*

12. *Ibid.*

13. SPG Media, "ABL YAL 1A Airborne Laser, USA," at *www.airforce-technology.com/projects/abl* (March 15, 2006).

14. Press release, "Boeing Receives Aircraft for Laser Gunship Program," Boeing, January 23, 2006, at *www.boeing.com/news/releases/2006/q1/060123a_nr.html* (March 15, 2006).

15. Colonel Craig Hughes, Office of Force Transformation, U.S. Department of Defense, "Re-directed Energy: the Tactical Relay Mirror System," presentation at The Heritage Foundation, Washington, D.C., February 13, 2006.

16. U.S. Air Force Research Laboratory, "High-Power Microwaves," fact sheet, September 2002, at *www.de.afrl.af.mil/Factsheets/HPM.swf* (March 15, 2006).


The Heritage Foundation

# Backgrounder

weapons. Current HPM research focuses on pulsed power devices, which create intense, ultrashort bursts of electrical energy and would be used to power the microwave generator of an HPM weapon. The Air Force Research Lab's Propulsion Directorate has studied using generators that use high-temperature superconducting wire and high-voltage capacitors.[17]

Another power source, well-suited to one-time use in an e-bomb, is the Explosively Pumped Flux Compression Generator (EPFCG). The EPFCG uses chemical explosives to compress an electrically charged coil. This destroys the device but produces electrical pulses in the terawatt range—the equivalent of 10 to 1,000 lightning strikes.[18]

Paired with a microwave generator, an EPFCG could produce an ultrashort, intense microwave burst. Depending on factors such as burst height, microwave frequency, and the shielding around the target electronics, such an e-bomb could have an effective range of several hundred meters.[19]

A subset of HPM devices can affect the human body. Millimeter waveband energy can penetrate human skin to a very shallow depth, heating the tissue below. This produces a burning pain without actually damaging the tissue. The pain forces the person to flee the area. This type of weapon shows great potential as a riot-control device or area-denial system.[20]

The Active Denial System (ADS) is a nonlethal anti-personnel DEW that uses millimeter-wavelength beams to create a painful sensation in an individual without causing actual injury. It is relatively close to deployment. The system generates a focused beam of energy at the frequency of 95 gigahertz. These waves penetrate only a few millimeters into the skin and cause the sensation of heat. The sensation increases in intensity until the affected individual moves out of the beam or it is shut off. There is no injury to the target individual.[21]

A demonstration system was tested at Kirtland Air Force Base in 2000. A year later, testing showed that the ADS could produce effects at ranges beyond current small-arms range. A prototype ADS system mounted on a Humvee went into testing in August 2005.[22]

## The Future of DEW

Future research will seek to increase the power and decrease the size of DEW systems. As they become smaller, DEW weapons will first be vehicle-mounted and then possibly man-portable. The death ray of science fiction may in fact become a reality in the not too distant future.

Lasers are becoming smaller and more powerful. For example, a recent test of a solid-state laser by Northrop Grumman produced a continuous 27-kilowatt beam that lasted just under six minutes.[23]

A possible future development is the electrolaser. Electrolasers make use of laser bloom, a normally undesired effect. In an electrolaser, twin laser beams create an ionized channel inside the atmosphere, which conducts electricity. A high-voltage electrical charge is then fed into one of the laser

17. Dr. Stephen Adams, "Electrical Power and Thermal Management for Airborne Directed Energy Weapons," U.S. Air Force Research Laboratory, September 2001, at *www.afrlhorizons.com/Briefs/Sept01/PR0101.html* (March 15, 2006).

18. Carlo Kopp, "The Electromagnetic Bomb—A Weapon of Electrical Mass Destruction," at *www.globalsecurity.org/military/library/report/1996/apjemp.htm* (March 15, 2006).

19. GlobalSecurity.org, "High Power Microwave (HPM)/E-Bomb," at *www.globalsecurity.org/military/systems/munitions/hpm.htm* (March 15, 2006).

20. *Ibid.*

21. U.S. Air Force Research Laboratory, "Active Denial System," fact sheet, September 2005, at *www.de.afrl.af.mil/Factsheets/ActiveDenial.swf* (March 15, 2006).

22. *Ibid.*

23. Press release, "Northrop Grumman Surpasses Power, Run-Time Requirements of Joint High Power Solid-State Laser Program for Military Use," Northrop Grumman Corporation, November 9, 2005, at *www.irconnect.com/noc/press/pages/news_releases.mhtml?d=89438* (March 15, 2006).


The Heritage Foundation

Case 1:06-cv-02125-RWR   Document 27-2   Filed 05/02/2008   Page 98 of 108

beams, striking the target. The electrical shock is enough to stun personnel, detonate improvised explosive devices, or destroy electronic equipment.

Improvements in energy-generating systems may also make particle-beam weapons feasible. Particle beams would have tremendous power as weapons. Like lasers, particle beams travel at the speed of light, but unlike lasers, the particles in a particle beam have mass, giving the beam tremendous kinetic energy.

At some point in the future, entire military units may be armed with only DEWs. A mechanized unit advancing through a town, protected by an anti-artillery and anti-missile laser shield, clearing the surrounding buildings of snipers and enemy troops with an active denial system, and using electrolasers to stun them before taking them prisoner, all while using HPM weapons to render the enemy's communications useless, would be a powerful military unit indeed.

## Policy and Legal Implications for DEWs

Weapons designed to cause undue suffering are banned under the Geneva Convention, and human rights groups argue that directed-energy weapons raise a host of new legal and moral concerns that do not apply to previous generations of conventional weapons. For example, while the Chinese ZM-87 laser interference device is technically a laser dazzler, it can permanently damage the human eye at a distance of two to three kilometers.[24] Would the permanent blinding of a soldier struck by a ZM-87's laser beam be considered intentional or accidental? Does the mere use of a weapon that can cause permanent blindness constitute inflicting undue suffering? The humanitarian community is also concerned about the long-term biological effects of DEWs (microwaves in particular) and their possible use against civilian targets.[25]

However, a stronger counterargument is that directed-energy weapons, especially lasers, are more humane than conventional weapons because they can strike pinpoint targets, thus causing less collateral damage. A laser weapon could target not only a single vehicle in a convoy, but also a specific spot on that vehicle (e.g., the engine) and disable it without injuring the passengers. Furthermore, the power of lasers and microwave weapons has decreased, allowing for nonlethal uses.

DEW technology is changing faster than international laws and treaties can adapt. General DOD policy is that directed-energy weapons can be used legitimately on the battlefield. As with all new weapons, the DOD General Counsel reviews each DEW for compliance with international and U.S. laws before the Pentagon is allowed to field it.[26] Most DEWs are not yet far enough along in development and thus have not received this final stamp of approval.

As the Pentagon addresses these issues, it should do so in the same way that it would for any other category of weapon that it has reviewed. While some uses may be illegal (e.g., targeting an unarmed civilian who in no way poses a threat), other uses are just as assuredly legal and legitimate.

## Fixing the Research and Deployment Bottlenecks

While directed-energy research is advancing, inadequate funding is hindering more rapid development and deployment of these technologies. The military has rhetorically embraced the wonders of DEWs, but it has not always opened its wallet to fund the technologies.

True support for a program is often best measured by the resources that an organization is willing to devote to it. For instance, the Active Denial

24. China North Industries Corporation, "ZM-87 Portable Laser Disturber Fact Sheet," quoted in Human Rights Watch, "Blinding Laser Weapons: The Need to Ban a Cruel and Inhumane Weapon," September 1995, at *www.hrw.org/reports/1995/General1.htm* (March 15, 2006).

25. "Electromagnetic Weapons: Come Fry with Me," *The Economist*, January 30, 2003, at *www.globalsecurity.org/org/news/2003/030130-ebomb01.htm* (March 15, 2006).

26. David Ruppe, "Directed-Energy Weapons: Possible U.S. Use Against Iraq Could Threaten International Regimes," Global Security Newswire, at *www.globalsecurity.org/org/news/2002/020816-dew.htm* (March 15, 2006).


The Heritage Foundation

System was not ready for deployment when the United States invaded Iraq, in part because the money was not there. The Defense Department and Congress should start to fund promising and proven DEW technology so that promising weapon systems can move from the lab to the battlefield where they can help military personnel.

## Conclusion

DEW technology and its enabling infrastructure have matured to the point that DEWs can begin moving from the lab to the battlefield. While directed-energy technology is not the panacea for all situations that its most ardent advocates claim, it can give the U.S. military flexibility in tailoring its responses (e.g., lethal or nonlethal) to different types of targets (humans or machines).

Much work needs to be done before DEWs are deployed. The armed services need to move from just saying that DEWs are a good idea to fully supporting their development. The Defense Department needs to establish clear guidelines for using the technology. The speed, ultraprecision, and nonlethal capabilities of directed-energy weapons are all good reasons why the United States should continue to research, develop, and, where appropriate, field these technologies.

—*Alane Kochems is a Policy Analyst for National Security in the Douglas and Sarah Allison Center for Foreign Policy Studies, a division of the Kathryn and Shelby Cullom Davis Institute for International Studies, at The Heritage Foundation. Andrew Gudgel, a former Army Warrant Officer, is currently a freelance writer.*



EXHIBIT "P"

366 F.3d 975
366 F.3d 975, 04 Cal. Daily Op. Serv. 3875, 2004 Daily Journal D.A.R. 5434
(Cite as: 366 F.3d 975)
▷

**Page 1**

Briefs and Other Related Documents

United States Court of Appeals,
Ninth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Donald **FRIEDMAN**, Defendant-Appellant.
No. 03-10422.

Submitted Feb. 27, 2004.
Filed May 6, 2004.

Background: Defendant was charged with one count of threatening to assault federal officers. The United States District Court for the Eastern District of California, William B. Shubb, Chief Judge, found that defendant was incompetent to stand trial and involuntarily committed defendant. Defendant appealed.

Holdings: The Court of Appeals, William A. Fletcher, Circuit Judge, held that:

(1) commitment order was an immediately appealable collateral order, and

(2) district court properly found that defendant was incompetent to stand trial.

Affirmed.

West Headnotes

[1] Criminal Law ⚖══1023(2)
110k1023(2)

[1] Criminal Law ⚖══1023(9)
110k1023(9)
In criminal cases, the final judgment rule ordinarily prohibits appellate review until a defendant is convicted and sentenced; nevertheless, a departure from the ordinary procedure is permitted when to wait for a final decision would practically defeat the right to any review at all. 28 U.S.C.A. § 1291.

[2] Criminal Law ⚖══1023(3)
110k1023(3)
Under the collateral order doctrine, a preliminary or interim decision is appealable as a collateral order when it (1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final

judgment.

[3] Criminal Law ⚖══1023(3)
110k1023(3)
Commitment order based on a finding that defendant was incompetent to stand trial was an immediately appealable collateral order; a commitment order was analogous to an order denying bail and requiring pretrial detention, which was effectively unreviewable upon final judgment, and therefore immediately appealable as a collateral order. 18 U.S.C.A. § 4241(d).

[4] Criminal Law ⚖══1158(2)
110k1158(2)
The court of appeals reviews a district court's determination that a criminal defendant is competent to stand trial for clear error.

[5] Mental Health ⚖══432
257Ak432
District court properly entered commitment order based on defendant's refusal to rationally assist in his defense, where refusal was a direct result of defendant's paranoid schizophrenia making the defendant incompetent. 18 U.S.C.A. § 4241(d).
**\*976** Donald S. Frick, Sacramento, California, Donald **Friedman**, Butner, NC, for the defendant-appellant.

Philip A. **Ferrari**, Office of the United States Attorney, Sacramento, CA, for the plaintiff-appellee.

Appeal from the United States District Court for the Eastern District of California, William B. Shubb, Chief Judge, Presiding.    D.C. No. CR-03-00060-WBS.

Before: T.G. NELSON, W. FLETCHER, and BERZON, Circuit Judges.

WILLIAM A. FLETCHER, Circuit Judge.

Pursuant to 18 U.S.C. § 4241(d), defendant-appellant Donald **Friedman** was involuntarily committed to the custody of the Attorney General based on a finding by the district court that he is incompetent to stand trial on federal criminal charges. We hold that we have jurisdiction over

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

366 F.3d 975
(Cite as: 366 F.3d 975, *976)

Friedman's appeal of this order. On the merits, we affirm the decision of the district court.

### I. Background

On January 30, 2003, Donald Friedman walked into an FBI field office with a two-page letter signed by him and addressed to Special Agent Jack Murmylo of the United States Secret Service. Friedman's letter states, in part:

This is to inform you of my intention to torture one or more of your San Francisco agents if I do not immediately (today) get everything that I am entitled to related to the records that the U.S. Secret Service has related to me.

* * *

Agents of the U.S. Secret Service, as you already know, have been committing very serious crimes against me and other members of my family for a very long time, and I'm taking more direct action to prevent it from continuing.

* * *

I am going to get an admissible confession from at least one of your agents one way or the other, and if I don't get what I am demanding from you today, I will use the method of torture described in the attached pages [FN1] to obtain that confession *977 and to punish the agent for his or her involvement in the illegal acts that your agents have perpetrated against me and my family.

> FN1. The attached pages, photocopied from Robert Ludlum's novel *The Janson Directive*, describe a method of torture whereby an electrical current is sent through a wire inserted into the victim's spinal column, thereby causing great pain.

* * *

I have been more than reasonable, and more than patient, but I am going to get the admissible information one way or the other, and if it takes violence directed at your agents by me, so be it. I won't kill any of them, but during the torture they will wish they were dead.

* * *

Have a nice day, [signed] Donald M. Friedman

Friedman believed that Secret Service agents had, among other things, arranged to have him molested when he was thirteen, fired an electromagnetic radiation-based weapon at him that caused his shoes to melt, and fired a similar weapon at his father which caused him to develop the prostate cancer that eventually killed him. Prior to this time, Friedman had apparently filed a Freedom of Information Act

request for Secret Service records pertaining to him, but was dissatisfied with the response he received.

Friedman handed this letter to an FBI agent on duty at the front desk of the field office. The agent read the letter and asked Friedman three times whether he was sure that he really wanted it delivered to Special Agent Murmylo. Friedman responded each time in the affirmative. The agent explained to Friedman that the letter constituted a threat against a federal officer and, therefore, a federal crime. Friedman replied that he understood that he was about to commit a federal crime as a result of delivering the letter, and expected to be arrested that day. Finally, the agent asked Friedman if he really intended to torture Secret Service agents if his demands were not met, and Friedman confirmed that he did. Friedman was then placed under arrest and subsequently charged with one count of threatening to assault federal officers in violation of 18 U.S.C. § 115(a)(1)(B).

Friedman has, at all times, maintained the position that he is perfectly sane and competent to stand trial. Nevertheless, the government moved for, and the district court granted, an examination to determine Friedman's competency. He was accordingly examined by a psychiatrist selected by the government, who prepared a written report concluding that Friedman suffered from paranoid schizophrenia and was incompetent to stand trial. After receiving this report, Friedman requested that he be examined by a medical professional of his own choosing. The psychologist chosen by Friedman concurred with the government's psychiatrist that Friedman "is clearly psychotic and [ ] precisely fits the diagnosis of paranoid schizophrenia." He also concluded that, while Friedman was capable of understanding the nature and purpose of the proceedings against him, he was not able to assist his attorney in conducting his defense in a rational manner and was therefore incompetent to stand trial.

Meanwhile, Friedman sent several letters to the presiding district judge complaining about his attorney's performance. He also requested that the court issue a protective order against the Secret Service to prevent its agents from using electromagnetic weapons against him. In response, an agent of the Secret Service submitted a declaration to the court stating that he had reviewed internal records and determined that there were no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

366 F.3d 975
(Cite as: 366 F.3d 975, *977)

records pertaining to electromagnetic weapons or their use against anyone, including Friedman.

The district court then held a competency hearing at which Friedman testified, *inter alia,* that the back of a pair of his shoes were vaporized by an electromagnetic *978 weapon fired at his feet in 2001. Friedman presented the shoes in question to the district court, but it appeared to the court that the heel of the shoe had simply worn out due to ordinary use. Friedman also testified that the defense he wanted to present was that the Secret Service's misdeeds toward him forced him into writing the threatening letter. He did not want to present an insanity plea, he said, because he is not insane as a general matter, nor was he temporarily insane when he made the threat. The medical professionals who examined Friedman also testified, and the court took their written submissions into evidence.

The court found that "although [Friedman] understands the nature of these proceedings, because of his mental disease the defendant refuses to assist rationally or properly in his defense and thus is incompetent to stand trial." The court therefore ordered that Friedman be "committed forthwith to the custody of the Attorney General for treatment in a suitable facility in accordance with 18 U.S.C. § 4241(d)" [FN2] (the "Commitment Order"). The Commitment Order was for a term of four months, as per § 4241(d)(1), and was due to end on December 17, 2003. As that date approached, the district court issued a second order extending the commitment for an additional four months pending this appeal.

FN2. Section 4241(d) reads:

Determination and disposition.--If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility--

(1) for such a *reasonable period of time,* not to exceed *four months,* as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed; and

(2) for an *additional reasonable period of time* until—

(A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the trial to proceed; or

(B) the pending charges against him are disposed of according to law;

whichever is earlier.

If, at the end of the time period specified, it is determined that the defendant's mental condition has not so improved as to permit the trial to proceed, the defendant is subject to the provisions of section 4246.

(emphasis supplied).

Friedman appealed the Commitment Order to this court, and the parties subsequently moved jointly for an expedited hearing. The government argued that the Commitment Order was neither a final order nor an appealable collateral order and that we therefore lacked jurisdiction to hear the appeal. Because this was an expedited appeal, we resolved it in a brief unpublished order in which we rejected the government's contention and held that we have jurisdiction over the appeal. On the merits, we affirmed the Commitment Order and remanded the action to the district court. We now explain our rulings.

## II. Appellate Jurisdiction

[1][2] As a general rule, this court may only resolve appeals of "final decisions of the district courts." 28 U.S.C. § 1291. In criminal cases, this rule ordinarily prohibits appellate review until a defendant is convicted and sentenced. *Flanagan v. United States,* 465 U.S. 259, 263, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984). Nevertheless, a departure from the ordinary procedure *979 is permitted when to wait for a final decision " 'would practically defeat the right to any review at all.' " *Id.* at 265, 104 S.Ct. 1051 (quoting *Cobbledick v. United States,* 309 U.S. 323, 324-25, 60 S.Ct. 540, 84 L.Ed. 783 (1940)). Thus, under the "collateral order" doctrine announced in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), "a preliminary or interim decision is appealable as a 'collateral order' when it (1) 'conclusively determine[s] the disputed question,' (2) 'resolve[s] an important issue completely separate from the merits of the action,' and (3) is 'effectively unreviewable on appeal from a final judgment.' " *Sell v. United States,* 539 U.S.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

366 F.3d 975
(Cite as: 366 F.3d 975, *979)

166, 123 S.Ct. 2174, 2182 (2003) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (discussing *Cohen* )) (alterations in original). In examining these three factors, we are mindful that the Supreme Court has construed them "with the utmost strictness in criminal cases." *Flanagan*, 465 U.S. at 265, 104 S.Ct. 1051.

There can be no doubt that the Commitment Order conclusively determines Friedman's "present right to be at liberty prior to trial." *United States v. Gold*, 790 F.2d 235, 239 (2d Cir.1986). Moreover, the issue of involuntary commitment is completely separate from the issue of whether Friedman committed the crime with which he is charged. *See Sell*, 539 U.S. at 174, 123 S.Ct. at 2182. The issue is also important because the Commitment Order deprives Friedman of his freedom, a basic liberty guaranteed by the Fifth Amendment. The question, then, comes down to whether the Commitment Order would be effectively unreviewable if we delay Friedman's appeal until he is either convicted and sentenced, or acquitted.

[3] [3] Several of our sister circuits have found that a commitment order entered pursuant to § 4241(d), like the one at issue here, would be effectively unreviewable on appeal from a final judgment. *United States v. Ferro*, 321 F.3d 756, 760 (8th Cir.2003); *United States v. Filippi*, 211 F.3d 649, 650-51 (1st Cir.2000); *United States v. Boigegrain*, 122 F.3d 1345, 1349 (10th Cir.1997) (en banc) (overturning prior circuit precedent); *United States v. Davis*, 93 F.3d 1286, 1289 (6th Cir.1996); *United States v. Weissberger*, 951 F.2d 392, 396 (D.C.Cir.1991); *Gold*, 790 F.2d at 239. We are unaware of any contrary authority. Judge Kearse's discussion in *Gold* is particularly persuasive:

Unlike a ruling that the defendant *is* competent and *must* proceed to trial, which could be effectively reviewed and remedied, if erroneous, on appeal from any final judgment against him, an order finding that a defendant is not competent to stand trial and committing him for hospitalization would be effectively unreviewable on appeal from a final judgment. First, there may never be a criminal trial if the defendant is never found competent to stand trial; in this instance, there would be no appellate review. If the defendant eventually were found competent to stand trial and were acquitted, there again would be no appellate review. If the

defendant were eventually found competent to stand trial and were convicted, the commitment order could be reviewed on appeal from his conviction; but the matter of the relief to be granted if the order were found to have been erroneous would be moot. Whether or not the conviction were set aside, nothing could recover for the defendant the time lost during his confinement; probably no one could be held liable to him in damages for the loss of his liberty.

790 F.2d at 239 (emphasis in original). Moreover, we believe that the Commitment Order is analogous to an order denying bail and requiring pretrial detention, *980 which, the Supreme Court has found to be effectively unreviewable upon final judgment, and therefore immediately appealable as a collateral order. *Stack v. Boyle*, 342 U.S. 1, 6, 72 S.Ct. 1, 96 L.Ed. 3 (1951); *see Boigegrain*, 122 F.3d at 1349 (analogizing a § 4241(d) commitment order to an order denying bail and requiring pretrial detention); *Weissberger*, 951 F.2d at 396-97 (same); *Gold*, 790 F.2d at 239 (same).

The government relies on *United States v. Ohnick*, 803 F.2d 1485 (9th Cir.1986), in support of its argument that Friedman's Commitment Order under § 4241(d) is not appealable. In that case, Ohnick had already conceded incompetence to stand trial and the propriety of his temporary incarceration under § 4241(d). He was at the next step in the process, seeking to avoid indefinite incarceration under § 4246(a). Such incarceration required not only an initial determination of incompetence to stand trial, but also a subsequent determination of dangerousness. Ohnick moved to have the dangerousness determination made by a federal district court in California. When the California district court refused to assert jurisdiction over the dangerousness hearing, Ohnick appealed that refusal. When we heard the appeal, a federal district court in Missouri had already scheduled a hearing to determine Ohnick's dangerousness, and was awaiting only the outcome of Ohnick's appeal to us before proceeding with that hearing. *Id.* at 1486.

We held in *Ohnick* that the refusal by the California district court to assert jurisdiction over the dangerousness hearing under § 4246(a) was not an appealable collateral order under *Cohen*. If the Missouri district court found that Ohnick was dangerous and therefore upheld his indefinite incarceration under § 4246(a), Ohnick would have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

366 F.3d 975
(Cite as: 366 F.3d 975, *980)

Page 5

had an opportunity to challenge the merits of that determination on appeal, as well as to challenge the propriety of the Missouri district court, rather than the California district court, making that determination. *Id.* at 1487. In this case, by contrast, if **Friedman** is not allowed to take an interlocutory appeal from his involuntary commitment and temporary incarceration under § 4241(d), he may never be able to appeal the district court's determination that he was properly committed and incarcerated under that section.

We therefore hold that the Commitment Order is an immediately appealable collateral order.

### III. The Merits

[4] We review a district court's determination that a criminal defendant is competent to stand trial for clear error. *United States v. Gastelum-Almeida,* 298 F.3d 1167, 1171 (9th Cir.2002). As recognized by the district court, § 4241(d) establishes a two-part disjunctive test of competency:

If ... the [district] court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable[1] to understand the nature and consequences of the proceedings against hirr *or* [2] to assist properly in his defense, the court shall [declare the defendant incompetent and] commit [him or her] to the custody of the Attorney General.

(Emphasis supplied.) In the Commitment Order, the district court found that **Friedman** understood the nature of the proceedings against him, but also found that "because of his mental disease the defendant refuses to assist rationally or properly in his defense."

[5] We observe that the district court's Commitment Order states that **Friedman** "refuses" to assist properly in his defense, not that he is "unable" to do so. Nevertheless, it is obvious from the record that *981 **Friedman's** so-called refusal to rationally assist in his defense is a direct result of his paranoid schizophrenia. For example, in a letter he wrote to the district judge in April 2003, **Friedman** complained that his attorney was not actively

searching for evidence regarding alleged death threats from Secret Service agents against him and his family. **Friedman** described this evidence as "necessary [to] quickly and completely exonerate me of these charges, including the ridiculous allegations that I am somehow mentally ill or unbalanced." He therefore requested that his attorney be replaced with "someone who is going to be more diligent at obtaining the easily available evidence which is going to exonerate [him]."

In a real and important sense, **Friedman's** paranoid schizophrenia is preventing him from working with his attorney, rendering him "unable" to "assist properly in his defense" within the meaning of § 4241(d). *Cf. Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (holding that the proper test of competency to assist in one's defense is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding"). We find no error, let alone clear error, in the district court's Commitment Order finding **Friedman** incompetent and committing him to the custody of the Attorney General.

AFFIRMED.

366 F.3d 975, 04 Cal. Daily Op. Serv. 3875, 2004 Daily Journal D.A.R. 5434

Briefs and Other Related Documents (Back to top)

. 2004 WL 425447T2 (Appellate Brief) Reply Brief for Appellant (Jan. 20, 2004)Original Image of this Document (PDF)

. 2004 WL 425448T2 (Appellate Brief) Reply Brief for Appellant (Jan. 20, 2004)Original Image of this Document (PDF)

. 2003 WL 23300896T2 (Appellate Brief) Opening Brief for Appellant (Dec. 04, 2003)Original Image of this Document (PDF)

. 03-10422 (Docket) (Aug. 08, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    **Page 6**
Slip Copy, 2006 WL 3741850 (E.D.Cal.)
(Cite as: 2006 WL 3741850 (E.D.Cal.))
**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
E.D. California.
UNITED STATES of America, Plaintiff,
v.
Donald M. **FRIEDMAN**, Defendant.
No. CR. S-03-0060 WBS.

Dec. 19, 2006.
Philip A. **Ferrari**, Sacramento, CA, for Plaintiff.

*ORDER*

WILLIAM B. SHUBB, United States District
Judge.

**\*1** Defendant Donald M. **Friedman** was originally
charged in a single count indictment with making
threats against federal law enforcement officers in
violation of 18 U.S.C. § 115. On July 28, 2003,
after conducting a hearing pursuant to 18 U.S.C. §
4241, the court found that although **Friedman**
understood the nature of the proceedings, because of
his mental disease he refused to assist rationally or
properly in his defense, and was thus incompetent to
stand trial. The court accordingly ordered **Friedman**
committed to the custody of the Attorney General
for treatment pursuant to 18 U.S.C. § 4241(d).
**Friedman's** appeal from that order was affirmed by
the Ninth Circuit. *United States v. Friedman,* 366
F.3d 975 (9th Cir.2004).

On January 20, 2004, the court denied the Federal
Medical Center's request to involuntarily medicate
**Friedman** pursuant to *Sell v. United States,* 539
U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003),
and ordered him returned to this district. On
September 13, 2004, after hearing, the court found
that **Friedman's** mental condition had not so
improved, and would not likely so improve, so as to
permit him to proceed to trial, and accordingly
ordered him committed pursuant to the provisions of
18 U.S.C. § 4246. On October 28, 2004, on the
motion of the United States Attorney, because the
case could not be brought to trial, the court
dismissed the indictment pursuant to Rule 48(a) of
the Federal Rules of Criminal Procedure.

**Friedman** now moves, in propria persona, (1) for
"Reappointment of Counsel, (2) for "Expungement
of Arrest and All Related Proceedings," (3) Appear
Telephonically, and (4) for "Emergency
Scheduling."

I. *Motion for Reappointment of Counsel*

**Friedman** currently has nothing before this court.
All charges against him have been dismissed. There
exists no absolute right to appointment of counsel in
collateral proceedings such as those contemplated by
defendant's other motions. *See, e.g., Irwin v.
United States,* 414 F.2d 606 (9th Cir.1969).

18 U.S.C. § 3006A authorizes the appointment of
counsel at any stage "if the interests of justice so
require." However, the interests of justice do not so
require here. **Friedman's** moving papers appear to
be predicated on the same kinds of delusional
arguments which resulted previously in his being
found incompetent to stand trial. Accordingly, the
court will deny the motion for reappointment of
counsel for that purpose.

II. *Motion for Expungement*

**Friedman** argues that the court has ancillary
jurisdiction to hear his motion to expunge his arrest
and related proceedings. The Supreme Court has
instructed that courts may use the doctrine of
ancillary jurisdiction "for two separate, though
sometimes related, purposes: (1) to permit
disposition by a single court of claims that are, in
varying respects and degrees, factually
interdependent, and (2) to enable a court to function
successfully, that is, to manage its proceedings,
vindicate its authority, and effectuate its decrees."
*Kokkonen v. Guardian Life Ins. Co. of Am.,* 511
U.S. 375, 379-80, 114 S.Ct. 1673, 128 L.Ed.2d 391
(1994). The Ninth Circuit has held that the latter
purpose--to manage proceedings, vindicate
authority, and effectuate decrees--permits a district
court to order the expungement of criminal records
in cases over which it once exercised jurisdiction.
*United States v. Sumner,* 226 F.3d 1005, 1014 (9th
Cir.2000).

**\*2** Neither of those purposes would be served here.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          **Page 7**
(Cite as: 2006 WL 3741850, *2 (E.D.Cal.))

Moreover, to the extent that **Friedman's** arguments are intelligible, they are based on equitable considerations, which the Ninth Circuit has specifically held do not comport with the second purpose of ancillary jurisdiction. *Sumner*, 226 F.3d at 1014. **Friedman** has presented no cognizable reason why his arrest and related proceedings should be expunged. There is no reason to expunge the record of the fact that **Friedman** was arrested, or that he was adjudged incompetent to stand trial. Even if the court had jurisdiction to strike reference to those proceedings from the records, it would not choose to do so. The court will accordingly deny defendant's motion for expungement.

Because the court denies **Friedman's** motion for

expungement, there is no need to consider his motions to appear telephonically and for emergency scheduling.

IT IS THEREFORE ORDERED that defendant's motions for reappointment of counsel and expungement of arrest and all related proceedings be, and the same hereby are, DENIED.

Slip Copy, 2006 WL 3741850 (E.D.Cal.)

Motions, Pleadings and Filings (Back to top)

. 2:03cr00060 (Docket) (Feb. 6, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DONALD FRIEDMAN, ) | |
| ) | |
| **Plaintiff,** ) | Civil Action No. 06-2125 (RWR) |
| ) | |
| **v.** ) | |
| ) | |
| **U.S. SECRET SERVICE,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### PROOF OF SERVICE

I, _Thuc Nguyen_, am over 18 years old, a citizen of the State of California, and am not a party to the above-captioned case.

On _Apr. 9th, 2008_, I served the attached documents by placing them in a fully postage prepaid envelope and placed that envelope into the U.S. Mail, after addressing it as follows:

> Mr. Kenneth Adebonojo, AUSA
> U.S. Attorney's Office
> Civil Division
> 555 Fourth Street, N.W.
> Washington, DC  20530

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _Apr. 9th, 2008_

Signed: _____

Address:

**POSTAL EXPRESS**
**274 E. SUNSET AVE.**
**SUISUN, CA 94585**