**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
DONALD FRIEDMAN,                          )
                                          )
                    Plaintiff,            )
                                          )
            v.                            )          Civil Action No. 06-2125 (RWR)
                                          )
UNITED STATES SECRET SERVICE,             )
                                          )
                    Defendant.            )
_____ )

## MEMORANDUM OPINION AND ORDER

Defendant has renewed its motion for summary judgment.  Based on a review of the

motion, plaintiff's opposition, and the entire record of this case, the Court will grant the motion

in part and deny it in part without prejudice.

### I.  BACKGROUND

In September 2006, plaintiff submitted a request to the United States Secret Service

("Secret Service") under the Freedom of Information Act ("FOIA"), *see* 5 U.S.C. § 552, for the

following information:

> Any and all files, records, documents, information, photos,
> research materials (incl. results), and purchasing and any other
> contract-related information related to or referring to any U.S.
> Secret Service development of, acquisition of, installation of,
> deployment of, testing of, research related to, and/or investigation
> or evaluation of the capabilities, properties, and/or effects of any:
>
> 1)      directed energy weapons or systems (incl. any and all parts
> or components thereof); and/or
> 2)      directed energy devices or systems (incl. any and all parts
> or components thereof); and/or

3)      electromagnetic radiation-emitting devices or systems (incl. any and all parts or componants [sic] thereof) which are capable of causing any injury or perception of physical pain in any person who is hit or struck by the device's or system's emissions.

Am. Compl., Ex. A (Letter to FOIA/PA Manager, U.S. Secret Service, from plaintiff dated

September 1, 2006) at 1-2 (emphasis added).  In subsequent correspondence, plaintiff defined the

term "directed energy weapons and/or systems" to mean:

any device(s) which use any directed, beamed, or pulsed emission of electromagnetic radiation and/or energy (which is comprised of any sound, infrasound, infrasonic, light, infrared, ultraviolet, heat, millimeter-wave, or microwave radiation and/or energy, which is capable of any of the following:
1)      causing pain, injury, disability, discomfort, incapacitation, or disorientation; and/or
2)      inducing sleep; and/or
3)      stunning; and/or
4)      causing nausea or seizure; and/or
5)      decreasing spontaneous activity; and/or
6)      affecting, modifying, influencing, or controlling any activity, behavior, or bodily functions; and/or
7)      causing any other adverse effect on any part or system of the human body.

*Id.*, Ex. B (Letter to FOIA/PA Manager, U.S. Secret Service, from plaintiff dated September 9,

2006) at 1-2 (emphasis added).

Plaintiff later amended the phrase "causing pain, injury, disability, discomfort,

incapacitation, or disorientation" to read: "causing pain, injury, disability, discomfort,

incapacitation, distraction, or alteration or degradation of any perception, performance, task,

skill, or job[.]"  Def.'s Mem. of P. & A. in Supp. [of its] Mot. for Summ. J., Decl. of Craig W.

Ulmer ("Ulmer I Decl."), Ex. F (Letter to U.S. Secret Service, Liaison Division, from plaintiff

dated January 31, 2007) at 1 (emphasis in original).  A third letter "clarified (but did not

modify)" plaintiff's September 1, 2006 request, Am. Compl. ¶ 7, by defining the phrase

"deployment of" to mean the "'use of' any directed energy weapons or systems, etc. since any

use of any directed energy weapons or devices or any of the other devices described in [the] original request would also require deployment of those devices." Ulmer I Decl., Ex. D (Letter to FOIA/PA Manager, U.S. Secret Service, from plaintiff dated September 29, 2006) at 1-2. Further, plaintiff stated that "all special or limited access programs, areas, locations, labs, etc. within protective research, etc. <u>must</u> be searched since most, if not all, of the records being requested are probably considered sensitive or highly confidential." *Id.*, Ex. D at 2 (emphasis in original). Plaintiff's fourth letter explained that his request "<u>includes</u> searching the one or more mobile units/vehicles, which have been within directed-energy weapon, system, or device range of [plaintiff], which agency personnel have been using to transport the various directed-energy weapons, systems, and devices and the wall-penetrating surveillance/targetting equipment [the Secret Service has] been criminally misusing on [him] on a daily basis since 2/25/97." *Id*., Ex. F (Letter to U.S. Secret Service, Liaison Division, from plaintiff dated January 31, 2007) at 2 (emphasis in original).

## A.  *Secret Service Records*

The Secret Service sent to plaintiff a written acknowledgment of its receipt of the FOIA request, assigned File Number 20060535.  Am. Compl., Ex. D (Letter to plaintiff from K.J. Lyerly, Special Agent in Charge, Freedom of Information & Privacy Acts Officer, U.S. Secret Service, dated October 2, 2006).  Secret Service staff began to process plaintiff's FOIA request upon payment of fees associated with the agency's search for records.  *See* Ulmer I Decl. ¶¶ 9-12.

The Secret Service construed plaintiff's request broadly as one "for any documents concerning directed energy weapons/systems or electromagnetic radiation devices/systems." *Id.* ¶ 4.  Staff initially conducted a search of the Master Central Index ("MCI") and of paper and

computer records maintained by the Secret Service's Uniformed Division, Investigative Support

Division and Intelligence Division; these searches produced no responsive records.  *Id*. ¶¶ 15-16.

Staff also determined that the Training component of the Office of Human Resources and

Training conducted no training on weapons described in plaintiff's FOIA request, and, therefore,

that the office maintained no responsive records.  *Id.* ¶ 16.  A search of paper records and the

internal e-mail network of the Technical Security Division ("TSD"), the division "primarily

responsible for compiling information on Secret Service security measures and technologies

which could potentially pose a threat to Secret Service protectees or . . . facilities," yielded

responsive records, although "none of the responsive material . . . in any way deals with the

plaintiff."  *Id.* ¶ 17.

    Even though the "responsive documents the Secret Service located do not in any way

concern the plaintiff," *id.* ¶ 4, the Secret Service nevertheless released them to plaintiff on July

23, 2007, *id.* ¶ 19.  It withheld approximately 454 pages of records in their entirety under

Exemptions 1, 2, 4, 5, 6, 7(C) and 7(E).  *Id.*, Ex. H (Letter to plaintiff from Peter Schurla, Acting

Special Agent in Charge, Acting Freedom of Information and Privacy Acts Officer, U.S. Secret

Service, dated July 23, 2007) at 2.  Subsequent review of the records led to the release of

additional documents and information previously withheld.  *Id.* ¶ 32.  "In order to ensure that

plaintiff received all releasable information," on October 11, 2007, the Secret Service released "a

complete set of releasable information," explaining that information still was withheld under

Exemptions 1, 2, 4, 5, 6, 7(C) and 7(E), *see id.*, Ex. U (Letter to plaintiff from Craig W. Ulmer,

Special Agent In Charge, Freedom of Information & Privacy Acts Officer, U.S. Secret Service,

dated October 11, 2007) at 1.  A third release of records occurred on October 24, 2007, at which

time the Secret Service released "an additional seven pages of releasable information," reducing

the number of pages withheld in their entirety to approximately 369 pages.  *Id.* ¶ 33; *see id.*, Ex.

V (Letter to plaintiff from C.W. Ulmer dated October 24, 2007).

### B. Referrals

The Secret Service's searches located records which originated in other federal agencies.

Ulmer I Decl. ¶ 19.  In accordance with its regulations, *see* 6 C.F.R. § 5.4(c), the Secret Service

referred records to the United States Coast Guard, the Department of Energy, the United States

Air Force, the United States Navy, the Department of Homeland Security, the Department of

Justice, the United States Army, the Federal Aviation Administration, the Department of

Defense, the Defense Threat Reduction Agency, and the United States Marine Corps, for each

entity's direct response to plaintiff.[1]   *See* Ulmer I Decl. ¶¶ 20-30.

---

[1]      With respect to the referral of records, Secret Service regulations provide:

When a component receives a request for a record in its possession, it shall
determine whether another component, or another agency of the Federal
Government, is better able to determine whether the record is exempt from
disclosure under the FOIA and, if so, whether it should be disclosed as a matter of
administrative discretion.  If the receiving component determines that it is best
able to process the record in response to the request, then it shall do so.  If the
receiving component determines that it is not best able to process the record, then
it shall either:
(1) Respond to the request regarding that record, after consulting with the
component or agency best able to determine whether to disclose it and with any
other component or agency that has a substantial interest in it; or
(2) Refer the responsibility for responding to the request regarding that record to
the component best able to determine whether to disclose it, or to another agency
that originated the record (but only if that agency is subject to the FOIA).
Ordinarily, the component or agency that originated a record will be presumed to
be best able to determine whether to disclose it.

6 C.F.R. § 5.4(c).

### 1.  United States Coast Guard Records

The records referred by the Secret Service to the United States Coast Guard ("Coast Guard") pertained to Underwater Loudhailer technology, *see* Mem. of P. & A. in Supp. of Def.'s Renewed Mot. for Summ. J. ("Def.'s Mem."), Ex. 3 (Decl. of Richard Hansen ("Hansen Decl.")) ¶ 1, which was described as "just a general warning device equivalent to a public address system and was/is NOT a 'Directed Energy Weapon or System.'"  Hansen Decl. ¶ 4.  In 2003, the Coast Guard's Research and Development Center in Connecticut "was to identify other potential interested [a]gencies, including the [Secret] Service, to evaluate/review the white papers submitted by industry on potential 'Underwater Loudhailer' designs." *Id.* ¶ 3.  The Secret Service had no interest in the technology "and refused to even look at/review it; and that was the end/only involvement of the [Secret] Service with that technology." *Id.*  Accordingly, the Coast Guard determined that these records were beyond the scope of plaintiff's FOIA request for "Directed Energy Weapon or System." *Id.* ¶ 5.  The Coast Guard did not release any information to plaintiff.  Def.'s Mem., Ex. 1 (Second Decl. of Craig W. Ulmer ("Ulmer II Decl.")), Ex. A (Letter to plaintiff from T.W. Jones, Captain, U.S. Coast Guard, dated August 28, 2007).

### 2.  Department of Energy Records

The two documents referred by the Secret Service to the Department of Energy ("DOE"), described as "FY 1999 OSS-Sponsored R&D Quad Charts" and "Acoustic Barrier Test Bed," were "actually the title page and body of one single document."  Ulmer II Decl., Ex. B (Letter to plaintiff from Larry D. Wilcher, Director, Office of Security Technology and Assistance, Office of Health, Safety and Security, DOE, dated November 5, 2007).  The document "summarize[d] the status of a project conducted in the late 1990s to investigate the effect of acoustics on buildings." *Id.*  The DOE "d[id] not believe this technology is a directed energy weapon, or that

the project status summary is responsive" to plaintiff's FOIA request, and the DOE released no

records then.  *Id.*  Subsequently, notwithstanding its prior determination that the document was

"only marginally responsive," the DOE deemed it "suitable for release" to plaintiff in full.

Def.'s Mem., Ex. 2 (Letter to plaintiff from L.D. Wilcher dated April 22, 2009).

### 3.  United States Air Force Records

The Secret Service referred to the United States Air Force ("Air Force") two reports titled

"Contractor's Progress, Status, and Management Report for the Air Surveillance Integration

Project" (39 pages) and "9 February 1999 Status Review Meeting" (148 pages).  Def.'s Mem.,

Ex. 6 (Decl. of Lucius A. Cattles, Jr. ("Cattles Decl.")) ¶¶ 3-4.  Both reports were withheld in full

under Exemption 1.  Cattles Decl. ¶¶ 10-13; *see* Ulmer II Decl., Ex. P (Letter to plaintiff from

Gerard Murray, Freedom of Information Act Manager, Headquarters 66th Air Base Wing

(AFMC), Hanscom Air Force Base, dated August 21, 2008).  The Air Force also withheld "the e-

mail addresses, login names, and passwords for military computer systems appearing in the

records" under Exemption 2 on the ground that disclosure "could allow an individual to cause

harm to government computer systems."  Def.'s Mem., Ex. 5 (Decl. of Carolyn Price ("Price

Decl.")) at 4 (page number designated by the Court).

Certain other records referred by the Secret Service to the Air Force were in turn

forwarded to Kirtland Air Force Base in New Mexico for review.  Def.'s Mem., Ex. 4 (Decl. of

Tishlyn E. Taylor ("Taylor Decl.")) at 2 (page number designated by the Court).  "The records

consisted of nine electronic mail messages and a document dated January 31, 2000 from a

meeting about laser technologies."  Taylor Decl. at 2.  The meeting notes were released in full,

and the electronic mail messages were released in part after redacting names and personal

identifying information about Air Force personnel under Exemption 6.  *Id.*[1]

### 4.  United States Navy Records

The United States Navy ("Navy") received records referred by the Secret Service, and

"subsequently transferred this material to two of its components," Ulmer II Decl. ¶ 11, the Naval

Explosive Ordnance Disposal Technology Division and the Naval Air Systems Command.  The

former released records in redacted form, withholding personal information under Exemption 6.

*Id.*, Ex. D (Letter to plaintiff from the Head of the Employee Resources and Development

Division, Naval Explosive Ordnance Disposal Technology Division, Department of the Navy,

dated September 10, 2007).  The latter released in its entirety a document described as an "email

written by Major Thomas F. Daley, (USMC), VH Class Desk Officer, dated 20 February 2001

6:30pm." *Id.*, Ex. E (Letter to plaintiff from William T. Mohn, Associated Counsel, Initial Denial

Authority, Naval Air Systems Command, Headquarters, dated April 22, 2008).

### 5.  Department of Homeland Security Records

It appears that the Secret Service referred records to the Privacy Office of the Department

of Homeland Security ("DHS"), which in turn forwarded records to other DHS divisions.[2]

Ulmer II Decl. ¶ 12; Def.'s Mem., Ex. 7 (Decl. of Gayle S. Worthy ("Worthy Decl.")) ¶ 3 & Ex.

8 (Decl. of Nicole Marcson ("Marcson Decl.")) ¶ 3.

The Office of the Under Secretary for National Protection and Programs, National

Protection and Programs Directorate ("NPPD"), received 128 pages of potentially responsive

---

[1]     It appears that information has been withheld from Air Force records under Exemption
7(C).  *See* Ulmer II Decl., Ex. H at 2.  None of the supporting declarations addresses this point,
however.

[2]     The U.S. Secret Service, formerly a bureau within the U.S. Department of the Treasury,
now is a component of the DHS.  Ulmer I Decl. ¶ 1.

records, only nine of which fell under the NPPD's purview.  Worthy Decl. ¶¶ 1, 3.  These

records were in a FOIA request file and contained "a NPPD letter, dated September 12, 2007,

addressed to [plaintiff with] a final FOIA response consisting of nine pages."  *Id.* ¶ 7.  Four of

these pages were released in their entirety, and five pages were released in part after having

redacted the names, email addresses, phone numbers and other contact information of individuals

under Exemption 6.  *Id.*; Ulmer II Decl., Ex. F (Letter to plaintiff from Alisa N. Turner, Freedom

of Information Act Officer, Initial Denial Authority, NPPD, DHS, dated September 12, 2007) at

1.

      The NPPD forwarded to the Science and Technology ("S&T") Directorate a 43-page

powerpoint document.  Marcson Decl. ¶¶ 2, 5.  Although the document "appear[ed] to have

absolutely nothing to do with the original FOIA request . . . for records pertaining to the

deployment of or research related to 'energy weapons or systems,'" *id.* ¶ 5, S&T released the

document in part after having redacted certain information under FOIA Exemption 5.  *Id.* ¶ 6;

Ulmer II Decl., Ex. G (Letter to plaintiff from Nicole Marcson, Associate General Counsel for

Science and Technology, DHS dated August 8, 2008) at 1.

      On August 18, 2008, DHS returned to the Secret Service "the remaining documents

originally referred to DHS for processing (total of 76 pages) after determining that this material

originated from other entities."  Ulmer II Decl. ¶ 13.  Six of those pages were found to be

proprietary material originating from Raytheon Company.  *Id*.  Raytheon claimed the documents

contained trade secrets.  The Secret Service withheld two of the six pages in full and released the

remaining pages bearing redactions under Exemption 4,  *id.* ¶ 14; *see id.*, Ex. I (Letter to Emily

Griesy, Freedom of Information and Privacy Acts Branch, U.S. Secret Service, from Thomas J.

Finn, Counsel, Raytheon Missile Systems, dated September 12, 2008) at 1, and Exemptions 2, 6,

7(C) and 7(E), *id.*, Ex. J (Letter to plaintiff from C.W. Ulmer dated September 15, 2008) at 1.

Fifty-seven of the remaining pages originated from the Department of Defense ("DOD") and

were referred to the DOD.  Ulmer II Decl. ¶ 13.  The Secret Service released the remaining

records after having redacted certain information under Exemptions 2, 5, 6, 7(C) and 7(E).

Ulmer II Decl., Ex. H (August 8, 2008 letter from N. Marcson, Associate General Counsel for

Science and Technology, DHS) at 1.

### 6.  Department of Defense Records

The DOD informed the Secret Service by email on August 26, 2008, regarding the 57

pages referred to the DOD, that "this material was beyond the scope of plaintiff's request, and

therefore, DOD was not going to process these documents."  Ulmer II Decl. ¶ 13.

### 7.  Department of Justice Records

The National Institute of Justice ("NIJ"), within the Justice Department's Office of

Justice Programs ("OJP"), is "the research, development and evaluation agency of the U.S.

Department of Justice and is dedicated to researching crime control and justice issues," Def.'s

Mem., Ex. 9 (Decl. of Dorothy A. Lee ("Lee Decl.")) ¶¶ 1, 4.   NIJ provides "objective,

independent, evidence-based knowledge and tools to meet the challenges of crime and justice,

particularly at the state and local levels." Lee Decl. ¶ 4.  The Secret Service referred to the OJP a

single 35-page document.[3]  *Id.* ¶ 2.  The OJP released 29 pages in full, "redacted from three . . .

pages the names of non-federal individuals pursuant to . . . [Exemption 6]," and "redacted from

three . . . pages law enforcement information" pursuant to Exemption 7(E).  *Id.* ¶ 6; *see* Ulmer II

---

[3]    The referral from the Secret Service contained 38 pages: one page was a referral letter,
two pages were a copy of plaintiff's FOIA request, and the attachment was 35 pages long.  Lee
Decl. ¶ 9.

Decl., Ex. K (Letter to plaintiff from Rafael A. Madan, General Counsel, Office of Justice

Programs, DOJ, dated November 8, 2007).

### 8.   Department of the Army Records

The Department of the Army ("Army") determined that the records referred by the Secret

Service, which are not described in the defendant's motion or attachments, were not responsive

to plaintiff's FOIA request, and it released no records.  Ulmer II Decl. ¶ 16; *see id.*, Ex. L (Letter

to plaintiff from Deborah A. Dennis, FOIA Officer, Research, Development and Engineering

Command, Department of the Army, dated October 23, 2007).

### 9.   Transportation Security Administration Records

A document erroneously referred by the Secret Service to the Federal Aviation

Administration ("FAA") in turn was referred to the Transportation Security Administration

("TSA").  Ulmer II Decl. ¶ 17.  TSA released the document in its entirety.  *Id.*, Ex. M (Letter to

plaintiff from Kevin J. Janet, FOIA Officer, Freedom of Information Act Office, TSA, dated

August 28, 2008).

### 10.   Defense Threat Reduction Agency Records

The Secret Service referred three documents to the Defense Threat Reduction Agency

("DTRA").  Ulmer II Decl. ¶ 18.  DTRA determined that "significant portions of these

documents are publicly available via the internet," and that other information was exempt from

disclosure under Exemption 6.[4]  *Id.*, Ex. N (Letter to plaintiff from Brenda Carter, Freedom of

Information Act/Privacy Act Officer, DTRA, dated September 27, 2007) at 1.  Accordingly, the

DTRA released the records in redacted form.  *Id.*

---

[4]      The Secret Service reviewed these same pages, and in addition to "the names of
government personnel" redacted by the DTRA, the Secret Service "redacted staff names" under
Exemption 7(C).  Ulmer II Decl., Ex. N at 1.

11.  United States Marine Corps Records

The United States Marine Corps ("USMC") released the records referred by the Secret Service in their entirety.  *See* Ulmer II Decl., Ex. O (Letter to plaintiff from John B. Bennett, Counsel, Marine Corps System Command, USMC, dated January 8, 2008).


## II.  DISCUSSION

Plaintiff has filed this action in order "to expose the U.S. Secret Service's illegal and desperate attempt to fill a critical void in its protective-mission capabilities as well as enhance those capabilities with various highly-innovative directed-energy weapons ('DEWs'), devices, and related technologies . . . and the covert, out-of-control criminal and professional misconduct which has occurred . . . during that effort."  Pl.'s Verified Mem. of Renewed Opp'n to the Def.'s Mot. for Summ. J., Mot. for Order Related to the Def.'s Misuse of the (c)(1) Exclusion, and Mot. for *In Camera* Review of All Records ("Pl.'s Opp'n") at 2.  He asserts that defendant "has covertly, severely, and sadistically misused various, severe-pain-and-discomfort-inducing electromagnetic ('EM') radiation-based technologies on the [p]laintiff more than 125,000 times and other similar (and related) EM-radiation ('EMR') technologies . . . on a continuous, daily basis for more than 12 years."  *Id.* at 4-5.  The Secret Service moves for summary judgment, arguing that there no genuine issues of material fact as to its compliance with the FOIA and that it is entitled to judgment as a matter of law.  Def.'s Mem. at 1.

### A.  Summary Judgment Standard

The Court grants a motion for summary judgment if the moving party shows that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a

genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[A] material

fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party" on an element of the claim.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).  Factual assertions in the moving party's affidavits or declarations may be accepted

as true unless the opposing party submits his own affidavits or declarations or documentary

evidence to the contrary.  *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).  In opposing a

summary judgment motion, a party may not "replace conclusory allegations of the complaint or

answer with conclusory allegations of an affidavit," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871,

888 (1990), but rather must "set forth specific facts showing that there is a genuine issue for

trial."  *Anderson*, 477 U.S. at 248.  "[A] plaintiff pursuing an action under FOIA must establish

that either: (1) the Vaughn index does not establish that the documents were properly withheld;

(2) the agency has improperly claimed an exemption as a matter of law; or (3) the agency has

failed to segregate and disclose all nonexempt material in the requested documents."  *Schoenman

v. Fed. Bureau of Investigation*, 573 F. Supp. 2d 119, 134 (D.D.C. 2008)  (citations omitted).

        In a FOIA case, the Court may grant summary judgment based on information provided

in an agency's affidavits or declarations when they describe "the documents and the

justifications for nondisclosure with reasonably specific detail, demonstrate that the information

withheld logically falls within the claimed exemption, and are not controverted by either contrary

evidence in the record [or] by evidence of agency bad faith."  *Military Audit Project v. Casey*,

656 F.2d 724, 738 (D.C. Cir. 1981).  Such affidavits or declarations are accorded "a presumption

of good faith, which cannot be rebutted by 'purely speculative claims about the existence and

discoverability of other documents.'"  *SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d

1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. Cent. Intelligence Agency*, 692 F.2d 770, 771 (D.C. Cir. 1981)).

### B.  The Secret Service's Searches for Responsive Records

The Secret Service interpreted plaintiff's FOIA request broadly as one "for any documents concerning directed energy weapons/systems or electromagnetic radiation devices/systems" generally.  Ulmer I Decl. ¶ 4.  The "responsive documents the Secret Service located do not in any way concern the plaintiff," however.  *Id.*

The Secret Service "initially conducted a search for responsive records in the . . . Master Central Index (MCI)[,] . . . an online computer system used by all Secret Service field offices, protective divisions, and headquarters offices, and is the central record keeping system for information on all Secret Service cases."  Def.'s Mem., Ex. 10 (Third Decl. of Craig W. Ulmer ("Ulmer III Decl.")) ¶ 5.  Using search terms including "electromagnetic radiation weapons/systems" and "directed energy weapons/systems," a search of MCI yielded no responsive records.  Ulmer III Decl. ¶ 5.

Staff of its FOIA/PA Office next "determined what Secret Service division would possess information response to 'Direct Energy Devices or Systems,' and 'Electromagnetic Radiation-Emitting Devices or Systems.'"  Ulmer I Decl. ¶ 14.  Those divisions were: Intelligence, Human Resources and Training, Technical Security, Investigative Support, and Uniformed Divisions, *id.*, as well as the Procurement Division, Ulmer II Decl. ¶ 12.  Searches of these divisions' records, the declarant asserts, were "reasonably likely to produce records responsive to plaintiff's request."  Ulmer I Decl. ¶ 18; *see* Ulmer III Decl. ¶ 13.

The Protective Intelligence and Assessment Division ("PID"), formerly the Intelligence Division, is "responsible for overseeing the investigation and evaluation of protective

intelligence subjects and for the receipt, analysis, and dissemination of protective intelligence."

Ulmer III Decl., Ex. B (Decl. of William Highsmith ("Highsmith Decl.")) ¶ 2.  It maintains

information in five databases.  Highsmith Decl. ¶ 6.  The Protective Research Information

Systems Management (PRISM) database is used to "record[] threats, unusual behavior, and

background information pertaining to persons and groups of protective interest."  *Id.*  The

Targeted Violence Information Sharing System (TAVISS) database is accessible to multiple law

enforcement agencies and "enables participating agencies to collect information on individuals

who have exhibited unusual behavior towards protected government officials."  *Id.*  The

Counter-Surveillance Unit Report (CSUR) System reports protective intelligence, *id.*, and the

Master Central Index (MCI) database, as described above, is the Secret Service's "central record

keeping system on all Secret Service cases."  Ulmer III Decl. ¶ 5.  A fifth system of records "is

solely a list of names maintained in paper format that is used to conduct name checks."

Highsmith Decl. ¶ 8.

PID staff conducted a search of PRISM, TAVISS, CSUR and MCI, using the phrases

"electromagnetic radio use" and "energy device systems or weapons" as search terms.

Highsmith Decl. ¶ 7.  The search yielded no responsive records.  *Id.*  Because the paper records

"consist[] solely of a list of names, it would have no records responsive to the plaintiff's FOIA

request," and, therefore, no search of the paper records was conducted.  *Id.*

The Weapons Ordnance Technology Branch at the James J. Rowley Training Center

("RTC") is a unit within the Secret Service's Office of Human Resources and Training.  Ulmer

III Decl., Ex. C (Decl. of James A. Galvin ("Galvin Decl.")) ¶¶ 1-2.  It is responsible for training

Special Agents and Uniformed Division officers.  Galvin Decl. ¶ 2.  Using the search terms

"electromagnetic radiation," "directed energy weapons," and "directed energy systems," RTC

staff conducted a search of records maintained in paper format (a library of weaponry research, lesson plans, an inventory of weapons systems in the Weapons/Ordnance Library, administrative files pertaining to weapons testing and acquisition), and electronic records, including "the network drive containing any documents and other files generated or stored by the [Weapons Technology Section]" and the declarant's personal e-mail. *Id.* ¶ 6. No responsive records were located. *Id.* ¶ 7.

The Technical Security Division ("TSD"), an office within the Office of Protective Research, "is responsible for providing technical security and for planning, designing, developing, and implementing technical security equipment and systems in support of the Secret Service's investigative and protective functions." Ulmer III Decl., Ex. D (Decl. of Sharla Gibson ("Gibson Decl.")) ¶ 2. Staff determined that TSD's Science and Technology ("S&T") Subdivision, which performs research and evaluates investigative and protective technologies, is the unit mostly likely to maintain records responsive to plaintiff's FOIA request. Gibson Decl. ¶ 4. Using the search terms "active denial," "directed energy," "high power microwave," "laser," "less than lethal," "radio frequency weapon," and "vehicle mounted active denial system," *id.* ¶ 7, staff searched records maintained in an electronic format, including "the files stored on the computers, e-mail folders stored on computers, and the individual e-mail folders stored on the TSD network e-mail server of S&T personnel who were reasonably likely to maintain records concerning the subject matter of the plaintiff's FOIA request," *id.* ¶ 6. "The work of . . . S&T personnel included research into topical areas addressed or similar to those topics set forth in the plaintiff's FOIA request," and for this reason, responsive records "would most likely be found on their computers and not on the computers of other TSD personnel." *Id.* In addition, staff manually searched records "maintained in a paper format: hardcopy files and digital media

records stored in the offices of S&T personnel; hardcopy files and digital media records stored in

S&T Project Folders . . .; and TSD electronic network drives and folders associated with S&T

activities." *Id.* ¶ 8.  These searches yielded records described as e-mail messages between S&T

personnel and vendors of the types of systems listed in the request, brochures, research papers,

journals, articles, and internal documents regarding S&T research.  *Id.* ¶ 10.  These records were

"of a research nature and do not relate to any use by the Secret Service of the types of weapons

that are the subject of the plaintiff's FOIA request."  *Id.*

The Investigative Support Division ("ISD") "is an office within the Secret Service's

Office of Investigations that . . . manages several databases [containing] information regarding

Secret Service investigations," and it "maintain[s] all closed Secret Service investigative files."

Ulmer III Decl., Ex. E (Decl. of Valarie Wallace ("Wallace Decl.")) ¶ 2.  Using the search term

"electromagnetic radiation use," ISD staff searched the MCI, the Confidential Informant

database, and the Consensual database (containing information about wiretaps); the search

yielded no responsive records.  Wallace Decl. ¶ 6.  Because the remaining databases were "solely

. . . statistical databases and databases containing only names and identifying information"

presumably about individuals, staff declined to search these records because they were not likely

to contain records responsive to plaintiff's FOIA request.  *Id.* ¶ 7.

The Uniformed Division is divided into the Office of the Chief and four operational

branches, and the Office of the Chief includes the Central Files Unit ("CFU").  Ulmer III Decl.,

Ex. F (Decl. of Sergeant Timothy P. DeMar ("DeMar Decl.")) ¶ 6.  The CFU "maintains the

records of the Office of the Chief as well as scanned duplicates of the log books of the four

operational branches."  DeMar Decl. ¶ 6.  Log books record incidents and appointments.  *Id.* ¶ 7.

Each operational branch conducted a search of its respective administrative files and log book,

both of which are maintained in electronic format.  *Id.*  A CFU representative conducted an

electronic and a manual search of the CFU log book, the log books of the operational branches

scanned into a central records system, and the administrative files of the Office of the Chief.  *Id.*

In each instance, the search terms "directed energy weapons," "directed energy systems," and

"electromagnetic weapons" were used.  *Id.* ¶ 8.  No responsive records were located.  *Id.*

      The Procurement Division, located within the Office of Administration, "is responsible

for entering into and overseeing contracts . . . to provide services or equipment to the Secret

Service," Ulmer III Decl., Ex. G (Decl. of David J. Dawson ("Dawson Decl.")) ¶ 2, and its

Procurement Policy & Programs Branch "is responsible for establishing all procurement and

procurement-related policies and procedures . . . and managing all procurement systems,"

Dawson Decl. ¶ 3.  The procurement system database (PRISM) contains "[s]ubstantive

information on every contract to which the Secret Service is a party."  *Id*. ¶ 6.  It is searched by

fields, and staff conducted a search of four fields: line item description (a detailed list of items

provided under the contract), vendor name, description of the contract, and issuing office, *id.*,

using the phrases "electromagnetic system," "electromagnetic weapons," and "energy weapons"

as search terms, *id.* ¶ 7.  No responsive records were located.  *Id.*

      According to plaintiff, the Secret Service released "absolutely no records relating to the

agency's development, testing, or deployment of the real-life DEWs and DETs[.]"  Pl.'s Opp'n

at 20.  He contends that the Secret Service "has <u>absolutely not</u> performed its statutory duty and

there are still serious questions about the thoroughness of its searches, the completeness of its

releases of documents, the truthfulness of its disclosures and declarations, and the

appropriateness of its claim of exemptions."  *Id.* at 32-33 (emphasis in original).  He asserts that

individuals within the Secret Service "have established a covert group within the agency which

goes to great lengths to protect [its] criminal interests," that these individuals successfully have "circumvent[ed] the usual record keeping requirements, and they have circumvented the ability of the normal FOIA/PA requester to get information related to their illegal activities and extremely advanced equipment." *Id.* at 34-35. To support these contentions, plaintiff submits copies of correspondence and articles for the purpose of establishing the existence of directed-energy technology, *see id.*, Ex. A-H, J, and N, yet none of these documents directly addresses whether the Secret Service maintains records responsive to plaintiff's FOIA request. Proof that such weapons systems or technologies exist does not establish that the Secret Service maintains or unlawfully withholds records pertaining to these matters.

With respect to the agency's supporting declarations, plaintiff alleges that the Secret Service "has lied in a declaration to a federal court before about the very same subject it is now being asked to write a declaration about again," Pl.'s Opp'n at 36 (emphasis in original), presumably a reference to his allegation that examining doctors relied on "the agency's perjured declaration in misdiagnosing [p]laintiff as mentally ill," *id.* at 33, leading a court to find him incompetent to stand trial in a prior criminal case, *see id.* at 14, 30; *see United States v. Friedman*, No. Cr. S-03-0060, 2006 WL 3741850, at *1 (E.D. Cal. Dec. 19, 2006) (recounting plaintiff's indictment for making threats against federal law enforcement officers in violation of 18 U.S.C. § 115, involuntary commitment to the custody of the Attorney General for treatment under 18 U.S.C. § 4241(d), subsequent commitment under 18 U.S.C. § 4246, and dismissal of the indictment under Fed. R. Crim. P. 48(a) when it was determined that plaintiff could not proceed to trial due to his mental condition); *see also United States v. Friedman*, 366 F.3d 975, 976-77 (9th Cir. 2004) (describing the underlying criminal offense). If the agency has lied before, plaintiff suggests, its declarations in this case are suspect. Finally, plaintiff accuses

defendant of acting in bad faith "to hide its criminal and professional misconduct and to avoid the extremely bad publicity which will occur when the truth . . . is made public." Pl.'s Opp'n at 3.

The Secret Service's supporting declarations are accorded a presumption of good faith, and plaintiff's conjecture as to covert activity within the agency to prevent FOIA disclosures does not rebut the presumption. *See Vento v. Internal Revenue Serv.*, 714 F. Supp. 2d 137, 145 (D.D.C. 2010) (finding that plaintiffs' speculation that other documents exist did not rebut presumption of good faith accorded to agency's declaration); *Schmidt v. Shah*, No. 08-2185, 2010 WL 1137501, at *6 (D.D.C. Mar. 18, 2010) (concluding that search was not inadequate merely because it did not locate every record the requester believed to exist); *Harrison v. Fed. Bureau of Prisons*, 681 F. Supp. 2d 76, 85 n.6 (D.D.C. 2010) (rejecting requester's argument that agency's failure to produce a particular record is evidence of bad faith).

Plaintiff also cites his January 31, 2007 letter, *see* Ulmer I Decl., Ex. F, which asks "that the vehicles in which the DEWs and DETs are mounted or contained also be searched," Pl.'s Opp'n at 38, yet this search has not been done. He believes that "the bulk (or all) of the agency's records related to its DEW/DET activities could be located on computer hard drives or other computer storage devices in the vehicles and nowhere else." *Id.* at 39. In his view, the agency "must provide an accurate declaration identifying that they were searched, what was discovered, if anything, and describe[] the record storage or retrieval system . . . within the vehicles." *Id.* In addition to the vehicles, plaintiff contends that his FOIA request "includes equipment obtained by any means," for example, equipment borrowed from the military. *Id.* at 40.

For purposes of the FOIA, the term "records" does not include tangible objects. *See Nichols v. United States*, 325 F. Supp. 130, 135-36 (D. Kan. 1971) (holding that guns, bullets and

clothing worn by President Kennedy at the time of his assassination are not "records"), *aff'd*, 460 F.2d 671 (10th Cir.), *cert. denied*, 409 U.S. 966 (1972).  Furthermore, the Secret Service "did not search . . . mobile vehicles transporting directed energy weapons systems because the Secret Service deploys no such vehicles."  Ulmer II Decl. ¶ 5.  Thus, vehicles and other equipment are not records under the FOIA, and the Secret Service was under no obligation to search for them or to search their contents.

Based on the Secret Service's supporting declarations, absent a showing by plaintiff that the agency's declarations are not entitled to a presumption of good faith, the Court concludes that the searches were reasonably calculated to locate records response to plaintiff's FOIA request.

### C.  Exemptions

#### 1.  Exemption 1

Exemption 1 protects matters that are:

> specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order[.]

5 U.S.C. § 552(b)(1).  In a FOIA case, the Court determines *de novo* whether an agency properly withheld information under a claimed exemption, *see, e.g., King v. U.S. Dep't of Justice,* 830 F.2d 210, 217 (D.C. Cir. 1987), even if national security matters are at issue, *see Halperin v. Cent. Intelligence Agency*, 629 F.2d 144, 148 (D.C. Cir. 1980).  Courts generally defer to agency expertise in national security matters, however.  *See, e.g., Taylor v. Dep't of the Army,* 684 F.2d 99, 109 (D.C. Cir. 1982) (according "utmost deference" to classification affidavits); *Goland v. Cent. Intelligence Agency*, 607 F.2d 339, 352 (D.C. Cir. 1978); *see also Krikorian v. Dep't of State*, 984 F.2d 461, 464-65 (D.C. Cir. 1993) (acknowledging "unique insights" of executive agencies responsible for national defense and foreign relations).  An agency still bears the burden

of establishing that documents are properly classified and thus clearly exempt from disclosure,

*see Founding Church of Scientology of Wash., D.C., Inc. v. Bell*, 603 F.2d 945, 949 (D.C. Cir.

1979) (citing 5 U.S.C. § 552(a)(4)(B)), and "conclusory affidavits that merely recite statutory

standards, or are overly vague or sweeping will not, standing alone, carry the government's

burden." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009) (citing *Hayden v. Nat'l*

*Sec. Agency*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)).

Pursuant to Executive Order 12958, Fed. Reg. 19,825 (Apr. 20, 1995), as amended by

Executive Order 13292, 68 Fed. Reg. 15,315 (Mar. 28, 2003), an agency may classify

information only if all of the following conditions are met:

> (1)  an original classification authority is classifying the information;
> (2)  the information is owned by, produced by or for, or is under the control of the United States Government;
> (3)  the information falls within one or more of the categories of information listed in section 1.4 of this order; and
> (4)  the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Exec. Order No. 13292 § 1.1(a). There are three classification levels (top secret, secret and

confidential), *id.* § 1.2(a), and such classified information must fall within one of the following

categories:

> (a)  military plans, weapons systems, or operations;
> (b)  foreign government information;
> (c)  intelligence activities (including special activities), intelligence sources or methods, or cryptology;
> (d)  foreign relations or foreign activities of the United States, including confidential sources;
> (e)  scientific, technological, or economic matters relating to the national security, which includes defense against transnational terrorism;

(f)     United States Government programs for safeguarding nuclear materials or facilities;

(g)     vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security, which includes defense against transnational terrorism; or

(h)     weapons of mass destruction.

*Id.* § 1.4.

### a.  Secret Service

Under Exemption 1, the Secret Service withholds four reports (270 pages of records) in their entirety.  Ulmer I Decl.  ¶¶ 36, 38.  One report "outlines security measures in place at the White House to thwart aerial attacks," and the remaining three reports "concern potential countermeasures that could be used in an attempt to thwart air defense security measures at Secret Service protected facilities including the White House," *id.* ¶ 36.  The declarant states that Secret Service classification officials who have reviewed these reports determined that they should remain classified, *id.* ¶ 37, because they contain information about "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans or protection services relating to the national security as well as scientific, technological, or economic matters relating to the national security," *id.* ¶ 35, the unauthorized disclosure of which "reasonably could be expected to result in damage to national security[,]" *id.*  If these reports were released, the declarant states that information contained therein "could clearly be used to identify the vulnerabilities and capabilities of the air defense system at the White House and other Secret Service protected facilities," thus placing "the lives of the President, Vice-President, and other Secret Service protectees in danger," and, in turn, having "a direct and serious impact on national security."  *Id.* ¶ 37.

b.  Air Force

The relevant records are: a 39-page report titled "Contractor's Progress, Status, and Management Report for the Air Service Integration Project," and a 148-page document titled "9 February 1999 Status Review Meeting."  Cattles Decl. ¶ 4.  The documents "originated as part of a project at MIT Lincoln Laboratory that became sponsored by [the Air Force Electronic Systems Division]."  *Id*. ¶ 5.  According to the declarant, who is the former program manager for the Enhanced Region Situational Awareness program, *id.* ¶ 2,  and is the classification authority with respect to this project, *id.* ¶ 5, both documents are under the government's control, "were originally properly classified and . . . presently they remain classified . . . and are marked at the 'Secret' level [because] the unauthorized disclosure of this information reasonably could be expected to cause serious damage to national security," *id*. ¶ 10.  Specifically, information in the documents "relates to the national security of the national capit[a]l region," and disclosure of these documents "could reveal vulnerabilities that would allow the system to be defeated."  *Id.* ¶ 11 (emphasis omitted).  The declarant avers that these documents "meet one of the criteria of section 1.4(a and g), E.O. 12958, as amended," *id*. ¶ 10, meaning that the reports concern "military plans, weapons systems, or operations" within the meaning of § 1.4(a) as well as "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security, which includes defense against transnational terrorism" within the meaning of § 1.4(g).

Plaintiff opines that the Court "has very little discretion in relation to . . . the application of Exemption (b)(1) . . . due to the bad faith activities in which [defendant] has engaged," and for this reason, he requests an *in camera* inspection of the records.  Pl.'s Opp'n at 41.  *In camera* review is not warranted in this case because the declarants reveal to the extent possible without

revealing classified information that the four reports maintained by the Secret Service and the two reports referred to the Air Force fall within the scope of Exemption 1.  An original classification authority has classified the information; the reports were located as a result of a search of Secret Service records; in each case the declarant avers that the information falls into one of the categories listed in § 1.4; and the disclosure of the information could reasonably be expected to result in damage to the national security, specifically, to the security of the White House, the national capital region, and other facilities protected by the Secret Service.  In this case, the declarations do not merely recite the standard set forth in Exec. Order No. 13292, and they are not so vague or conclusory that plaintiff and the Court cannot determine whether Exemption 1 applies.  Plaintiff's speculation as to the declarants' bad faith does not overcome the deference generally accorded to agency declarations in circumstances such as these.  The declarants present a logical and plausible explanation for withholding the relevant records, and the records properly are withheld under Exemption 1.

## 2.   Exemption 2

Exemption 2 protects from disclosure material that is "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2).   In the past, "if a document for which disclosure is sought meets the test of 'predominant internality,' and if disclosure significantly risks circumvention of agency regulations or statutes, then Exemption 2 exempts the material from mandatory disclosure."  *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 670 F.2d 1051, 1074 (D.C. Cir. 1981) (en banc), *abrogated by Milner v. Dep't of the Navy*, __ U.S. __, 131 S.Ct. 1259 (2011).  In *Milner*, the Supreme Court returns to the plain meaning of the text of Exemption 2 by restricting its application to "[a]n agency's . . . rules and practices dealing with employee relations or human resources."  *Milner*, 131 S.Ct. at 1265.

Relying on Exemptions 2 and 7(E), the Secret Service withholds "internal Secret Service e-mail addresses," which "in and of themselves would appear to have no informational value to the public," but release of the information "could assist someone in hacking into a federal computer data base and gathering information from that data base."  Ulmer I Decl. ¶ 45.  Relying on Exemption 2, the Air Force withholds as "high 2" exempt information "the e-mail addresses, login names, and passwords for military computer systems" on the ground that their disclosure "could allow an individual to cause harm to government computer systems."  Price Decl. at 4.  The *Milner* decision renders these positions unsustainable.  "Exemption 2 may no longer be used to justify withholding records on the grounds that disclosure would risk circumvention of the law or federal agency functions."  *Raher v. Fed. Bureau of Prisons*, No. CV-09-526, 2011 WL 2014875, at *2 (D. Or. May 24, 2011).  On this record, the Court cannot grant summary judgment in defendant's favor with respect to any information withheld under Exemption 2.

The supporting declarations were prepared before *Milner* and therefore do not address whether the email addresses, login names and passwords are related solely to the agencies' internal personnel rules and practices. The Court therefore will deny the defendant's motion for summary judgment in part, and allow the defendant an opportunity to reconsider its reliance on Exemption 2 in light of *Milner.*

### 3.  Exemption 4

Exemption 4 protects from disclosure matters that are "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  Six pages of responsive records originated with Raytheon Company ("Raytheon"), Ulmer II Decl. ¶ 13, and these records are described as a slide presentation entitled Portable Active Denial Systems, *id.*, Ex. I at 1.  The Secret Service treats these materials as agency

records for purposes of the FOIA and, citing  Raytheon's written objections, *see id.*, Ex. I, withholds information under Exemption 4.  In addition, the Secret Service withheld information from these same records under Exemptions 2, 6, 7(C) and 7(E).  *Id.*, Ex. J at 1.  While Raytheon articulates a rationale for withholding information under Exemption 4, *see id.*, Ex. I, the Secret Service offers no explanation of its own reasons for withholding information from the Raytheon records under any of the exemptions.  For this reason, the Court defers consideration of all the exemptions claimed with respect to the Raytheon documents.

### 4.  Exemption 5

Exemption 5 protects from disclosure "inter-agency or intra-agency memorand[a] or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "[T]he parameters of Exemption 5 are determined by reference to the protections available to litigants in civil discovery; if material is not available in discovery, it may be withheld from FOIA requesters."  *Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 516 (D.C. Cir. 1996) (internal quotation marks omitted); *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 148 (1975).

Under Exemption 5, the deliberative process privilege allows an agency to "shield[] . . . government 'materials which are both predecisional and deliberative.'"  *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 616 (D.C. Cir. 1997) (quoting *Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc)).  To show that a document is predecisional, the agency need not identify a specific final agency decision; it is sufficient to establish "what deliberative process is involved, and the role played by the documents at issue in the course of that process."  *Heggestad v. U.S. Dep't of Justice*, 182 F. Supp. 2d 1, 7 (D.D.C. 2000) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980)); *see also In re*

*Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) ("The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made[.]").

A document is "deliberative" if it "makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975). The deliberative process privilege is designed to "prevent injury to the quality of agency decisions." *Sears, Roebuck,* 421 U.S. at 151. Such protection is thought to encourage frank discussion of policy matters, prevent premature disclosure of proposed policies, and avoid public confusion that may result from disclosure of rationales that were not ultimately grounds for agency action. *See, e.g., Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982).

### a.  Secret Service

The Secret Service withholds in full a two-page document which "outlines the preliminary evaluations of a technical security employee of the Secret Service . . . to his supervisors." Ulmer I Decl. ¶ 40. It contains the employee's "pre-decisional opinions," the release of which, the declarant states, "could discourage open and frank discussions on security matters within the Secret Service." *Id.* Further, release could "make it less likely that Secret Service employees will be candid in offering opinions regarding emerging technologies that may impact on Secret Service protective responsibilities." *Id.*

### b.  Homeland Security

Among the records referred by the Secret Service to Homeland Security was "a 43 page powerpoint document." Marcson Decl. ¶ 5. It was "pre-decisional in nature," and was "intended to assist a program manager formulate thoughts around border and transportation security issues (such as border control officer physical safety and training)." *Id.* Moreover, the document

"appear[ed] to have absolutely nothing to do with the original FOIA request which was for records pertaining to the deployment of or research related to 'energy weapons or systems.'" *Id.*

Plaintiff puts forth no objection to the withholding of any information under Exemption 5. The supporting declarations reflect that the evaluation prepared by the Secret Service employee and the powerpoint presentation prepared by the DHS employee are predecisional in nature and the declarants adequately explained the deliberative process for which each document was prepared. These records are exempt from disclosure under Exemption 5.

### 5.  Exemption 6

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). By comparison, Exemption 7(C) applies only to "records or information compiled for law enforcement purposes," to the extent that disclosure of such information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). "Exemptions 6 and 7(C), though similar, are not coextensive." *Beck v. Dep't of Justice*, 997 F.2d 1489, 1492 (D.C. Cir. 1993). Both exemptions are designed to protect the personal privacy interests of individuals named or identified in government records. *See id.* at 1491.

The threshold inquiry asks whether the requested information is contained in a type of file covered by Exemption 6. *Washington Post Co. v. U.S. Dep't of Health & Human Servs.,* 690 F.2d 252, 260 (D.C. Cir. 1982). If the agency satisfies this threshold question, the Court must determine whether disclosure of the information would constitute a clearly unwarranted invasion of personal privacy. *Id.* The Court begins its analysis by reviewing the information withheld under Exemption 6.

### a. Secret Service

The Secret Service withholds under both Exemptions 6 and 7(C) "the names and phone numbers of individuals employed by entities outside of the Secret Service who provide security advice and information on potential security threats," and the "names and telephone numbers of law enforcement personnel."  Ulmer I Decl. ¶ 48.  It asserts that the individuals' privacy rights outweigh the "little or no public interest in [disclosure of their] names and phone numbers."  *Id.* Release of information about these individuals, the declarant states, "could cause these individuals a personal risk due to their connection with the Secret Service and other government entities," for example, if a person intent on harming a protectee sought out these individuals "to gain information regarding the security procedures in place."  *Id.*

### b. Air Force

Under Exemption 6, the Air Force withholds the names of and identifying information about Air Force personnel from nine e-mail messages and from one document from a meeting about laser technologies.  Taylor Decl. at 2.  The declarant explains that, since "the terrorist attacks of September 11, 2001, the Air Force . . . and other DOD personnel have a heightened interest in their personal privacy because of the greater security awareness required in times of national emergency and because they are at increased risk regardless of their duties or assignment."  *Id.* at 3.  For these reasons, the Air Force finds that the personnel identified in the email messages "had particular heightened privacy interests because they were engaged in research and development of directed energy weapons."  *Id.*  Balanced against these privacy interests, the Air Force identifies no public interest; release of the names of these Air Force personnel provides "little or no information about the Air Force's performance of its statutory duties or what the government is up to with regard to directed energy weapons."  *Id.*

Similarly, the Air Force withholds the names of employees and military members appearing in five pages of e-mail messages, Price Decl. at 2, explaining that, after September 11, 2001, the DOD no longer discloses the names of its service-members and civilian employees. *Id.* at 3. These Air Force personnel "have a heightened interest in their personal privacy . . . regardless of their duties or assignment," which, balanced against the minimal public interest in disclosure, warrants the decision to redact personal information contained in these email messages. *Id.*

### c. NPPD

Under Exemption 6, the NPPD redacted the names, e-mail addresses, phone numbers and other contact information of agency personnel from five pages of records referred to DHS by the Secret Service and released to plaintiff in September 2007. Worthy Decl. ¶¶ 3, 7. The NPPD has determined that the privacy interests of these individuals outweigh "any minimal public interest in disclosure of the information." *Id.* ¶ 8.

### d. OJP, DTRA and the Navy

The Justice Department's OJP redacts from a three-page document "the names of non-federal individuals." Lee Decl. ¶ 6. The DTRA redacts "the names of government personnel" under Exemption 6, Ulmer II Decl., Ex. N, as does the Navy, *id.*, Ex. D. Neither the DTRA nor the Navy submits a declaration to explain these determinations. Although the OJP has submitted a declaration, it does not explain its reasons for withholding information under Exemption 6.

The declarants thus place more emphasis on the individuals' privacy interests without making any representations that the threshold requirement for exempting information is met. None of the declarants establishes that any of the information withheld under Exemption 6 is in personnel or medical files, or "similar files." 5 U.S.C. § 552(b)(6); *see Arieff v. U.S. Dep't of the*

*Navy*, 712 F.2d 1462, 1466 (D.C. Cir. 1983) ("When confronted with a challenge to a withholding of agency records on the basis of [Exemption 6], courts must make a two-step determination *de novo*" and the first step is to determine " whether the information sought is to be found in personnel, medical or similar files"). The term "similar files" is construed broadly and is "intended to cover detailed Government records on an individual which can be identified as applying to that individual." *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982) (citation omitted); *New York Times Co. v. Nat'l Aeronautics and Space Admin.*, 920 F.2d 1002, 1006 (D.C. Cir. 1990) (instructing courts to look "not to the nature  of the files that contain the information sought in a FOIA request, but to the nature of the information requested") (en banc) (internal quotation marks and citation omitted).  "While this definition of 'similar files' appears to be all encompassing, it does have limits." *Aguirre v. Sec. & Exch. Comm'n*, 551 F. Supp. 2d 33, 53 (D.D.C. 2008).

Plaintiff's request is designed primarily to obtain information about directed energy weapons and electromagnetic radiation-emitting devices.  He does not seek information about a particular individual, and none of the responsive records was retrieved using the name of or any identifying information about a particular person.  In this case, information about third parties happens to have been found in the responsive records and does not appear to contain personal or intimate information about these third parties.  For example, the names of government employees and servicemembers and their work telephone numbers are withheld.  Such information ordinarily is not considered "similar files" for purposes of Exemption 6.  *See, e.g., Brown v. Fed. Bureau of Investigation*, 873 F. Supp. 2d 388, 402 (D.D.C. 2012) (work telephone number, not personal number, is not "similar file" for purposes of Exemption 6); *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 257 (D.D.C. 2005) (finding that

names and work numbers of paralegals are not "similar to a 'personnel' or 'medical' file[s]" or "personal or intimate information, such as a home address or a social security number, that would be considered protected information under . . . Exemption 6"). Nor is correspondence subject to redaction under Exemption 6 "solely because it identifies government employees." *Aguirre*, 551 F. Supp. 2d at 54; *see Families for Freedom v. U.S. Customs & Border Prot.*, 837 F. Supp. 2d 287, 300 (S.D.N.Y. 2011) (concluding that "mundane interoffice communications that do not contain any detailed personal information" do not qualify as "similar files" under Exemption 6); *Kubik v. U.S. Fed. Bureau of Prisons*, No. 10-6078, 2011 WL 2619538, at *9 (D. Or. July 1, 2011) (agency did not properly redact names of prison staff, noting that "[r]eports on prison riots and shooting incidents are not personnel and medical files and cannot be withheld as a 'similar file' under Exemption 6"); *VoteHemp, Inc. v. Drug Enforcement Admin.*, 567 F. Supp. 2d 1, 14-15 (D.D.C. 2004) (finding that information which "merely identifies the names of government officials who authored documents and received documents from third parties concerning hemp" did not fit definition of personal, medical, or other similar files for purposes of Exemption 6 protection). The defendants' supporting declarations have not adequately demonstrated that the information withheld under Exemption 6 is in a personnel, medical, or similar file within the scope of Exemption 6.

### 6. Exemption 7

Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes," but only to the extent that disclosure of such records would cause an enumerated harm. 5 U.S.C. § 552(b)(7); *see Fed. Bureau of Investigation v. Abramson*, 456 U.S. 615, 622 (1982). "To show that . . . documents were compiled for law enforcement purposes, the [agency] need only establish a rational nexus between the investigation and one of the agency's

law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law." *Blackwell v. Fed. Bureau of Investigation*, 646 F.3d 37, 40 (D.C. Cir. 2011) (internal quotation marks and citations omitted).

According to its declarant, the Secret Service "is a protective law enforcement and security agency operating under the provisions of [18 U.S.C. § 3056,]" and it "is responsible for the protection of various individuals, including the President and Vice President" of the United States.[1] Ulmer I Decl. ¶ 43. Plaintiff's FOIA request pertained to directed energy weapons, devices or systems of weapons developed, acquired, installed, deployed, tested or investigated by the Secret Service and which were capable of causing certain physical effects such as pain, incapacitation, or injury. The relevant Secret Service records are maintained by the Technical Security Division, "the office within the Secret Service's Office of Protective Research that is responsible for providing technical security and for planning, designing, developing, and implementing technical security equipment and systems in support of the Secret Service's investigative and protective functions." Gibson Decl. ¶ 2. The records are described as "e-mails between . . . personnel [of TSD's Science and Technology Subdivision] and vendors of the types of systems" mentioned in plaintiff's FOIA request, "brochures of the vendors' systems, research papers, journals, and articles concerning these systems, and internal documents outlining S&T research interests." *Id.* ¶ 10. Although "[t]hese records are all of a research nature and do not relate to any use by the Secret Service of the types of weapons" plaintiff describes, *id.*, the Secret Service deems them all law enforcement records because they "were compiled in connection

---

[1]      Generally, the Secret Service is authorized to protect the President, the Vice President, the President-elect, the Vice President-elect, their immediate families, former Presidents, their spouses, and their children under 16 years of age, and visiting heads of foreign states or foreign governments. 18 U.S.C. § 3056(a).

with the Secret Service's statutory responsibilities to protect the President[,] Vice-President and other designated individuals."  Ulmer I Decl. ¶ 43.

A law enforcement agency's "decision to invoke [E]xemption 7 is entitled to deference," *Campbell v. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998) (citing *Pratt v. Webster,* 673 F.2d 408, 419 (D.C. Cir. 1982)), but deference does not amount to blind acceptance of the agency's assertions.  This is not the typical case where the requester sought records about his own criminal prosecution, such that "documents generated in the course of investigating and prosecuting [the requester] were quite obviously related to the [agency's] law enforcement duties."  *Blackwell*, 646 F.3d at 40.  Here, it appears that the Secret Service relies on its status as a law enforcement agency to withhold records that it deems "of a research nature," Gibson Decl. ¶ 10, and thus may not be related directly to a law enforcement purpose.  "The D.C. Circuit has made clear . . . that an agency's broad claim that its files are law enforcement files – without addressing the particular documents at issue – is insufficient to establish that the specific documents in dispute within those files are law enforcement records under FOIA."  *Lardner v. Dep't of Justice*, 638 F. Supp. 2d 14, 32 (D.D.C. 2009) (citing *Campbell*, 164 F.3d at 32)), *aff'd*, 398 F. App'x 609 (D.C. Cir. 2010) (per curiam).  On the current record, the Court cannot conclude that the relevant Secret Service records are law enforcement records within the scope of Exemption 7.

Nor is the Court able to conclude that the DOJ and the Air Force properly may rely on Exemption 7.  The DOJ withholds "law enforcement type information," Lee Decl. ¶ 6, from a 35-page document, *id.* ¶ 2, under Exemption 7(E) on the ground that its disclosure would reveal "guidelines for law enforcement investigations or prosecutions that could reasonably be expected to risk the circumvention of the law."  *Id.* ¶ 6.  Without a fuller description of the records at issue and more than a conclusory statement of its decision to withhold information, the DOJ fails to

demonstrate that the information withheld falls within the scope of Exemption 7 generally or that it is exempt from disclosure under Exemption 7(E) specifically.   The redaction of information from Air Force records under Exemption 7(C), *see* Ulmer II Decl., Ex. H at 2, is not explained, and there is no basis upon which to determine whether Exemption 7 applies in this instance.

## III.  CONCLUSION

The Secret Service has conducted a search which was reasonably calculated to locate records responsive to plaintiff's FOIA request, and its referral of records to other federal government agencies was proper and in accordance with 6 C.F.R. § 5.4(c).  Further, information properly is withheld under Exemptions 1 and 5.  In these respects, defendant's motion for summary judgment will be granted.  In all other respects, the motion will be denied without prejudice.

Accordingly, it is hereby

ORDERED that Defendant's Renewed Motion for Summary Judgment [Dkt. #72] is GRANTED IN PART and DENIED IN PART WITHOUT PREJUDICE.  Judgment is entered for defendant regarding the Secret Service's search for records responsive to plaintiff's FOIA request and the determination to withhold information under Exemptions 1 and 5, and denied without prejudice regarding the determination to withhold information under Exemptions 2, 4, 6, 7(C), and 7(E).  It is further

ORDERED that, not later than April 1, 2013, defendant shall file a renewed motion for summary judgment regarding: (1) information withheld by the United States Secret Service under Exemptions 2, 6, 7(C), and 7(E); (2) information withheld by the United States Air Force under Exemptions 2, 6 and 7(C);  (3) information withheld by the United States Navy under Exemption 6; (4) information withheld by the United States Department of Homeland Security

under Exemption  6; (5) information withheld from the Raytheon records under Exemptions 2, 4, 6, 7(C), and 7(E); (6) information withheld by the United States Department of Justice, Office of Justice Programs, under Exemptions 6 and 7(E); and (7) information withheld from Defense Threat Reduction Agency records under Exemptions 6 and 7(C).  It is further

ORDERED that plaintiff's Motion for Order Related to the Defendant's Misuse of the (c)(1) Exclusion, and Motion for *In Camera* Review of All Records [Dkt. #76] is DENIED, and that his Motion for More Expeditious Treatment of the Aforecaptioned Case [Dkt. #83] and Motion for Immediate Relief [Dkt. #85] are GRANTED.

SO ORDERED.

SIGNED this 14th day of February, 2013.

/s/
RICHARD W. ROBERTS
United States District Judge